**PLAINTIFF'S EXHIBIT 1**

## IN THE UNITED STATES DISTRCT COURT
## FOR THE DISTRICT OF MARYLAND

ROSS ROLEY,

     Plaintiffs,

v.                                                    Case No.: 8:18-cv-00152-TDC

NATIONAL PROFESSIONAL
EXCHANGE, INC., *et al*.,

     Defendants.

---

### RULE 56 AFFIDAVIT OF PLAINTIFF ROSS ROLEY

    I, Ross Roley, do solemnly swear under the penalty of perjury and on personal knowledge that the foregoing is true and correct:

    1.    I am an adult male over eighteen (18) years of age, and I currently reside at 98-708 Nohoaupuni Place, Aiea, Hawaii.

    2.    From 1976-1980, I attended the United States Air Force Academy and graduated with a Bachelor of Science in Mathematics.  In 1984, I obtained a Master's Degree in Operations Research from the Air Force Institute of Technology.  I served in the United States Air Force until 2008, retiring at the rank of Colonel.

    3.    I am presently employed as a Senior Military Analyst with Battelle Memorial Institute.  Pursuant to Title IV of the Intergovernmental Personnel Act of 1970, ("IPA"), on or about June 15, 2018, I was assigned to work at U.S. Indo-Pacific Command, ("PACOM"), at Camp H.M. Smith in Honolulu, Hawaii, as an Energy Innovation Office Lead.  My present IPA assignment agreement expires on June 14, 2020.

    4.    Prior to my employment with National Professional Exchange Inc., ("NPX"), I was employed by Cubic Applications, Inc., as a government contractor.

**SUMMARY JUDGMENT J.R. 1**

Initial _____ / Date _____

5.      On or around March 2011, I began looking for an organization where I could work under an IPA assignment agreement at PACOM.  On or around this time, the Chief of the Innovation and Experimentation Division at PACOM recommended that I contact NPX about an IPA assignment opportunity.

6.      On or around September 2011, I contacted NPX and spoke with Sharon Bell, NPX's Managing Director, about pursuing any available opportunities with the Company to work on assignment at PACOM under an IPA agreement.

7.      On or around December 1, 2011, I was hired by NPX as an employee.  Upon my hire at NPX, NPX provided me with an employee handbook and required me to complete state and federal forms for tax withholding purposes.

8.       From December 1, 2011, through November 30, 2012, I worked at Camp H.M. Smith as an NPX contractor on projects concerning energy innovation.

9.      On November 16, 2012, I executed an IPA assignment agreement with NPX and PACOM whereby I was to be temporarily assigned to work at PACOM, J8 Resources and Assessment Directorate, from December 1, 2012, through November 30, 2014, as an Energy Office Lead.  The terms of my IPA assignment agreement expressly provided for the duration of the assignment and the compensation and benefits, including reimbursement for business-related travel expenses.  NPX was responsible for paying my salary and reimbursing me for business-related travel expenses incurred, as my employer, while on assignment at PACOM.

10.     During my employment with NPX, I executed three separate IPA assignment agreements.  The first IPA assignment agreement ran from approximately December 1, 2012, through approximately November 30, 2014.  The second IPA assignment agreement ran from approximately December 1, 2014, through approximately November 30, 2015.  And the last IPA

2

Initial _____ / Date _____

assignment agreement ran from approximately December 1, 2015, through approximately November 30, 2016.

11.     While in the employ of NPX and on assignment at PACOM, I frequently traveled to the State of Maryland for business-related purposes.   All such travel was reimbursable. Specifically, I traveled to Maryland on approximately the following dates to attend various energy conferences: (1) February 26-30, 2012, in National Harbor, Maryland, to attend the ARPA-e Energy Innovation Summit; (2) February 25-28, 2013, in National Harbor, Maryland, to attend the ARPA-e Energy Innovation Summit; (3) November 5-8, 2013, in Rockville, Maryland, to attend the Industrial Control Systems Joint Working Group; (4) February 24-27, 2014, in National Harbor, Maryland, to attend the ARPA-e Energy Innovation Summit; (5) February 8-13, 2015, in National Harbor, Maryland, to attend the ARPA-e Energy Innovation Summit; (6) June 15-20, 2016, in National Harbor, Maryland, to attend the TechConnect World Innovation Summit; and (7) February 29, 2016, through March 3, 2016, in National Harbor, Maryland, to attend the ARPA-e Energy Innovation Summit.  For each and every business trip to Maryland, I submitted my travel-related expenses to NPX for reimbursement.  NPX never denied me reimbursement for any of the above identified business-related trips to Maryland.

12.     On or around September 2016, I discovered that NPX had failed to properly reimburse me for many work-related travel expenses, pursuant to the terms of my IPA assignment agreement.  On or around this same time, I also discovered that NPX had failed to pay to me the correct wages specified in my IPA assignment agreements.

13.     On or around this time, I complained to Ms. Bell, NPX's Managing Director, regarding the underpayment of my wages and NPX's failure to reimburse me for business-related travel expenses incurred.  I contacted Ms. Bell regarding these matters via e-mail and telephone

3

**SUMMARY JUDGMENT J.R. 3**

Initial _____ / Date_____

because Ms. Bell was the individual at NPX who was in charge of NPX's payroll and travel reimbursements.

     14.     On March 31, 2017, I sent to Ms. Bell proof of NPX's underpayment of my wages and un-reimbursed travel expenses via certified mail.

     15.     I have never been employed directly with PACOM as a civil service employee. PACOM never provided me with a W2. I only received W2s from NPX. At all times relevant to this action, I was in the employ of NPX.


<u>2 Dec 2019</u>
Date

Ross Roley
Ross Roley


SUBSCRIBED AND SWORN to before me this _2ND_ day of _DECEMBER_ , 2019.

NOTARY PUBLIC

My Commission Expires: _5 JUNE 2021_

Doc. Date: _2 DEC 19_ # of Pages: _2_
Isreal E. Jenkins   First Judicial Circuit
Doc. Description: _____
_AFFIDAVIT_

_2 DEC 19_
Notary Signature     Date
NOTARY/CERTIFICATION

4

**SUMMARY JUDGMENT J.R. 4**

Initial _____ / Date_____

**PLAINTIFF'S EXHIBIT 2**



# Transcript of Sharon Jean Bell, Designated Representative and Individually

**Date:** September 12, 2019

**Case:** Roley -v- National Professional Exhange, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

SUMMARY JUDGMENT J.R. 5

1                 IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF MARYLAND

3   ROSS ROLEY,                          :

4                      Plaintiffs,:

5     v.                                 : Case No.:

6   NATIONAL PROFESSIONAL                : 8:18-cv-00152-TDC

7   EXCHANGE, INC., et al.,              :

8                      Defendants.:

9                      -----------

10    Deposition of NATIONAL PROFESSIONAL EXCHANGE, INC.,

11       By and through its Designated Representative,

12                    SHARON JEAN BELL,

13                    and Individually

14                  Baltimore, Maryland

15            Thursday, September 12, 2019

16                     10:43 a.m.

17

18

19

20   Job No.:  259802

21   Pages:  1 - 67

22   Reported By:  Dawn M. Hart, RPR/RMR/CRR

```
1        Deposition of National Professional Exchange,

2    Inc., by and through its Designated Representative,

3    Sharon Jean Bell, and individually, held at the

4    law offices of:

5

6             FERGUSON, SCHETELICH & BALLEW, P.A.

7             100 South Charles Street

8             Suite 1401

9             Bank of America Center

10            Baltimore, Maryland 21201-2725

11            (410) 837-2200

12

13

14

15

16

17

18            Pursuant to Notice, before Dawn M. Hart,

19   RPR/RMR/CRR and Notary Public in and for the State of

20   Maryland.

21

22
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                      3

```
1                  A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFF:

3         MATTHEW KREISER, ESQUIRE

4         JOSEPH, GREENWALD & LAAKE, PA

5         6404 Ivy Lane

6         Suite 400

7         Greenbelt, Maryland 20770

8         (301) 220-2200

9

10   ON BEHALF OF THE DEFENDANTS:

11        CRAIG F. BALLEW, ESQUIRE

12        FERGUSON, SCHETELICH & BALLEW, P.A.

13        100 South Charles Street

14        Suite 1401

15        Bank of America Center

16        Baltimore, Maryland 21201-2725

17        (410) 837-2200

18

19

20

21

22
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    4

```
 1              C O N T E N T S

 2   EXAMINATION OF SHARON JEAN BELL              PAGE

 3       By Mr. Kreiser                              6

 4       By Mr. Ballew                              58

 5       By Mr. Kreiser                             62

 6       By Mr. Ballew                              63

 7       By Mr. Kreiser                             63

 8

 9              E X H I B I T S

10      (Exhibits are attached to the transcript.)

11   NPX DEPOSITION EXHIBITS                       PAGE

12   Exhibit 1   Amended Notice of Deposition re    10

13               NPX

14   Exhibit 2   NPX Employee Handbook              30

15   Exhibit 3   Assignment Agreement re Roley      33

16               12/1/12 through 11/30/14

17   Exhibit 4   Assignment Agreement re Roley      45

18               12/1/14 through 11/30/15

19   Exhibit 5   Assignment Agreement re Roley      47

20               12/1/15 through 11/30/16

21   Exhibit 6   NPX Responses to Roley's Requests  53

22               for Admissions
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    5

```
1                    E X H I B I T S  (Continued)

2           (Exhibits are attached to the transcript.)

3    NPX DEPOSITION EXHIBITS                          PAGE

4     Exhibit 7    NPX Answers to Roley's First Set    55

5                  of Interrogatories

6

7    S. BELL DEPOSITION EXHIBIT                        PAGE

8     Exhibit 1    Bell's Answers to Roley's First     57

9                  Set of Interrogatories

10

11

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    6

```
1                P R O C E E D I N G S

2                  SHARON JEAN BELL

3           being first duly sworn or affirmed to

4    testify to the truth, the whole truth, and nothing but

5    the truth, was examined and testified as follows:

6           EXAMINATION BY COUNSEL FOR THE PLAINTIFF

7    BY MR. KREISER:

8        Q    Good morning.

9             Could you please state your full legal name

10   for the record?

11       A    Sharon Jean Bell.

12       Q    Ms. Bell, my name is Matt Kreiser.  I

13   represent Plaintiff Ross Roley in his action against

14   National Professional Exchange, Incorporated, and

15   yourself in your individual capacity.  I'm going to

16   ask you a series of questions related to the claims at

17   issue in this case.

18           Because this deposition is being

19   transcribed, I ask that you please refrain from

20   nodding your head yes or shaking your head no.

21           Additionally, I'll try to allow you to

22   finish your answer to my question before asking you
```

```
 1    another question.  This is so we have a clear
 2    transcript.
 3              Is that agreeable?
 4        A    Yes.
 5        Q    Okay.  If you do not understand my question,
 6    ask me to repeat it or rephrase it, and I'll try to
 7    repeat and/or rephrase the question.  But if you
 8    answer my question, I'm going to assume that you
 9    understood the question.
10              Is that okay?
11        A    Yes.
12        Q    And if you need to take a break, just let me
13    know, but if we have a question pending, I'm going to
14    ask that you answer it before we take a break.
15              Is that okay?
16        A    Yes.
17        Q    Okay.  I take it by your responses you
18    understand and speak the English language and you
19    understand what I'm saying?
20        A    Yes, I speak English.
21        Q    Okay.  Thought so.
22              Do you have any questions before we begin?
```

```
1        A      No, I do not.

2        Q      Okay.  You understand that you are

3   testifying here today on behalf of National

4   Professional Exchange Corporation in its capacity as

5   its corporate designee?

6        A      Yes.

7        Q      Okay.  And you understand that you will also

8   be testifying in your own individual capacity today on

9   certain matters?

10       A      Yes.

11       Q      Okay.  And counsel sitting next to you

12  represents both National Professional Exchange

13  Corporation, which I'm going to refer to "NPX."  It's

14  a -- save me the time.

15              Is that okay?

16       A      Yes.

17       Q      Okay.  He represents both NPX and yourself

18  in this matter, correct?

19       A      Yes.

20       Q      Okay.  And you understand that your answers

21  as the designee of NPX will be based not only on your

22  personal knowledge, but also based upon all the
```

1    information that is known or reasonably available to

2    be known by NPX.

3             Do you understand?

4        A    Yes.

5        Q    Are you presently on any medications that

6    could affect your testimony here today?

7        A    Well, I am on a lot of medications, but I do

8    not think that it will affect my testimony.

9        Q    Okay.  So you don't have any reason to

10   believe that any testimony you've given here -- have

11   given or will give here today will be affected one way

12   or the other by the medications?

13       A    No.

14       Q    Okay, excellent.

15            And you understand as the designee for NPX

16   your answers here today will be binding upon the

17   corporation?

18       A    Yes.

19       Q    Okay.  Did you review any documents in

20   preparation for your deposition?

21       A    Yes.

22       Q    Okay.  Which documents?

```
1        A    I went over corporate documents.  Basically,

2   what you have.  The documents of the company, that you

3   had requested.

4        Q    Okay.  So the documents you reviewed were

5   the ones produced to us during discovery; is that

6   correct?

7        A    Correct.

8        Q    Did you speak with anybody today regarding

9   your testimony other than your attorney?

10       A    No, sir.

11       Q    As we go along, if you need to refer to a

12  document, let me know, and we'll have it entered into

13  the record and then have you review the document if

14  you need to review it, okay?

15       A    Okay.

16            (NPX Exhibit 1 was marked for identification

17  and is attached to the transcript.)

18       Q    What I've handed you has been marked NPX

19  Exhibit 1 for identification.

20            Have you seen this document before?

21       A    Yes.

22       Q    Okay.  What is it?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019          11

1    A    This would be -- this is a Notice Deposition
2    of me being the corporate designee.
3        Q    Okay.  And have you read it before today?
4        A    Yes.
5        Q    And are you prepared to give testimony today
6    about each of the topics identified in this Notice?
7        A    Yes.
8        Q    Okay.  Now, outside of yourself, is there
9    anybody that would know or have more information
10   regarding any of the topics identified in the Notice?
11       A    Not that I'm aware of.
12       Q    Okay.  What's your educational background?
13       A    I have a degree in accounting, an
14   associate's degree in accounting.
15       Q    Okay.  Where did you receive your
16   associate's?
17       A    Bryant & Stratton.
18       Q    Okay.  When did you receive that Associate's
19   Degree?
20       A    I don't even remember.  '86, '87, '88.  I
21   don't know, so many years ago.
22       Q    It was a while ago?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    12

```
 1       A    Yeah, yeah.  Just irrelevant to me, really,
 2   I mean.  So no, I don't even recall the date.
 3       Q    Do you have any other degrees or
 4   certifications of any sort?
 5       A    No other degrees.  I mean, certifications,
 6   I've done, you know, certs in this and that.
 7       Q    What are some of the certifications you've
 8   done?
 9       A    I mean, I think like maybe a Microsoft.  I
10   might have taken a Microsoft.  I've taken maybe a
11   class for government contracting, just to -- I don't
12   recall the names of the classes, just different
13   classes you can get certifications for.
14       Q    Did you receive any other certifications
15   outside of your associate's in accounting or --
16       A    No.
17       Q    Any other kind of financial course did you
18   take?
19       A    No.
20       Q    So like no certifications as a tax preparer
21   or anything like that?
22       A    Oh, at one time, maybe.  I think when I was
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    13

1    18 I was certified to do taxes.

2         Q    So was I.

3         A    I do recall that.

4         Q    Okay.  So testifying as NPX's designee, what

5    was your title at NPX?

6         A    I was the Managing Director for NPX.

7         Q    Okay.  What were your job duties as the

8    Managing Director?

9         A    I oversaw the office staff, the day-to-day

10   operations.  I worked with Department of Defense in

11   coordinating the IPA agreements.

12        Q    So you worked with the Government agencies

13   in coordinating the IPAs and individuals from NPX to

14   be assigned to those respective Federal agencies?

15        A    No.  The agency would contact me and -- for

16   example, if the agency -- PACOM contacted me and said

17   I would like to hire Ross Roley.

18        Q    Okay.  We'll get a little more into that.

19        A    Yeah.  So it's reverse of what you said.

20        Q    Okay.  So -- but in your capacity, you

21   worked with the Federal agencies for the IPA

22   agreements?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    14

```
1        A    I worked with the Federal agencies, yes.

2        Q    On behalf of NPX?

3        A    On behalf of NPX.

4        Q    Okay.  What type of business does NPX

5   operate?

6        A    NPX is a not for profit.

7        Q    So it's a 501(c)(3) under the IRS code?

8        A    501(c)(6).

9        Q    501(c)(6), okay.

10            So just generally, what is NPX's operation,

11   what's its business?

12        A    Basically, it's a think tank.  You have a

13   think tank of experts and the members, which the

14   members would be the contractors, you know, the

15   contractors always want to know what the IPAs are

16   doing.

17        Q    Okay.  So what's -- can you go into a little

18   bit more about who a member is?

19        A    A member might be BAE, might be SCRA, might

20   be Booz Allen.  It could be any one of the Government

21   contractors who are working with DOD.  I haven't --

22   honestly, I cannot recall the list of members.  We had
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    15

1    a very small member; we were trying to grow it.  It

2    really was not one of my main focuses.

3            On our website you could sign up for

4    membership.  A lot of Government contractors would

5    sign up for membership.

6        Q    So membership with NPX --

7        A    Uh-huh.

8        Q    -- as a member organization?

9        A    Yes.

10       Q    Okay.  So how does this work?  Explain to

11   me, or educate me, so to speak, how does it work

12   between the IPAs, the member organizations and

13   Government entities as far as personnel going to these

14   Government entities.

15       A    As an IPA going into a Government entity?

16       Q    Uh-huh.

17       A    The Government entity would have a need, it

18   would be something -- it would have to be something

19   unusual.  It couldn't be something like my skill set I

20   don't qualify, you don't qualify, million to one

21   everybody has our skill set.  It has to be a skill set

22   that is uncommon to even qualify to be an IPA, first

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    16

1    of all.  So to get into the program.

2              So the Government would have a need, and

3    they would outsource -- they would find the

4    individual, so whatever their need was, they would

5    find an individual.

6              Now they need to hire the individual, but

7    they can't hire this individual in typical manner.

8    It's a short-term assignment.  It's typically not to

9    last any more than six years.  Usually they go on

10   two-year assignments at a time.  And you cannot be on

11   the same assignment any more than six years.

12       Q     So the person that's assigned under an IPA

13   agreement does not become the employee of that Federal

14   agency, correct?

15       A     They go on detail to that Federal agency.

16       Q     Okay.  And when we reference "IPA," we're

17   talking about the Interpersonnel Governmental --

18   Interpersonnel -- I'm sorry, Intergovernmental

19   Personnel Act, correct?

20       A     Correct.

21       Q     Is NPX an entity or agency of the State --

22   of any state or Federal Government?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    17

1        A     We are considered "Other."

2        Q     Okay.

3        A     "Other."   If you look at the regulations

4    under the IPA, you have Federal, State, Other.   We are

5    "Other."   Tribal -- Indian tribes is another "Other."

6        Q     So you're not like an arm of the State of

7    Maryland?

8        A     No, we are not.

9        Q     Okay.   And in what state is NPX

10   incorporated?

11       A     Nevada.

12       Q     Why was Nevada chosen?

13       A     That would be a John Harris question.   He is

14   the one who -- he always liked to use Nevada.   I guess

15   easy for him to do paperwork.

16       Q     Who's John Harris?

17       A     He was the -- I think he was the original

18   Treasurer.   But he -- he's the one who filed all the

19   paperwork.

20       Q     Do you remember what year NPX was

21   incorporated in Nevada?

22       A     Let me think for a second.   2006, maybe.

1   2004 -- I don't know.

2         Q     Would it be fair to say on or around about

3   15 years ago?

4         A     Yes.

5         Q     Have you been with NPX since its inception?

6         A     Yes.  Actually, it would have been 2006,

7   yes.

8         Q     But you have been with NPX since its

9   inception?

10        A     Yes.  I actually -- well, about six, seven

11  months after I started in January.

12        Q    Okay.

13        A     I think they incorporated around -- it was

14  like around June I had been talking with them, but I

15  was not hired as an employee until January of -- I

16  guess it would have been 2007.

17        Q     And you were hired as the Managing Director?

18        A     Yes.

19        Q     Okay.  Has NPX been licensed to do business

20  in states other than Nevada?

21        A     Yes.

22        Q     What states?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                              19

1      A      Well, I can try to remember all of them.

2   Let's see.  Kansas, Missouri, Georgia, Florida,

3   Virginia, Maryland, Pennsylvania, Colorado, Hawaii,

4   and I believe California.  Alabama.

5      Q      In between 2011 and 2016, was NPX licensed

6   to do business in the State of Maryland?

7      A      Yes.

8      Q      Is NPX still licensed to do business in the

9   State of Maryland?

10     A      No, NPX has wound -- no, NPX is closed.

11     Q      Okay.

12     A      Well, we're in -- we're processing closing.

13  We're still in the process of closing down.

14     Q      You're in the process of winding down the

15  business?

16     A      We do no business.

17     Q      You're in the process of winding down the

18  business?

19     A      Yes.

20     Q      When did that process start?

21            MR. BALLEW:  The winding down?

22            MR. KREISER:  Yes, thank you.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    20

1        A        Well, our last contract ended -- I want to
2    say it was in 20 -- 2018.
3        Q        When you say "the last contract," that was
4    for assignment to a Federal agency?
5        A        That would have been an assignment.
6        Q        Okay.  Why did NPX decide to begin winding
7    down the business?
8        A        Well, first -- well, we lost our TRADOC
9    IPAs.
10       Q        I'm sorry, what was that?
11       A        TRADOC.  It was an Army -- it was a large
12   section of our business.  The TRADOC was a large
13   section of our business.  We had a lot of agreements
14   there.  We lost that.  And I wanted to pursue other
15   avenues as well.  So it was either, well, if the
16   company wanted to continue, someone else would have to
17   run it.
18                And Marvin Fairclough, who was the other
19   director -- well, not director -- but other officer,
20   did not want to run it either, so we chose to start
21   closing the business down.
22       Q        Would it be fair to say in your role as the

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    21

1   Managing Director you're responsible for the
2   day-to-day operations of NPX?
3         A     In Maryland, in my day -- in my office, yes.
4         Q     How many locations or offices does NPX have?
5         A     When you -- I don't understand your
6   question.
7         Q     So does NPX, or during its existence, when
8   it was operating, did it have an office or office
9   building?
10        A     Yes.
11        Q     Okay.  Where was its offices located?
12        A     Our first office would have been -- I don't
13  remember the exact address; it was either California
14  or Hollywood, Maryland.  And then we moved another
15  location in Hollywood, Maryland, for five years.  We
16  were there for about five years.
17              And it was right around that time, the end
18  of the fifth year, is when we lost the TRADOC IPAs,
19  which was significant, so it was like that really hurt
20  the rent.
21              So what we chose to do -- at that time, we
22  had to downsize our operations -- well, I worked out

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    22

1    of my house after that.

2         Q    So there was a physical location for NPX --

3         A    Absolutely.

4         Q    -- in Maryland.

5              Do you know when NPX had its physical

6    location in Maryland?  For what dates?

7         A    Yes.  It would have been from the

8    original -- when it originally started, which would

9    have been 2006, up until -- well, you mean until it

10   went to my house -- I guess that's what --

11        Q    Yes.  Physical location.

12        A    I actually had an office at my house, too.

13        Q    Okay.

14        A    So a separate office.  It wasn't like, you

15   know, any clients could come to my house.

16        Q    Well, let's keep it to an office location

17   where clients could come to.

18             And as you stated -- previously testified,

19   there was a location for a separate office for where

20   clients could come to in the State of Maryland,

21   correct?

22        A    Yes.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019          23

```
1        Q     So when did NPX have that location?

2        A     We had several locations.  I will tell you

3   the last location that we had before moving to Chaffey

4   Court, which is my office home, it would have been

5   around the end of -- I want to say '13 is when that

6   lease expired.

7        Q     Okay.  So at the end of 2013 --

8        A     I'm thinking.

9        Q     -- the office for NPX in Maryland was

10  your -- at your personal residence?

11       A     No, it would have been before that.  It was

12  before that.

13       Q     Okay.  So before 2013?

14       A     Yeah.

15       Q     Okay.  So --

16       A     I mean, I would have --

17       Q     Let me ask --

18       A     I don't know the exact dates on that.  I'd

19  have to go look and see when that lease expired.

20             We had a five-year lease in Hollywood, and

21  the lease before that -- I think we had a three-year

22  lease before that at a different address.
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    24

1      Q     Okay.  So in 2011 did NPX have the office on

2  lease in Hollywood, Maryland?

3      A     I believe so.

4      Q     What about 2012?

5      A     Honestly, I'm not sure.  It would have been

6  around that time frame.  I know there was a lot going

7  on with TRADOC around that time frame.  I'm not

8  exactly sure of the exact move date.

9      Q     So it would be fair to say sometime on or

10  around 2012/2013 is when the lease for the Hollywood,

11  Maryland, location expired?

12      A     I believe so.

13      Q     Okay.  And then after the lease expired for

14  the Hollywood, Maryland, location, did the office in

15  Maryland move to your personal residence?

16      A     It moved to a office site on my personal

17  residence.  It is separate from my home.

18      Q     Okay.  Can you -- can you explain that?

19      A     I will explain that, yes.

20            You can open up a door and walk into an

21  office and go right up some stairs and you're in an

22  office.  You do not walk into my home whatsoever at

1    all.  You exit those stairs to leave.  You do not walk

2    into my home at all.

3         Q    Is it a separate attachment or is it --

4         A    It's a thousand square foot office space

5    attached to my home.  It is still attached, but it is

6    separate.

7         Q    And so from on or about 2012/2013, NPX's

8    operations were run from that location?

9         A    Correct.

10         Q    Did NPX have any employees outside of

11    yourself in the State of Maryland?

12         A    Yes.

13         Q    Did NPX have any employees in the State of

14    Maryland between 2011 and 2016?

15         A    Yes.

16         Q    Do you know how many employees during that

17    time?  The time I'm referencing is 2011 to 2016.

18         A    Between -- I would say at least three, maybe

19    four.

20         Q    Okay.  Who were those individuals?

21         A    Myself, Melanie Bowles.

22         Q    What was Ms. Bowles responsible for?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019          26

1      A      She was a bookkeeper.

2      Q      Okay.  And the third person?

3      A      JoAnn Benfield.

4      Q      And what was Ms. Benfield responsible for?

5      A      She was an administrative person.  Took care

6  of -- like the travel claims, when they came in, she

7  would process those.

8      Q      Between 2011 and 2016, what was the

9  organizational structure of NPX as far as leadership

10  and who reported to whom?

11      A      Well, they would -- the two that we just

12  mentioned would have reported directly to me.

13      Q      Okay.  Now, as a corporation, did NPX have a

14  Board of Directors?

15      A      Myself and Marvin Fairclough.

16      Q      Can you spell his last name for me?

17      A      F-A-I-R-C-L-O-U-G-H.

18             We also had IPAs who also worked -- we had

19  other employees.

20      Q      Okay.

21      A      But not in the State of Maryland.

22      Q      Okay.  Where were those other employees

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                          27

```
 1   located?
 2        A     We had employees in Hawaii and, at that
 3   time, maybe also in either Kansas or Pennsylvania.
 4        Q     And were those individuals on detail to a
 5   Federal agency through an IPA?
 6        A     They were -- yes, they were on detail.
 7        Q     Between 2011 and 2016, who was responsible
 8   at NPX for supervising employee payroll?
 9        A     I supervised Melanie on payroll.
10        Q     So Melanie -- would it be fair to say that
11   Ms. Bowles would process the payroll and you would
12   supervise that operation?
13        A     Yes.
14        Q     And in your position as Managing Director,
15   did you have the ability to hire employees to NPX?
16        A     I had the ability -- I would have to have
17   approval to hire office staff.
18        Q     What was that approval process?
19        A     It would have to be approved by the Board of
20   Directors.  We also had an Advisory Board.
21        Q     Okay.  Did the Advisory Board play any role
22   in the approval of hiring staff for NPX?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                           28

1        A      If I needed to hire a staff, I would have to

2    discuss and get the approval of the Board to hire

3    staff.

4        Q      Okay.  And the Board consists of yourself

5    and Mr. Fairclough?

6        A      Yes.  And then we had the Advisory Board.

7        Q      What was the role of the Advisory Board?

8        A      Basically, to help us kind of go in the

9    direction of basically bringing the expertise of all

10   the experts to education, to -- you know, because

11   basically what we wanted to do was educate the public

12   on a lot of the Homeland Defense and Homeland Security

13   things that we were working on.

14       Q      Okay.  So the Advisory Board, would they --

15       A      Kind of help us in the directions of

16   different things that we could possibly go after.

17       Q      Okay.  So they would help NPX seek out

18   opportunities?

19       A      Correct.

20       Q      And during NPX's existence, how were its

21   records kept and maintained?

22       A      We used QuickBooks.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                        29

```
1        Q      And the QuickBooks was used for the

2   accounting payroll --

3        A      All --

4        Q      -- side?

5              MR. BALLEW:  Let him finish his question.

6        A      I'm sorry.

7        Q      I'll just make sure --

8              MR. BALLEW:  It makes it easier for the

9   Court Reporter.

10       Q      Just so we have a clear transcript, I'll

11  repeat the question.

12             NPX utilized QuickBooks for its accounting

13  and payroll software?

14       A      Yes.

15       Q      Did NPX keep any hard documents; for

16  example, personnel files for its staff?

17       A      Yes.

18       Q      Did it keep personnel files for anybody on

19  detail under an IPA agreement?

20       A      Just the basic things that were required to

21  be sent back to us.

22       Q      Okay.  What were those items that were
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                   30

1    required to be sent back?

2        A    W-4, any Hawaii -- in this case with Roley,

3    there would have been a Hawaii withholding form,

4    everything that was in the handbook --

5        Q    Okay.

6        A    -- that was given to him.

7             (NPX Exhibit 2 was marked for identification

8    and is attached to the transcript.)

9        Q    Ms. Bell, what I've handed you has been

10   marked as NPX Exhibit 2 for identification.

11            Do you recognize this document?

12       A    Yes.

13       Q    What is it?

14       A    It's the Employee Handbook.

15       Q    And for individuals on detail to Federal

16   agencies, like Mr. Roley, through IPA agreements, were

17   you they given a copy of this handbook?

18       A    Absolutely.

19       Q    Okay.  You can put that aside.

20            So for an individual -- and we'll get to

21   Mr. Roley -- for an individual that NPX details to a

22   Federal agency, how does NPX come about to meet the

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    31

1    individual?  How are they onboarded?  How does that

2    process work?

3         A      The Government agency -- in this case,

4    PACOM -- called me and said --

5         Q      Just to make sure we're clear on the

6    transcript, when you refer to "PACOM," that's

7    United States Pacific Command?

8         A      Yes.

9         Q      Okay.  Continue.

10        A      PACOM calls and they would have a position

11   and they have somebody they would like to put in that

12   position, can I hire them?

13             I will see if I can hire them, which means

14   they have to go work for me for 90 days on contract

15   somewhere.  In this case, Ross Roley worked for me for

16   one year prior to going into an IPA agreement.

17             So I put them on contract.  That's how the

18   process started.

19        Q      So it's kind of like a probationary period,

20   so to speak.  You hire them and then I have to do some

21   sort of contractual work for 90 days -- or for

22   Mr. Roley's case, one year -- and then you detail them

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    32

1    to an agency if the agency has a need for their

2    specific skill set?

3         A    No.

4         Q    No?

5         A    That's not what I said to you.

6         Q    No.  Can you --

7         A    The agency has to have a need for that skill

8    set prior to Roley even being hired or considered to

9    be hired.

10        Q    Okay.  So let's talk about the process for

11   Mr. Roley.  So PACOM had a need, correct?

12        A    PACOM.

13        Q    PACOM had a need, correct?

14        A    Yes.

15        Q    And what was that need?

16        A    They needed somebody who had a specialty in

17   energy.  He -- whatever his specialty is -- I would

18   have to look up his actual skill set.  It was the

19   Energy Department, energy area.

20        Q    Do you know around the date PACOM contacted

21   you regarding filling this need?

22        A    I would have to go back and look at

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    33

1    paperwork, but I would guess probably, if he worked

2    for me for a year, I would guess maybe three months

3    before his first agreement started, maybe, his

4    first -- the first year.

5          Q     Okay.

6          A     So July of 2011, maybe.

7          Q     So on or around sometime in 2011 is when

8    PACOM --

9          A     I'd have to look when did -- when did his

10   first agreement start with PACOM?  What's the date on

11   that?  And actually the employment date would be right

12   on that very first page right there.  I think it's

13   like No. 7 or something, page 1.

14               (NPX Exhibit 3 was marked for identification

15   and is attached to the transcript.)

16         Q     Ms. Bell, what I've handed you has been

17   marked as NPX Exhibit 3 for identification.

18               Do you recognize this document?

19         A     Yes.

20         Q     Okay, what is it?

21         A     This is an IPA agreement, OF 69, for

22   Ross Roley.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                          34

1      Q    And can you turn to the last page?

2      A    (Complying.)

3      Q    And in the box marked 36, what are the

4   dates?

5      A    12/1/12 to 11/30/14.

6      Q    So this is an IPA Assignment Agreement from

7   Mr. Roley from NPX to PACOM, correct?

8      A    Yes.

9      Q    That was termed to run from December 1,

10  2012, through November 30, 2014, correct?

11     A    Correct.

12     Q    Okay.  And so Mr. Roley -- strike that.

13          So NPX -- PACOM contacted NPX, then,

14  regarding the need prior to 2012, correct?

15     A    Yes, actually -- yes.

16     Q    Okay.  And when it came to Mr. Roley, how

17  did he become associated with NPX?

18     A    PACOM contacted NPX and asked me if I would

19  hire Ross Roley.  I hired Ross Roley on December 1,

20  2011.

21     Q    So NPX hired Mr. Roley on December 1, 2011,

22  and on that hiring decision, it was between you and

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                     35

```
1    Mr. Fairclough that made that decision to hire
2    Ross Roley?
3         A    Yes.
4         Q    Okay.  And you previously testified that
5    after NPX hired Mr. Roley, you had him on contract for
6    you prior to executing this Assignment Agreement,
7    correct?
8         A    To --
9         Q    In the interim -- what my question is, in
10   the interim period of time between December 1, 2011
11   and December 1, 2012, what services did Mr. Roley
12   perform?
13        A    PACOM put Mr. Roley on SCRA -- and I do not
14   recall what they stand for, but their initials are
15   SCRA -- contract with them until they could get the
16   funding, because he has to be on contract for that
17   90-day.  The reason he was over 90 days is they were
18   waiting for funding for that agreement.
19        Q    So in general, when it comes to IPA
20   agreements between an entity such as NPX and the
21   Federal agency, there has to be funding from the
22   Government to finance the agreement, correct?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    36

1        A      Yes.

2        Q      Is it in the form of a grant or how does

3    that funding work; do you know?

4        A      That would be a PACOM question.

5        Q      In regards to Mr. Roley, how was his IPA

6    agreement here for -- running from December 1, 2012,

7    through November 30, 2014, not funding?

8        A      How was it not funded?

9        Q      How was it funded?

10       A      I'm not sure what lines -- again, that's a

11   PACOM question.

12       Q      So NPX is not aware one way or the other

13   where the money -- what the form of the funding was to

14   support the IPA agreement, correct?

15       A      I would not know what program PACOM is

16   getting the funding from.  I will know when it's

17   funded because I will get notification from PACOM

18   saying you're funded.  Where those funds came from, I

19   have no idea.

20       Q      So when PACOM -- when did PACOM notify NPX

21   that it had funding for Mr. Roley's initial IPA

22   agreement?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    37

1        A     On this initial one?  I'm not sure the exact

2    date, but this was signed November 28th --

3    November 20th I signed it, November 28th the

4    Government signed it, and Roley signed it on the 16th

5    of November of 2012.

6        Q     Would it be fair to say that on or around

7    the time you executed this document you were notified

8    by PACOM that you had -- that there was funding for

9    this IPA agreement?

10       A     We would have been working on that, yes.

11       Q     Okay.  And on the last page, that is your

12   signature, under Signature of Authorizing Officer, in

13   box 39?

14       A     Yes.

15       Q     Now, at the outset, following -- sorry,

16   strike that.

17             Following Mr. Roley's hire on or around

18   December 1, 2011, what documents was he given from

19   NPX?

20       A     Following his hiring?

21       Q     Yes.  For instance --

22       A     It would be -- do you mean prior?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    38

```
 1        Q     For instance, you previously testified that

 2   he was given the handbook, correct?

 3        A     Before being hired, any new employee would

 4   have been given an offer letter --

 5        Q     Okay.

 6        A     -- an employee package --

 7        Q     What was part of that employee package?

 8        A     Part of the employee package would have been

 9   a handbook that would have -- there would also -- with

10   the handbook would have been a document that says --

11   and he did sign that he received a handbook notifying

12   he understood all our rules and regulations -- he

13   would have been given a time sheet, he would have

14   been -- also, he would have been given a separate copy

15   of our travel policy.  He would have been given

16   information on how to sign up for Cole Travel so that

17   he could use our travel system.

18              There's a whole -- I don't have the document

19   in front of -- there's a checklist that we use with

20   everything that goes in the document.

21              There's also a checklist in the office of

22   everything that we have to receive back from the
```

1    employee.  I do not have that information in front of

2    me.

3        Q    Okay, but did NPX have that document from

4    Mr. Roley, the checklist?

5        A    Yes.

6            MR. KREISER:  Can we go off the record?

7            (A discussion was held off the record.)

8            MR. KREISER:  We're back on the record.

9    BY MR. KREISER:

10       Q    And Mr. Roley was required to acknowledge --

11   was he required to acknowledge receipt of the contents

12   of this employee package?

13       A    Yes.

14       Q    And you said there was a -- you previously

15   testified, I'm sorry, there was a handbook given to

16   him for which he had to sign, a time sheet, NPX travel

17   policy.

18            Was there any other documents?

19       A    There would have been 401(k) information,

20   disability information, health insurance information,

21   dental information, disability, life, it would have

22   been information on our holiday policies, vacation

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                      40

1    request policies.

2        Q     Did Mr. Roley execute a W-4 at the outset of

3    his hire with NPX?

4        A     Yes, that's part of the package.

5        Q     Can I have you go back to Exhibit 3, please.

6        A     (Complying.)

7        Q     Okay.  And under Instructions, can you read

8    the first paragraph to the left starting with "This

9    agreement"?

10       A     "This agreement constitutes the written

11   record of the obligations and responsibilities of the

12   parties to a temporary assignment arranged under the

13   provisions of the Intergovernmental Personnel Act of

14   1970."

15       Q     Okay.  And can you also read the paragraph

16   below starting with "The term state ..."

17       A     "The term state or local government when

18   appearing in this form also refers to an institution

19   of higher education and Indian tribunal government and

20   any other eligible organization."

21       Q     Okay.  And as you previously testified, NPX

22   was an eligible organization under that "Other"

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                           41

1    category, correct?

2         A    Yes, we're "Other."

3         Q    And can you identify the organization in box

4    No. 7, please?

5         A    NPX.

6         Q    Okay.  And PACOM is the organization

7    identified in box 6, correct?

8         A    Yes.

9         Q    So the parties to the agreement were

10   Mr. Roley, NPX, and PACOM, correct?

11        A    Yes.

12        Q    And can you identify the amount in box 14

13   labeled "State or Local Annual Salary"?

14        A    $176,440.

15        Q    Okay.  Explain to me the process of how

16   someone such as Mr. Roley on detail to a Federal

17   agency is compensated, is paid.

18        A    Okay.  Generally how it works, it works just

19   like anybody else.  How he gets paid is he turns a

20   time sheet in every two weeks.

21        Q    So Mr. Roley would work -- and he was

22   working on location at PACOM, correct?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    42

1        A    Yes.  He always worked in Hawaii.  That is

2   where he was employed.

3        Q    So at PACOM's location in Hawaii, correct?

4        A    He was employed in Hawaii, yes.

5        Q    And he would work and perform his duties and

6   then each -- was it each week or every two weeks he

7   would fill out a time sheet?

8        A    Every two weeks he would turn in a time

9   sheet.

10        Q    And he would turn in that time sheet to you,

11   correct?

12        A    No, he would first have to turn the time

13   sheet in to his supervisor.

14        Q    Okay.  And then what's the process after it

15   goes to his supervisor?

16        A    His supervisor would sign the time sheet or

17   give it back or whatever, approve it, and once the

18   time sheet was approved, it was sent to me for

19   payment.

20        Q    What's the process from there after you

21   receive the time sheet that's approved?

22        A    The time -- the time sheet would go into the

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                           43

1    administrative office, it would go into QuickBooks,

2    and every two weeks we would be paid.

3         Q      Okay.  So how does that processing work?

4    Does NPX pay him directly and seek reimbursement from

5    the Government under the agreement?  How does that

6    process work?

7         A      No.  Prior to the agreement -- once the

8    agreement has been executed, the funding is there.

9    Except for travel.  Travel has to get a separate

10   funding line.  So once -- I've got my year of funding

11   on here, once I've got my signed agreement.

12        Q      As this agreement runs between December 1,

13   2012, and November 30, 2014, were you -- was NPX given

14   a block of funds for this agreement?

15        A      When you say "fund," what do you mean by

16   "funds"?

17        Q      So for Mr. Roley's -- to pay Mr. Roley's

18   salary, did the Government give NPX the amount for

19   that period of time in a lump sum, or how did that

20   work?  I'm trying to understand that process.

21        A      You're asking me if I was prepaid?

22        Q      Yes.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                44

```
1        A    No.
2        Q    So how did the funding come to NPX to pay
3   the salary?
4        A    Funding and paying are totally separate
5   things.
6        Q    Okay.
7        A    So how did he get paid, he got paid every
8   two weeks.
9        Q    Okay.  And he was paid by NPX.
10       A    Yes.
11       Q    Every two weeks.
12       A    Yes.
13            Do you know what funding is?
14       Q    Yes.
15       A    Sorry.  I didn't mean to ask you questions,
16   sorry.
17       Q    At the bottom of page 2, can you read the
18   last paragraph beginning with "Return to previous
19   position ..."
20       A    Page 2, which one?
21       Q    The very last paragraph beginning with
22   "Return to previous position ..."
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                  45

```
1        A      "Return to previous position.  Mr. Roley

2   will be eligible to return to the employer with the

3   same salary and status that he had prior to the IPA

4   assignment."

5               (NPX Exhibit 4 was marked for identification

6   and is attached to the transcript.)

7        Q      Ms. Bell, what I've handed you has been

8   marked as NPX Exhibit 4 for identification.

9               Do you recognize this document?

10       A      Yes.

11       Q      Okay.  What is it?

12       A      It is an IPA agreement.

13       Q      Okay.  Is this the follow-up IPA agreement

14   from the one that ran from December 1, 2012, through

15   November 30, 2014?

16       A      Could be.  Could be a working document.

17   Looks like it's the final document.

18       Q      Okay.  Can you turn to page 2 for me,

19   please.

20       A      (Complying.)

21       Q      And in box No. 20, can you identify those

22   dates for me, please?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                46

```
 1        A    12/01/14 to 11/30/15.
 2           Q    So after Mr. Roley's first IPA agreement
 3   expired on November 30, 2014, what happened?
 4           A    The PACOM renewed the agreement for one
 5   year.
 6           Q    Okay.  And that was from December 1, 2014,
 7   through November 30, 2015?
 8           A    Yes.
 9           Q    And then the salary of Mr. Roley was to be
10   paid under this renewed agreement as identified in box
11   14; is that correct?
12           A    Yes, he received a 2,000-dollar raise.
13           Q    And NPX is identified in box No. 7; is that
14   correct?
15           A    Yes.
16           Q    Okay.  And similar to the first -- or exact
17   as the first agreement, PACOM, NPX and Mr. Roley were
18   the parties of this agreement, correct?
19           A    Yes.
20           Q    Can I have you turn to the last page,
21   please.
22           A    (Complying.)
```

SUMMARY JUDGMENT J.R. 51

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    47

```
 1        Q    And that's your signature in box 39?

 2        A    Yes.

 3        Q    Okay.  And you're signing as the Managing

 4   Director for NPX in box 43, correct?

 5        A    Correct.

 6        Q    Okay.

 7             (NPX Exhibit 5 was marked for identification

 8   and is attached to the transcript.)

 9        Q    Okay.  Ms. Bell, what I've just handed you

10   has been marked as NPX Exhibit 5 for identification.

11             Do you recognize this document?

12        A    Yes.

13        Q    What is it?

14        A    It's IPA agreement.  It would have been the

15   third one for an extension for Ross Roley.

16        Q    So Exhibit 4, the previous agreement,

17   expired on November 30, 2015, correct?

18        A    Yes.

19        Q    Okay.  And similar to -- following

20   Mr. Roley's first agreement, PACOM extended the

21   assignment, or detail, from December 1, 2015, through

22   November 30, 2016; is that correct?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    48

1          A     Yes.

2          Q     And Mr. Roley was to be paid the salary

3   identified in box 14 on this agreement, correct?

4          A     Yes.

5          Q     And again, as identified in box 7 and box 6,

6   PACOM and NPX were parties to this agreement, correct?

7          A     Yes.

8          Q     Along with Mr. Roley?

9          A     Yes.

10         Q     Okay.  Can I have you turn to the last page.

11         A     (Complying.)

12         Q     And in box 39 is that your signature?

13         A     Yes.

14         Q     And while Mr. Roley was on detail to PACOM

15  under each of these IPA agreements, did NPX provide to

16  him 401(k) benefits?

17         A     Yes.

18         Q     Okay.  Did NPX provide to him health

19  benefits?

20         A     I don't recall.

21         Q     Okay.  On Exhibit 5, can I have you turn to

22  page 3.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                              49

```
 1          A     (Complying.)

 2          Q     And in box 31, which is the middle of the

 3    page on the right, could you read that paragraph that

 4    begins with "Benefits provided by NPX ..."

 5          A     "Benefits provided by NPX include 401(k),

 6    short- and long-term disability insurance, Social

 7    Security benefits, personal time off (160 hours),

 8    Federal holidays, health, dental, vision insurance

 9    with employee contribution.  Supplemental insurance

10    available."

11          Q     And so under the terms of this IPA

12    agreement, was NPX obligated to provide all of those

13    benefits itemized in box No. 31?

14          A     If he contributed.

15          Q     Okay.  So we'll just -- hypothetically

16    speaking, if Mr. Roley contributed and elected to

17    participate in those benefit programs, NPX would have

18    provided those benefits?

19          A     Yes.

20          Q     Okay.  And at the end of each year that

21    Mr. Roley was working at PACOM, did NPX issue to him a

22    W-2?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    50

1          A     Yes.

2          Q     So that would be for under these agreements

3    beginning in 2011 through -- sorry.

4                So beginning from 2012 through 2016, for

5    each one of those taxable years, NPX issued to

6    Mr. Roley a W-2 form, correct?

7          A     NPX, that is not correct.

8          Q     Okay.  So what part of that would be

9    incorrect?

10         A     NPX issued Ross Roley a W-2 starting in

11   2011.

12         Q     In 2011 -- so 2011 through 2016 Mr. Roley

13   received from NPX a W-2 for each of those tax years?

14         A     Correct.

15         Q     Okay.  And when Mr. Roley would submit his

16   time sheet, it'd be approved by his supervisor at

17   PACOM.

18               Prior to disbursement of his wages from NPX

19   for that two-week period, did NPX withhold taxes?

20         A     We would withhold taxes every paycheck, yes.

21         Q     And did NPX pay any payroll taxes on

22   Mr. Roley's behalf?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                       51

1        A      Yes.

2           Q      And did there come a time when Mr. Roley

3    complained to NPX that he hadn't received all of his

4    wages that were to be provided under the terms of his

5    IPA agreements?

6           A      Yes.

7           Q      Do you remember when he first complained?

8           A      It was after he had left the company.   I

9    don't remember whatever date it was.

10          Q      When did Mr. Roley leave the company?

11          A      2016.   It was around December of 2016, I

12   believe.   Whatever the date on the last agreement was.

13       Q      So I'm going to have you refer back to

14   Exhibit 5, the last page, box 36.

15          Did Mr. Roley leave the company after

16   November 30, 2016?

17          A      That would have been his last day.

18          Q      So how did that transpire, what happened?

19          A      He actually resigned.

20          Q      Okay.   So after November 30, 2016, Mr. Roley

21   resigned from NPX?

22          A      Correct.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                        52

1     Q      So after Mr. Roley complained to NPX about

2  not receiving his wages, what happened?  What did --

3  what was NPX's response?

4     A      Shocked.  I couldn't believe it.  Especially

5  when he told me five years.  It's like how did you not

6  know that you were missing $15,000 for five years.

7  And especially for the first year it was paid -- or

8  especially it was paid correctly at first.

9     Q      Did NPX ever conduct an investigation into

10  what happened to cause the shortage to Mr. Roley?

11     A      Immediately.

12     Q      Okay.  So what did NPX do?

13     A      Immediately went to go look through the

14  records to see if it was true that he did not get paid

15  his actual wages.

16     Q      So which -- who conducted the investigation?

17     A      I did.

18     Q      And which records did you review?

19     A      I went to the payroll system immediately.

20     Q      And that's the payroll system in QuickBooks,

21  correct?

22     A      QuickBooks.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                      53

1      Q      Did NPX ever utilize like a payroll

2   processing service like ADP between 2011 and 2016?

3      A      Not ADP, we used QuickBooks Intuit, which is

4   the same sort of -- the same thing.  I've used both.

5      Q      So it was in-house?

6      A      Yes.

7      Q      Okay.  So after you reviewed the QuickBooks

8   payroll documents, what did you find?

9      A      It was correct, we owed him money.

10      Q      Do you recall how much money Mr. Roley is

11   presently owed?

12      A      No, I do not recall off the top of my head.

13      Q      Okay.

14             (NPX Exhibit 6 was marked for identification

15   and is attached to the transcript.)

16      Q      Ms. Bell, what I've just handed you has been

17   marked as NPX Exhibit 6 for identification.

18             Do you know what this document is?

19      A      Yes.

20      Q      Okay.  And these are Mr. Roley's Requests

21   for Admissions that were propounded to NPX through its

22   counsel and -- which asks NPX to admit or deny a

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    54

1    series of questions.

2         A    Uh-huh.

3         Q    Did you partake in answering these

4    questions?

5         A    Yes.

6         Q    Can you turn to -- the pages aren't

7    numbered -- the second-to-last page.

8         A    (Complying.)

9         Q    And can you read Request No. 34 into the

10   record, please.

11        A    "Admit that you failed to pay the Plaintiff

12   wages that are due, owning and payable in the amount

13   of 56,564.82."

14        Q    And what was the response?

15        A    "Admitted."

16        Q    Okay.  So NPX admits that Mr. Roley as of

17   today is owed $56,564.82 in wages, correct?

18        A    Yes.

19        Q    And did there come a time when Mr. Roley

20   complained to NPX about not receiving reimbursement

21   for any travel expenses?

22        A    Yes.

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                          55

1     Q     Okay.  How did NPX respond to complaints?

2     A     We looked into it.

3     Q     Okay.  Was it identified that Mr. Roley did

4  not receive travel expense reimbursements?

5     A     In some cases, yes.

6     Q     Do you remember how much?

7     A     No, I do not.

8     Q     Can you turn to the last page, please, on

9  Exhibit 6.

10    A     (Complying.)

11    Q     Can you read Request No. 35 into the record.

12    A     "Admit that you failed to reimburse

13  Plaintiff for his travel expenses incurred that are

14  due, owning and payable in the amount of $13,349.31."

15    Q     And can you read the response, please.

16    A     "Admitted."

17    Q     So as of today, NPX has not reimbursed

18  Mr. Roley for $13,349.31 in travel expenses?

19    A     Correct.

20          (NPX Exhibit 7 was marked for identification

21  and is attached to the transcript.)

22    Q     And what I've handed you, Ms. Bell, has been

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                      56

1    marked as NPX Exhibit 7 for identification.

2           Do you recognize this document?

3       A   Yes.

4       Q   Okay.  What are they?

5       A   Answers -- it's the answers to the

6    Interrogatories.

7       Q   To the Interrogatories.

8           And they were answered by NPX, correct?

9       A   Yes.

10      Q   Did you partake in answering these

11   Interrogatories?

12      A   Yes.

13      Q   And the answers contained in these

14   Interrogatories from NPX are true, accurate to the

15   best of your information, knowledge and belief?

16      A   Yes.

17      Q   Okay.

18          (NPX Exhibit 8 was marked for identification

19   and is attached to the transcript.)

20      Q   Ms. Bell, what I have given you has been

21   marked as --

22          MR. KREISER:  Can we go off the record?

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                  57

```
1              (A discussion was had off the record.)

2              (NPX Exhibit 8 was remarked for

3     identification as S. Bell Deposition Exhibit 1 and is

4     attached to the transcript.)

5              MR. KREISER:  We're back on the record.

6     BY MR. KREISER:

7         Q    Ms. Bell, what I have handed you has been

8     marked as Bell Exhibit 1 for identification.

9              Do you recognize this document?

10        A    Yes.

11        Q    Okay.  What is it?

12        A    It's answers to questions.

13        Q    These are the Answers to Interrogatories

14    that were served upon yourself through counsel,

15    correct?

16        A    Yes.

17        Q    Okay.  And you partook in answering these

18    Interrogatories, correct?

19        A    Yes.

20        Q    And was the information you provided for

21    these Interrogatories true and correct to the best of

22    your information, knowledge and belief?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    58

```
1        A    Yes.

2             MR. KREISER:  Okay.  I have no further

3    questions.

4             MR. BALLEW:  Just a few questions, Ms. Bell.

5         EXAMINATION BY COUNSEL FOR THE DEFENDANTS

6    BY MR. BALLEW:

7        Q    You were asked earlier what type of company

8    and you mentioned 501(c)(6).

9             Are you familiar with the 501(c)(6)

10   category?

11       A    It is a membership organization.

12       Q    Do you have an ownership interest in NPX?

13       A    No, NPX is a not-for-profit organization.

14            (Pause in the proceedings.)

15       Q    And you testified on Direct that you were

16   the Managing Director for NPX?

17       A    Yes.

18       Q    And did you receive a salary?

19       A    Yes.

20       Q    And what was your salary during the period

21   of 2011 through 2016?

22       A    It was probably maybe around 140,000,
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                    59

```
1    120,000, somewhere in that neighborhood probably.

2         Q    Did your salary change, go up or go down,

3    over that period of time?

4         A    Oh, I can tell you my salary most likely

5    went down, because we were winding down and I was

6    working less hours.  My salary definitely decreased.

7         Q    During your time as Managing Director, did

8    you receive bonuses?

9         A    No.

10        Q    Commissions?

11        A    No.

12        Q    Okay.  You mentioned your duties.  I want to

13   ask you a little more in that area.

14             Could you have hired Mr. Roley without PACOM

15   direction and approval?

16        A    No.

17        Q    Did you set his rate of pay?

18        A    No.

19        Q    Who did?

20        A    PACOM.

21        Q    In the area of discipline, did you have

22   authority to fire Mr. Roley?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    60

```
1        A     No.

2        Q     Who did?

3        A     PACOM.

4        Q     Did you have the authority to suspend or

5   demote him?

6        A     No.

7        Q     Who did?

8        A     PACOM.

9        Q     Did you direct Mr. Roley's work?

10       A     No.

11       Q     Who did?

12       A     PACOM.

13       Q     Did you give him assignments?

14       A     No.

15       Q     Did you tell him what to do?

16       A     No.

17       Q     Who gave him assignments?

18       A     PACOM.

19       Q     And who told him what to do?

20       A     PACOM.

21       Q     Did you evaluate his performance?

22       A     No.
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    61

```
 1        Q      Who did?

 2        A      PACOM.

 3        Q      Did you -- the phrase is "the manner and

 4   means of completing work."  Were you involved in

 5   determining how Mr. Roley did his work?

 6        A      No.

 7        Q      Who did?

 8        A      PACOM.

 9        Q      Did you control the tools or equipment or

10   systems that Mr. Roley used to complete this work?

11        A      No.

12        Q      Who did?

13        A      PACOM.

14        Q      Did you set his work schedule?

15        A      No.

16        Q      Who did?

17        A      PACOM.

18        Q      Did you determine the location where he

19   would work?

20        A      No.

21        Q      Did you determine the office space that he

22   would use?
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                62

```
 1        A    No.

 2        Q    Who did?

 3        A    PACOM.

 4        Q    And did you control how he accessed the

 5   areas where he worked?

 6        A    No.

 7        Q    Who did?

 8        A    PACOM.

 9             MR. BALLEW:  No further questions.

10   FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF

11   BY MR. KREISER:

12        Q    One quick follow-up question.

13             While Mr. Roley was on detail, if he needed

14   to take a leave for any reason, how would that process

15   work.

16        A    He would have to get approval through the

17   Command.

18        Q    Okay.  And then where would his -- did NPX

19   provide a -- strike that.

20             So any hours that he would use for leave

21   would go to his leave bank through NPX, correct?

22        A    His leave would be reduced by any leave that
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                   63

1   he used.

2        Q     Okay.  And that would be notated by NPX,

3   correct?

4        A     Yes.

5              MR. KREISER:  Okay.  No further questions.

6              MR. BALLEW:  Just one last question -- or

7   area of question.

8        FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANTS

9   BY MR. BALLEW:

10       Q     I think you spoke to it before.

11             Did Mr. Roley perform any work duties in the

12  State of Maryland?

13       A     Never.

14       Q     Okay.

15             MR. BALLEW:  No further questions.

16             MR. KREISER:  Okay.  Follow-up on that.

17       FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF

18  BY MR. KREISER:

19       Q     What makes you state that Mr. Roley did not

20  perform any work duties in the State of Maryland?

21       A     I have no knowledge of him ever performing

22  any work in the State of Maryland, ever, nor has he

1    ever paid the State of Maryland any taxes.

2         Q    So are you -- so you're saying in your

3    answer that Mr. Roley never traveled to the State of

4    Maryland in any capacity during his assignment or on

5    detail at PACOM?

6         A    Not that I am aware of.  I'm aware that he

7    went to the Pentagon, but that is in DC.

8         Q    Okay.  But your position is that you're not

9    aware one way or another if Mr. Roley traveled to the

10   State of America to discharge any duties or

11   responsibilities?

12             MR. BALLEW:  You said State of America.

13             MR. KREISER:  I'm sorry, I apologize.  I

14   have a lot of Maryland pride.

15        Q    So you're not aware one way or the other if

16   Mr. Roley traveled to the State of Maryland to

17   discharge any duties while on detail at PACOM?

18        A    Not that I am aware of.

19             MR. KREISER:  Okay.  No further questions.

20             MR. BALLEW:  No further questions.

21             She'll read and sign.

22             THE COURT REPORTER:  Are you ordering a

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                65

```
 1   copy?

 2            MR. BALLEW:  Yes.

 3            (Off the record at 11:50 a.m.)

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    66

```
1              ACKNOWLEDGMENT OF DEPONENT

2        I, Sharon Jean Bell, do hereby acknowledge that I

3   have read and examined the foregoing testimony, and

4   the same is a true, correct and complete transcription

5   of the testimony given by me, and any corrections

6   appear on the attached Errata sheet signed by me.

7

8

9   _____        _____

10        (DATE)                          (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                    67

```
1        CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2

3        I, Dawn M. Hart, the officer before whom the

4    foregoing deposition was taken, do hereby certify that

5    the foregoing transcript is a true and

6    correct record of the testimony given; that said

7    testimony was taken by me stenographically and

8    thereafter reduced to typewriting under my direction;

9    that reading and signing was requested; and that I am

10   neither counsel for, related to, nor employed by any

11   of the parties to this case and have no interest,

12   financial or otherwise, in its outcome.

13       IN WITNESS WHEREOF, I have hereunto set my

14   hand and affixed my notarial seal this 18th day

15   of September, 2019.

16   My commission expires:

17   January 2, 2021

18

19

20   _____

21   NOTARY IN AND FOR THE

22   STATE OF MARYLAND
```

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                                68

| A | | | |
|---|---|---|---|
| **ability** | **admitted** | 29: 9, 3 : 6, | **42:** |
| 27: 5, 27: 6 | 54: 5, 55: 6 | 33:3, 33: 0, | **amended** |
| **about** | **adp** | 33:2 , 34:6, | 4: 2 |
| :6,  4: 8, | 53:2, 53:3 | 35:6, 35: 8, | **america** |
| 6: 7,  8:2, | **advisory** | 35:22, 36:6, | 2:9, 3: 5, |
| 8: 0, 2 : 6, | 27:20, 27:2 , | 36: 4, 36:22, | 64: 0, 64: 2 |
| 24:4, 25:7, | 28:6, 28:7, | 37:9, 40:9, | **amount** |
| 30:22, 32: 0, | 28: 4 | 40: 0, 4 :9, | 4 : 2, 43: 8, |
| 52: , 54:20 | **affect** | 43:5, 43:7, | 54: 2, 55: 4 |
| **absolutely** | 9:6, 9:8 | 43:8, 43: , | **annual** |
| 22:3, 30: 8 | **affected** | 43: 2, 43: 4, | 4 : 3 |
| **accessed** | 9: | 45: 2, 45: 3, | **another** |
| 62:4 | **affirmed** | 46:2, 46:4, | 7: , 7:5, |
| **accounting** | 6:3 | 46: 0, 46: 7, | 2 : 4, 64:9 |
| : 3,  : 4, | **affixed** | 46: 8, 47: 4, | **answer** |
| 2: 5, 29:2, | 67: 4 | 47: 6, 47:20, | 6:22, 7:8, |
| 29: 2 | **after** | 48:3, 48:6, | 7: 4, 64:3 |
| **accurate** | 8: , 22: , | 49: 2, 5 : 2 | **answered** |
| 56: 4 | 24: 3, 28: 6, | **agreements** | 56:8 |
| **acknowledge** | 35:5, 42: 4, | 3: , 3:22, | **answering** |
| 39: 0, 39: , | 42:20, 46:2, | 20: 3, 30: 6, | 54:3, 56: 0, |
| 66:2 | 5 :8, 5 : 5, | 35:20, 48: 5, | 57: 7 |
| **acknowledgment** | 5 :20, 52: , | 50:2, 5 :5 | **answers** |
| 66: | 53:7 | **al** | 5:4, 5:8, 8:20, |
| **act** | **again** | :7 | 9: 6, 56:5, |
| 6: 9, 40: 3 | 36: 0, 48:5 | **alabama** | 56: 3, 57: 2, |
| **action** | **against** | 9:4 | 57: 3 |
| 6: 3 | 6: 3 | **all** | **any** |
| **actual** | **agencies** | 8:22, 6: , | 7:22, 9:5, 9:9, |
| 32: 8, 52: 5 | 3: 2, 3: 4, | 7: 8, 9: , | 9: 0, 9: 9, |
| **actually** | 3:2 , 4: , | 25: , 25:2, | : 0, 2:3, |
| 8:6, 8: 0, | 30: 6 | 28:9, 29:3, | 2:4, 2: 4, |
| 22: 2, 33: , | **agency** | 38: 2, 49: 2, | 2: 7, 4:20, |
| 34: 5, 5 : 9 | 3: 5, 3: 6, | 5 :3 | 6:9, 6: , |
| **additionally** | 6: 4, 6: 5, | **allen** | 6:22, 22: 5, |
| 6:2 | 6:2 , 20:4, | 4:20 | 25: 0, 25: 3, |
| **address** | 27:5, 30:22, | **allow** | 27:2 , 29: 5, |
| 2 : 3, 23:22 | 3 :3, 32: , | 6:2 | 30:2, 38:3, |
| **administrative** | 32:7, 35:2 , | **along** | 39: 8, 40:20, |
| 26:5, 43: | 4 : 7 | 0: , 48:8 | 50:2 , 54:2 , |
| **admissions** | **ago** | **also** | 62: 4, 62:20, |
| 4:22, 53:2 | :2 , :22, | 8:7, 8:22, | 62:22, 63: , |
| **admit** | 8:3 | 26: 8, 27:3, | 63:20, 63:22, |
| 53:22, 54: , | **agreeable** | 27:20, 38:9, | 64: , 64:4, |
| 55: 2 | 7:3 | 38: 4, 38:2 , | 64: 0, 64: 7, |
| **admits** | **agreement** | 40: 5, 40: 8 | 66:5, 67: 0 |
| 54: 6 | 4: 5, 4: 7, | **always** | **anybody** |
| | 4: 9, 6: 3, | 4: 5, 7: 4, | 0:8, :9, |

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

69

| | | | |
|---|---|---|---|
| 29: 8, 4 : 9 | **assignment** | 42: 7, 5 : 3, | 39: 9, 39:22, |
| **anything** | 4: 5, 4: 7, | 57:5 | 43:8, 45:7, |
| 2:2 | 4: 9, 6:8, | **background** | 47: 0, 47: 4, |
| **apologize** | 6: , 20:4, | : 2 | 5 : 7, 53: 6, |
| 64: 3 | 20:5, 34:6, | **bae** | 55:22, 56:20, |
| **appear** | 35:6, 40: 2, | 4: 9 | 57:7 |
| 66:6 | 45:4, 47:2 , | **ballew** | **before** |
| **appearing** | 64:4 | 2:6, 3: , | 2: 8, 6:22, |
| 40: 8 | **assignments** | 3: 2, 4:4, 4:6, | 7: 4, 7:22, |
| **approval** | 6: 0, 60: 3, | 9:2 , 29:5, | 0:20, :3, |
| 27: 7, 27: 8, | 60: 7 | 29:8, 58:4, | 23:3, 23: , |
| 27:22, 28:2, | **associate's** | 58:6, 62:9, | 23: 2, 23: 3, |
| 59: 5, 62: 6 | : 4, : 6, | 63:6, 63:9, | 23:2 , 23:22, |
| **approve** | : 8, 2: 5 | 63: 5, 64: 2, | 33:3, 38:3, |
| 42: 7 | **associated** | 64:20, 65:2 | 63: 0, 67:3 |
| **approved** | 34: 7 | **baltimore** | **begin** |
| 27: 9, 42: 8, | **assume** | : 4, 2: 0, | 7:22, 20:6 |
| 42:2 , 50: 6 | 7:8 | 3: 6 | **beginning** |
| **area** | **attached** | **bank** | 44: 8, 44:2 , |
| 32: 9, 59: 3, | 4: 0, 5:2, | 2:9, 3: 5, | 50:3, 50:4 |
| 59:2 , 63:7 | 0: 7, 25:5, | 62:2 | **begins** |
| **areas** | 30:8, 33: 5, | **based** | 49:4 |
| 62:5 | 45:6, 47:8, | 8:2 , 8:22 | **behalf** |
| **aren't** | 53: 5, 55:2 , | **basic** | 3:2, 3: 0, 8:3, |
| 54:6 | 56: 9, 57:4, | 29:20 | 4:2, 4:3, |
| **arm** | 66:6 | **basically** | 50:22 |
| 7:6 | **attachment** | 0: , 4: 2, | **being** |
| **army** | 25:3 | 28:8, 28:9, | 6:3, 6: 8, |
| 20: | **attorney** | 28: | :2, 32:8, 38:3 |
| **around** | 0:9 | **because** | **belief** |
| 8:2, 8: 3, | **authority** | 6: 8, 28: 0, | 56: 5, 57:22 |
| 8: 4, 2 : 7, | 59:22, 60:4 | 35: 6, 36: 7, | **believe** |
| 23:5, 24:6, | **authorizing** | 59:5 | 9: 0, 9:4, |
| 24:7, 24: 0, | 37: 2 | **become** | 24:3, 24: 2, |
| 32:20, 33:7, | **available** | 6: 3, 34: 7 | 5 : 2, 52:4 |
| 37:6, 37: 7, | 9: , 49: 0 | **been** | **bell** |
| 5 : , 58:22 | **avenues** | 0: 8, 8:5, | : 2, 2:3, 4:2, |
| **arranged** | 20: 5 | 8:6, 8:8, | 5:7, 6:2, 6: , |
| 40: 2 | **aware** | 8: 4, 8: 6, | 6: 2, 30:9, |
| **aside** | : , 36: 2, | 8: 9, 20:5, | 33: 6, 45:7, |
| 30: 9 | 64:6, 64:9, | 2 : 2, 22:7, | 47:9, 53: 6, |
| **asked** | 64: 5, 64: 8 | 22:9, 23:4, | 55:22, 56:20, |
| 34: 8, 58:7 | **B** | 23: , 24:5, | 57:3, 57:7, |
| **asking** | | 30:3, 30:9, | 57:8, 58:4, 66:2 |
| 6:22, 43:2 | **back** | 33: 6, 37: 0, | **bell's** |
| **asks** | 29:2 , 30: , | 38:4, 38:8, | 5:8 |
| 53:22 | 32:22, 38:22, | 38: 0, 38: 3, | **below** |
| **assigned** | 39:8, 40:5, | 38: 4, 38: 5, | 40: 6 |
| 3: 4, 6: 2 | | | |

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

70

**benefit**
49: 7
**benefits**
48: 6, 48: 9,
49:4, 49:5,
49:7, 49: 3,
49: 8
**benfield**
26:3, 26:4
**best**
56: 5, 57:2
**between**
5: 2,  9:5,
25: 4, 25: 8,
26:8, 27:7,
34:22, 35: 0,
35:20, 43: 2,
53:2
**binding**
9: 6
**bit**
4: 8
**block**
43: 4
**board**
26: 4, 27: 9,
27:20, 27:2 ,
28:2, 28:4,
28:6, 28:7,
28: 4
**bonuses**
59:8
**bookkeeper**
26:
**booz**
4:20
**both**
8: 2, 8: 7,
53:4
**bottom**
44: 7
**bowles**
25:2 , 25:22,
27:
**box**
34:3, 37: 3,
4 :3, 4 :7,
4 : 2, 45:2 ,

**46:** 0, 46: 3,
47: , 47:4,
48:3, 48:5,
48: 2, 49:2,
49: 3, 5 : 4
**break**
7: 2, 7: 4
**bringing**
28:9
**bryant**
: 7
**building**
2 :9
**business**
4:4,  4:  ,
8: 9,  9:6,
9:8,  9: 5,
9: 6,  9: 8,
20:7, 20: 2,
20: 3, 20:2

**C**

**c) (3**
4:7
**c) (6**
4:8,  4:9,
58:8, 58:9
**california**
9:4, 2 : 3
**called**
3 :4
**calls**
3 : 0
**came**
26:6, 34: 6,
36: 8
**can't**
6:7
**cannot**
4:22,  6: 0
**capacity**
6: 5, 8:4, 8:8,
3:20, 64:4
**care**
26:5
**case**
:5, 6: 7,
30:2, 3 :3,

**3 :** 5, 3 :22,
67:
**cases**
55:5
**category**
4 : , 58: 0
**cause**
52: 0
**center**
2:9, 3: 5
**certain**
8:9
**certificate**
67:
**certifications**
2:4,  2:5,
2:7,  2: 3,
2: 4, 2:20
**certified**
3:
**certify**
67:4
**certs**
2:6
**chaffey**
23:3
**change**
59:2
**charles**
2:7, 3: 3
**checklist**
38: 9, 38:2 ,
39:4
**chose**
20:20, 2 :2
**chosen**
7: 2
**claims**
6: 6, 26:6
**class**
2:
**classes**
2: 2,  2: 3
**clear**
7: , 29: 0,
3 :5
**clients**
22: 5, 22: 7,

**22:**20
**closed**
9: 0
**closing**
9: 2,  9: 3,
20:2
**code**
4:7
**cole**
38: 6
**colorado**
9:3
**come**
22: 5, 22: 7,
22:20, 30:22,
44:2, 5 :2,
54: 9
**comes**
35: 9
**command**
3 :7, 62: 7
**commission**
67: 6
**commissions**
59: 0
**company**
0:2, 20: 6,
5 :8, 5 : 0,
5 : 5, 58:7
**compensated**
4 : 7
**complained**
5 :3, 5 :7,
52: , 54:20
**complaints**
55:
**complete**
6 : 0, 66:4
**completing**
6 :4
**complying**
34:2, 40:6,
45:20, 46:22,
48: , 49: ,
54:8, 55: 0
**conduct**
52:9
**conducted**
52: 6

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                                71

**considered**
 7: , 32:8
**consists**
28:4
**constitutes**
40: 0
**contact**
 3: 5
**contacted**
 3: 6, 32:20,
34: 3, 34: 8
**contained**
56: 3
**contents**
39:
**continue**
20: 6, 3 :9
**continued**
5:
**contract**
20: , 20:3,
3 : 4, 3 : 7,
35:5, 35: 5,
35: 6
**contracting**
 2:
**contractors**
 4: 4,   4: 5,
 4:2 ,   5:4
**contractual**
3 :2
**contributed**
49: 4, 49: 6
**contribution**
49:9
**control**
6 :9, 62:4
**coordinating**
 3:  ,   3: 3
**copy**
30: 7, 38: 4,
65:
**corporate**
8:5,  0: ,   :2
**corporation**
8:4, 8: 3,
9: 7, 26: 3
**correct**
8: 8,  0:6,

0:7,  6: 4,
6: 9,  6:20,
22:2 , 25:9,
28: 9, 32:  ,
32: 3, 34:7,
34: 0, 34:  ,
34: 4, 35:7,
35:22, 36: 4,
38:2, 4 : ,
4 :7, 4 : 0,
4 :22, 42:3,
42:  , 46:  ,
46: 4, 46: 8,
47:4, 47:5,
47: 7, 47:22,
48:3, 48:6,
50:6, 50:7,
50: 4, 5 :22,
52:2 , 53:9,
54: 7, 55: 9,
56:8, 57: 5,
57: 8, 57:2 ,
62:2 , 63:3,
66:4, 67:6
**corrections**
66:5
**correctly**
52:8
**could**
6:9, 9:6,
 4:20,   5:3,
22: 5, 22: 7,
22:20, 28: 6,
35: 5, 38: 7,
45: 6, 49:3,
59: 4
**couldn't**
 5: 9, 52:4
**counsel**
6:6, 8:  ,
53:22, 57: 4,
58:5, 62: 0,
63:8, 63: 7,
67: 0
**course**
 2: 7
**court**
  : , 23:4,

29:9, 64:22
**craig**
3:
**crr**
 :22, 2: 9

**D**

**date**
 2:2, 24:8,
32:20, 33: 0,
33:  , 37:2,
5 :9, 5 : 2,
66: 0
**dates**
22:6, 23: 8,
34:4, 45:22
**dawn**
 :22, 2: 8,
67:3
**day**
2 :3, 35: 7,
5 : 7, 67: 4
**day-to-day**
 3:9, 2 :2
**days**
3 : 4, 3 :2 ,
35: 7
**dc**
64:7
**december**
34:9, 34: 9,
34:2 , 35: 0,
35:  , 36:6,
37: 8, 43: 2,
45: 4, 46:6,
47:2 , 5 :
**decide**
20:6
**decision**
34:22, 35:
**decreased**
59:6
**defendants**
 :8, 3: 0,
58:5, 63:8
**defense**
 3: 0, 28: 2
**definitely**
59:6

**degree**
  : 3,    : 4,
  : 9
**degrees**
 2:3,  2:5
**demote**
60:5
**dental**
39:2 , 49:8
**deny**
53:22
**department**
 3: 0, 32: 9
**deponent**
66:
**deposition**
  : 0, 2: ,
4:  , 4: 2, 5:3,
5:7, 6: 8, 9:20,
  : , 57:3, 67:4
**designated**
  :  , 2:2
**designee**
8:5, 8:2 ,
9: 5,   :2,   3:4
**detail**
 6: 5, 27:4,
27:6, 29: 9,
30: 5, 3 :22,
4 : 6, 47:2 ,
48: 4, 62: 3,
64:5, 64: 7
**details**
30:2
**determine**
6 : 8, 6 :2
**determining**
6 :5
**different**
 2: 2, 23:22,
28: 6
**direct**
58: 5, 60:9
**direction**
28:9, 59: 5,
67:8
**directions**
28: 5

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019
72

**directly**
26: 2, 43:4
**director**
 3:6,  3:8,
 8: 7, 20: 9,
2 : , 27: 4,
47:4, 58: 6,
59:7
**directors**
26: 4, 27:20
**disability**
39:20, 39:2 ,
49:6
**disbursement**
50: 8
**discharge**
64: 0, 64: 7
**discipline**
59:2
**discovery**
 0:5
**discuss**
28:2
**discussion**
39:7, 57:
**district**
 : ,  :2
**document**
 0: 2,  0: 3,
 0:20, 30:  ,
33: 8, 37:7,
38: 0, 38: 8,
38:20, 39:3,
45:9, 45: 6,
45: 7, 47:  ,
53: 8, 56:2,
57:9
**documents**
9: 9, 9:22,
 0: ,  0:2,
 0:4, 29: 5,
37: 8, 39: 8,
53:8
**dod**
 4:2
**doing**
 4: 6
**dollar**
46: 2

**done**
 2:6,  2:8
**door**
24:20
**down**
 9: 3,  9: 4,
 9: 7,  9:2 ,
20:7, 20:2 ,
59:2, 59:5
**downsize**
2 :22
**due**
54: 2, 55: 4
**duly**
6:3
**during**
 0:5, 2 :7,
25: 6, 28:20,
58:20, 59:7,
64:4
**duties**
 3:7, 42:5,
59: 2, 63:  ,
63:20, 64: 0,
64: 7

---

**E**

**each**
 :6, 42:6,
48: 5, 49:20,
50:5, 50: 3
**earlier**
58:7
**easier**
29:8
**easy**
 7: 5
**educate**
 5:  , 28:
**education**
28: 0, 40: 9
**educational**
 : 2
**either**
20: 5, 20:20,
2 : 3, 27:3
**elected**
49: 6

**eligible**
40:20, 40:22,
45:2
**else**
20: 6, 4 : 9
**employed**
42:2, 42:4,
67: 0
**employee**
4: 4,  6: 3,
 8: 5, 27:8,
30: 4, 38:3,
38:6, 38:7,
38:8, 39: ,
39: 2, 49:9
**employees**
25: 0, 25: 3,
25: 6, 26: 9,
26:22, 27:2,
27: 5
**employer**
45:2
**employment**
33:
**end**
2 : 7, 23:5,
23:7, 49:20
**ended**
20:
**energy**
32: 7, 32: 9
**english**
7: 8, 7:20
**entered**
 0: 2
**entities**
 5: 3,  5: 4
**entity**
 5: 5,  5: 7,
 6:2 , 35:20
**equipment**
6 :9
**errata**
66:6
**especially**
52:4, 52:7,
52:8
**esquire**
3:3, 3:

**et**
 :7
**evaluate**
60:2
**even**
 :20,  2:2,
 5:22, 32:8
**ever**
52:9, 53: ,
63:2 , 63:22,
64:
**every**
4 :20, 42:6,
42:8, 43:2,
44:7, 44:  ,
50:20
**everybody**
 5:2
**everything**
30:4, 38:20,
 8
**exact**
2 : 3, 23: 8,
24:8, 37: ,
46: 6
**exactly**
24:8
**examination**
4:2, 6:6, 58:5,
62: 0, 63:8,
63: 7
**examined**
6:5, 66:3
**example**
 3: 6, 29: 6
**excellent**
9: 4
**except**
43:9
**exchange**
 :7,  : 0, 2: ,
6: 4, 8:4, 8: 2
**execute**
40:2
**executed**
37:7, 43:8
**executing**
35:6

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

73

| | | | |
|---|---|---|---|
| **exhibit**<br>4: 2, 4: 4,<br>4: 5, 4: 7,<br>4: 9, 4:2 , 5:4,<br>5:7, 5:8,  0: 6,<br> 0: 9, 30:7,<br>30: 0, 33: 4,<br>33: 7, 40:5,<br>45:5, 45:8,<br>47:7, 47: 0,<br>47: 6, 48:2 ,<br>5 : 4, 53: 4,<br>53: 7, 55:9,<br>55:20, 56: ,<br>56: 8, 57:2,<br>57:3, 57:8<br>**exhibits**<br>4: 0, 4:  ,<br>5:2, 5:3<br>**existence**<br>2 :7, 28:20<br>**exit**<br>25:<br>**expense**<br>55:4<br>**expenses**<br>54:2 , 55: 3,<br>55: 8<br>**expertise**<br>28:9<br>**experts**<br> 4: 3, 28: 0<br>**expired**<br>23:6, 23: 9,<br>24:  , 24: 3,<br>46:3, 47: 7<br>**expires**<br>67: 6<br>**explain**<br> 5: 0, 24: 8,<br>24: 9, 4 : 5<br>**extended**<br>47:20<br>**extension**<br>47: 5<br>**F**<br>**f-a-i-r-c-l-o-u--**<br>**g-h**<br>26: 7 | **failed**<br>54:  , 55: 2<br>**fair**<br> 8:2, 20:22,<br>24:9, 27: 0,<br>37:6<br>**fairclough**<br>20: 8, 26: 5,<br>28:5, 35:<br>**familiar**<br>58:9<br>**far**<br> 5: 3, 26:9<br>**federal**<br> 3: 4,  3:2 ,<br> 4: ,  6: 3,<br> 6: 5,  6:22,<br> 7:4, 20:4,<br>27:5, 30: 5,<br>30:22, 35:2 ,<br>4 : 6, 49:8<br>**ferguson**<br>2:6, 3: 2<br>**few**<br>58:4<br>**fifth**<br>2 : 8<br>**filed**<br> 7: 8<br>**files**<br>29: 6, 29: 8<br>**fill**<br>42:7<br>**filling**<br>32:2<br>**final**<br>45: 7<br>**finance**<br>35:22<br>**financial**<br> 2: 7, 67: 2<br>**find**<br> 6:3,  6:5,<br>53:8<br>**finish**<br>6:22, 29:5<br>**fire**<br>59:22 | **first**<br>5:4, 5:8, 6:3,<br> 5:22, 20:8,<br>2 : 2, 33:3,<br>33:4, 33: 0,<br>33: 2, 40:8,<br>42: 2, 46:2,<br>46: 6, 46: 7,<br>47:20, 5 :7,<br>52:7, 52:8<br>**five**<br>2 : 5, 2 : 6,<br>52:5, 52:6<br>**five-year**<br>23:20<br>**florida**<br> 9:2<br>**focuses**<br> 5:2<br>**follow-up**<br>45: 3, 62: 2,<br>63: 6<br>**following**<br>37: 5, 37: 7,<br>37:20, 47: 9<br>**follows**<br>6:5<br>**foot**<br>25:4<br>**foregoing**<br>66:3, 67:4,<br>67:5<br>**form**<br>30:3, 36:2,<br>36: 3, 40: 8,<br>50:6<br>**four**<br>25: 9<br>**frame**<br>24:6, 24:7<br>**front**<br>38: 9, 39:<br>**full**<br>6:9<br>**fund**<br>43: 5<br>**funded**<br>36:8, 36:9, | **36: 7, 36: 8**<br>**funding**<br>35: 6, 35: 8,<br>35:2 , 36:3,<br>36:7, 36: 3,<br>36: 6, 36:2 ,<br>37:8, 43:8,<br>43: 0, 44:2,<br>44:4, 44: 3<br>**funds**<br>36: 8, 43: 4,<br>43: 6<br>**further**<br>58:2, 62:9,<br>62: 0, 63:5,<br>63:8, 63: 5,<br>63: 7, 64: 9,<br>64:20<br>**G**<br>**gave**<br>60: 7<br>**general**<br>35: 9<br>**generally**<br> 4: 0, 4 : 8<br>**georgia**<br> 9:2<br>**getting**<br>36: 6<br>**give**<br>9:  ,   :5,<br>42: 7, 43: 8,<br>60: 3<br>**given**<br>9: 0, 9:  ,<br>30:6, 30: 7,<br>37: 8, 38:2,<br>38:4, 38: 3,<br>38: 4, 38: 5,<br>39: 5, 43: 3,<br>56:20, 66:5,<br>67:6<br>**go**<br> 0:  ,  4: 7,<br> 6:9,  6: 5,<br>23: 9, 24:2 ,<br>28:8, 28: 6, |

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

74

3 : 4, 32:22,
39:6, 40:5,
42:22, 43: ,
52: 3, 56:22,
59:2, 62:2
**goes**
38:20, 42: 5
**going**
6: 5, 7:8,
7: 3, 8: 3,
5: 3, 5: 5,
24:6, 3 : 6,
5 : 3
**good**
6:8
**government**
2: , 3: 2,
4:20, 5:4,
5: 3, 5: 4,
5: 5, 5: 7,
6:2, 6:22,
3 :3, 35:22,
37:4, 40: 7,
40: 9, 43:5,
43: 8
**governmental**
6: 7
**grant**
36:2
**greenbelt**
3:7
**greenwald**
3:4
**grow**
5:
**guess**
7: 4, 8: 6,
22: 0, 33: ,
33:2

**H**

**hand**
67: 4
**handbook**
4: 4, 30:4,
30: 4, 30: 7,
38:2, 38:9,
38: 0, 38: ,

39: 5
**handed**
0: 8, 30:9,
33: 6, 45:7,
47:9, 53: 6,
55:22, 57:7
**happened**
46:3, 5 : 8,
52:2, 52: 0
**hard**
29: 5
**harris**
7: 3, 7: 6
**hart**
:22, 2: 8,
67:3
**hawaii**
9:3, 27:2,
30:2, 30:3,
42: , 42:3, 42:4
**head**
6:20, 53: 2
**health**
39:20, 48: 8,
49:8
**held**
2:3, 39:7
**help**
28:8, 28: 5,
28: 7
**here**
8:3, 9:6, 9: 0,
9: , 9: 6,
36:6, 43:
**hereby**
66:2, 67:4
**hereunto**
67: 3
**higher**
40: 9
**hire**
3: 7, 6:6,
6:7, 27: 5,
27: 7, 28: ,
28:2, 3 : 2,
3 : 3, 3 :20,
34: 9, 35: ,
37: 7, 40:3

**hired**
8: 5, 8: 7,
32:8, 32:9,
34: 9, 34:2 ,
35:5, 38:3,
59: 4
**hiring**
27:22, 34:22,
37:20
**holiday**
39:22
**holidays**
49:8
**hollywood**
2 : 4, 2 : 5,
23:20, 24:2,
24: 0, 24: 4
**home**
23:4, 24: 7,
24:22, 25:2,
25:5
**homeland**
28: 2
**honestly**
4:22, 24:5
**hours**
49:7, 59:6,
62:20
**house**
22: , 22: 0,
22: 2, 22: 5
**hurt**
2 : 9
**hypothetically**
49: 5

**I**

**idea**
36: 9
**identification**
0: 6, 0: 9,
30:7, 30: 0,
33: 4, 33: 7,
45:5, 45:8,
47:7, 47: 0,
53: 4, 53: 7,
55:20, 56: ,
56: 8, 57:3,

57:8
**identified**
:6, : 0,
4 :7, 46: 0,
46: 3, 48:3,
48:5, 55:3
**identify**
4 :3, 4 : 2,
45:2
**immediately**
52: , 52: 3,
52: 9
**in-house**
53:5
**inc**
:7, : 0, 2:2
**inception**
8:5, 8:9
**include**
49:5
**incorporated**
6: 4, 7: 0,
7:2 , 8: 3
**incorrect**
50:9
**incurred**
55: 3
**indian**
7:5, 40: 9
**individual**
6: 5, 8:8,
6:4, 6:5,
6:6, 6:7,
30:20, 30:2 ,
3 :
**individually**
: 3, 2:3
**individuals**
3: 3, 25:20,
27:4, 30: 5
**information**
9: , :9,
38: 6, 39: ,
39: 9, 39:20,
39:2 , 39:22,
56: 5, 57:20,
57:22
**initial**
36:2 , 37:

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019                                               75

| | | | |
|---|---|---|---|
| **initials** | **irrelevant** | **kind** | 48: 0, 5 : 2, |
| 35: 4 | 2: | 2: 7, 28:8, | 5 : 4, 5 : 7, |
| **instance** | **irs** | 28: 5, 3 : 9 | 55:8, 63:6 |
| 37:2 , 38: | 4:7 | **know** | **law** |
| **institution** | **issue** | 7: 3,  0: 2, | 2:4 |
| 40: 8 | 6: 7, 49:2 |  :9,   :2 , | **leadership** |
| **instructions** | **issued** | 2:6,  4: 4, | 26:9 |
| 40:7 | 50:5, 50: 0 | 4: 5, 8: , | **lease** |
| **insurance** | **it'd** | 22:5, 22: 5, | 23:6, 23: 9, |
| 39:20, 49:6, | 50: 6 | 23: 8, 24:6, | 23:20, 23:2 , |
| 49:8, 49:9 | **itemized** | 25: 6, 28: 0, | 23:22, 24:2, |
| **interest** | 49: 3 | 32:20, 36:3, | 24: 0, 24: 3 |
| 58: 2, 67: | **items** | 36: 5, 36: 6, | **least** |
| **intergovernmental** | 29:22 | 44: 3, 52:6, | 25: 8 |
| 6: 8, 40: 3 | **ivy** | 53: 8 | **leave** |
| **interim** | 3:5 | **knowledge** | 25: , 5 : 0, |
| 35:9, 35: 0 | | 8:22, 56: 5, | 5 : 5, 62: 4, |
| **interpersonnel** | **J** | 57:22, 63:2 | 62:20, 62:2 , |
| 6: 7,  6: 8 | **january** | **known** | 62:22 |
| **interrogatories** | 8: , 8: 5, | 9: , 9:2 | **left** |
| 5:5, 5:9, 56:6, | 67: 7 | **kreiser** | 40:8, 5 :8 |
| 56:7, 56:  , | **jean** | 3:3, 4:3, 4:5, | **legal** |
| 56: 4, 57: 3, | : 2, 2:3, 4:2, | 4:7, 6:7, 6: 2, | 6:9 |
| 57: 8, 57:2 | 6:2, 6:  , 66:2 | 9:22, 39:6, | **less** |
| **intuit** | **joann** | 39:8, 39:9, | 59:6 |
| 53:3 | 26:3 | 56:22, 57:5, | **let's** |
| **investigation** | **job** | 57:6, 58:2, | 9:2, 22: 6, |
| 52:9, 52: 6 | :20,  3:7 | 62: , 63:5, | 32: 0 |
| **involved** | **john** | 63: 6, 63: 8, | **letter** |
| 6 :4 | 7: 3,  7: 6 | 64: 3, 64: 9 | 38:4 |
| **ipa** | **joseph** | **L** | **licensed** |
| 3: ,  3:2 , | 3:4 | **laake** | 8: 9,  9:5, |
| 5: 5,  5:22, | **july** | 3:4 | 9:8 |
| 6: 2,  6: 6, | 33:6 | **labeled** | **life** |
| 7:4, 27:5, | **june** | 4 : 3 | 39:2 |
| 29: 9, 30: 6, | 8: 4 | **lane** | **liked** |
| 3 : 6, 33:2 , | **K** | 3:5 | 7: 4 |
| 34:6, 35: 9, | **k** | **language** | **likely** |
| 36:5, 36: 4, | 39: 9, 48: 6, | 7: 8 | 59:4 |
| 36:2 , 37:9, | 49:5 | **large** | **line** |
| 45:3, 45: 2, | **kansas** | 20: , 20: 2 | 43: 0 |
| 45: 3, 46:2, | 9:2, 27:3 | **last** | **lines** |
| 47: 4, 48: 5, | **keep** | 6:9, 20: , | 36: 0 |
| 49:  , 5 :5 | 22: 6, 29: 5, | 20:3, 23:3, | **list** |
| **ipas** | 29: 8 | 26: 6, 34: , | 4:22 |
| 3: 3,  4: 5, | **kept** | 37: , 44: 8, | **little** |
| 5: 2, 20:9, | 28:2 | 44:2 , 46:20, | 3: 8,  4: 7, |
| 2 : 8, 26: 8 | | | 59: 3 |

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

76

**local**
40: 7, 4 : 3
**located**
2 :  , 27:
**location**
2 : 5, 22:2,
22:6, 22:  ,
22: 6, 22: 9,
23:  , 23:3,
24:  , 24: 4,
25:8, 4 :22,
42:3, 6 : 8
**locations**
2 :4, 23:2
**long-term**
49:6
**look**
 7:3, 23: 9,
32: 8, 32:22,
33:9, 52: 3
**looked**
55:2
**looks**
45: 7
**lost**
20:8, 20: 4,
2 : 8
**lot**
9:7,   5:4,
20: 3, 24:6,
28: 2, 64: 4
**lump**
43: 9

**M**

**made**
35:
**main**
 5:2
**maintained**
28:2
**make**
29:7, 3 :5
**makes**
29:8, 63: 9
**managing**
 3:6,   3:8,
 8: 7, 2 : ,

**27:** 4, 47:3,
58: 6, 59:7
**manner**
 6:7, 6 :3
**many**
  :2 , 2 :4,
25: 6
**marked**
 0: 6,  0: 8,
30:7, 30: 0,
33: 4, 33: 7,
34:3, 45:5,
45:8, 47:7,
47: 0, 53: 4,
53: 7, 55:20,
56: , 56: 8,
56:2 , 57:8
**marvin**
20: 8, 26: 5
**maryland**
 :2,  : 4,
2: 0, 2:20, 3:7,
3: 6,  7:7,
 9:3,  9:6,
 9:9, 2 :3,
2 : 4, 2 : 5,
22:4, 22:6,
22:20, 23:9,
24:2, 24:  ,
24: 4, 24: 5,
25:  , 25: 4,
26:2 , 63: 2,
63:20, 63:22,
64: , 64:4,
64: 4, 64: 6,
67:22
**matt**
6: 2
**matter**
8: 8
**matters**
8:9
**matthew**
3:3
**maybe**
 2:9,   2: 0,
 2:22,  7:22,
25: 8, 27:3,

**33:**2, 33:3,
33:6, 58:22
**mean**
 2:2,   2:5,
 2:9, 22:9,
23: 6, 37:22,
43: 5, 44: 5
**means**
3 : 3, 6 :4
**medications**
9:5, 9:7, 9: 2
**meet**
30:22
**melanie**
25:2 , 27:9,
27: 0
**member**
 4: 8,   4: 9,
 5: ,   5:8,
 5: 2
**members**
 4: 3,   4: 4,
4:22
**membership**
 5:4,   5:5,
 5:6, 58:
**mentioned**
26: 2, 58:8,
59: 2
**microsoft**
 2:9,   2: 0
**middle**
49:2
**might**
 2: 0,   4: 9
**million**
 5:20
**missing**
52:6
**missouri**
 9:2
**money**
36: 3, 53:9,
53: 0
**months**
 8:  , 33:2
**more**
   :9,  3: 8,

**4:** 8,   6:9,
6:  , 59: 3
**morning**
6:8
**most**
59:4
**move**
24:8, 24: 5
**moved**
2 : 4, 24: 6
**moving**
23:3
**much**
53: 0, 55:6
**myself**
25:2 , 26: 5

**N**

**name**
6:9, 6: 2,
26: 6
**names**
 2: 2
**national**
 :6,  : 0, 2: ,
6: 4, 8:3, 8: 2
**need**
7: 2,   0:  ,
 0: 4,   5: 7,
 6:2,   6:4,
 6:6, 32: ,
32:7, 32:  ,
32: 3, 32: 5,
32:2 , 34: 4
**needed**
28: , 32: 6,
62: 3
**neighborhood**
59:
**neither**
67: 0
**nevada**
 7:  ,   7: 2,
 7: 4,   7:2 ,
 8:20
**never**
63: 3, 64:3
**new**
38:3

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

77

next
8:
nodding
6:20
not-for-profit
58: 3
notarial
67: 4
notary
2: 9, 67:2
notated
63:2
nothing
6:4
notice
2: 8, 4: 2,
   : ,    :6,
   : 0
notification
36: 7
notified
37:7
notify
36:20
notifying
38:
november
34: 0, 36:7,
37:2, 37:3,
37:5, 43: 3,
45: 5, 46:3,
46:7, 47: 7,
47:22, 5 : 6,
5 :20
npx's
  3:4,   4: 0,
25:7, 28:20,
52:3
numbered
54:7

**O**

obligated
49: 2
obligations
40:
offer
38:4

office
 3:9, 2 :3,
2 :8, 2 : 2,
22: 2, 22: 4,
22: 6, 22: 9,
23:4, 23:9,
24: , 24: 4,
24: 6, 24:2 ,
24:22, 25:4,
27: 7, 38:2 ,
43: , 6 :2
officer
20: 9, 37: 2,
67:3
offices
2:4, 2 :4,
2 :
oh
 2:22, 59:4
onboarded
3 :
once
42: 7, 43:7,
43: 0, 43:
one
9:  ,   2:22,
  4:20,   5:2,
  5:20,   7: 4,
  7: 8, 3 : 6,
3 :22, 36: 2,
37: , 44:20,
45: 4, 46:4,
47: 5, 50:5,
62: 2, 63:6,
64:9, 64: 5
ones
  0:5
only
8:2
open
24:20
operate
  4:5
operating
2 :8
operation
  4: 0, 27: 2
operations
  3: 0, 2 :2,

2 :22, 25:8
opportunities
28: 8
ordering
64:22
organization
  5:8, 40:20,
40:22, 4 :3,
4 :6, 58:  ,
58: 3
organizational
26:9
organizations
5: 2
original
  7: 7, 22:8
originally
22:8
other
9: 2,   0:9,
  2:3,   2:5,
  2: 4,   2: 7,
  7: ,   7:3,
  7:4,   7:5,
  8:20, 20: 4,
20: 8, 20: 9,
26: 9, 26:22,
36: 2, 39: 8,
40:20, 40:22,
4 :2, 64: 5
otherwise
67: 2
out
2 :22, 28: 7,
42:7
outcome
67: 2
outset
37: 5, 40:2
outside
  :8,   2: 5,
25: 0
outsource
  6:3
over
  0: , 35: 7,
59:3
oversaw
  3:9

owed
53:9, 53:  ,
54: 7
own
8:8
ownership
58: 2
owning
54: 2, 55: 4

**P**

pa
3:4
pacific
3 :7
package
38:6, 38:7,
38:8, 39: 2,
40:4
pacom
  3: 6, 3 :4,
3 :6, 3 : 0,
32:  , 32: 2,
32: 3, 32:20,
33:8, 33: 0,
34:7, 34: 3,
34: 8, 35: 3,
36:4, 36:  ,
36: 5, 36: 7,
36:20, 37:8,
4 :6, 4 : 0,
4 :22, 46:4,
46: 7, 47:20,
48:6, 48: 4,
49:2 , 50: 7,
59: 4, 59:20,
60:3, 60:8,
60: 2, 60: 8,
60:20, 6 :2,
6 :8, 6 : 3,
6 : 7, 62:3,
62:8, 64:5,
64: 7
pacom's
42:3
page
4:2, 4:  , 5:3,
5:7, 33: 2,

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

33: 3, 34: ,
37: , 44: 7,
44:20, 45: 8,
46:20, 48: 0,
48:22, 49:3,
5 : 4, 54:7,
55:8
**pages**
 :2 , 54:6
**paid**
4 : 7, 4 : 9,
43:2, 44:7,
44:9, 46: 0,
48:2, 52:7,
52:8, 52: 4,
64:
**paperwork**
 7: 5,  7: 9,
33:
**paragraph**
40:8, 40: 5,
44: 8, 44:2 ,
49:3
**part**
38:7, 38:8,
40:4, 50:8
**partake**
54:3, 56: 0
**participate**
49: 7
**parties**
40: 2, 4 :9,
46: 8, 48:6,
67:
**partook**
57: 7
**pause**
58: 4
**pay**
43:4, 43: 7,
44:2, 50:2 ,
54: , 59: 7
**payable**
54: 2, 55: 4
**paycheck**
50:20
**paying**
44:4

**payment**
42: 9
**payroll**
27:8, 27:9,
27: , 29:2,
29: 3, 50:2 ,
52: 9, 52:20,
53: , 53:8
**pending**
7: 3
**pennsylvania**
 9:3, 27:3
**pentagon**
64:7
**perform**
35: 2, 42:5,
63: , 63:20
**performance**
60:2
**performing**
63:2
**period**
3 : 9, 35: 0,
43: 9, 50: 9,
58:20, 59:3
**person**
 6: 2, 26:2,
26:5
**personal**
8:22, 23: 0,
24: 5, 24: 6,
49:7
**personnel**
 5: 3,  6: 9,
29: 6, 29: 8,
40: 3
**phrase**
6 :3
**physical**
22:2, 22:5,
22:
**plaintiff**
3:2, 6:6, 6: 3,
54: , 55: 3,
62: 0, 63: 7
**plaintiffs**
 :4
**play**
27:2

**please**
6:9, 6: 9,
40:5, 4 :4,
45: 9, 45:22,
46:2 , 54: 0,
55:8, 55: 5
**policies**
39:22, 40:
**policy**
38: 5, 39: 7
**position**
27: 4, 3 : 0,
3 : 2, 44: 9,
44:22, 45: ,
64:8
**possibly**
28: 6
**prepaid**
43:2
**preparation**
9:20
**prepared**
 :5
**preparer**
 2:20
**presently**
9:5, 53:
**previous**
44: 8, 44:22,
45: , 47: 6
**previously**
22: 8, 35:4,
38: , 39: 4,
40:2
**pride**
64: 4
**prior**
3 : 6, 32:8,
34: 4, 35:6,
37:22, 43:7,
45:3, 50: 8
**probably**
33: , 58:22,
59:
**probationary**
3 : 9
**proceedings**
58: 4

**process**
 9: 3,  9: 4,
 9: 7,  9:20,
26:7, 27: ,
27: 8, 3 :2,
3 : 8, 32: 0,
4 : 5, 42: 4,
42:20, 43:6,
43:20, 62: 4
**processing**
 9: 2, 43:3,
53:2
**produced**
 0:5
**professional**
 :6,  : 0, 2: ,
6: 4, 8:4, 8: 2
**profit**
 4:6
**program**
 6: , 36: 5
**programs**
49: 7
**propounded**
53:2
**provide**
48: 5, 48: 8,
49: 2, 62: 9
**provided**
49:4, 49:5,
49: 8, 5 :4,
57:20
**provisions**
40: 3
**public**
2: 9, 28: ,
67:
**pursuant**
2: 8
**pursue**
20: 4
**put**
30: 9, 3 : ,
3 : 7, 35: 3

**Q**

**qualify**
 5:20,  5:22

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

79

**question**
6:22, 7: , 7:5,
7:7, 7:8, 7:9,
7: 3, 7: 3,
2 :6, 29:5,
29: , 35:9,
36:4, 36: ,
62: 2, 63:6,
63:7
**questions**
6: 6, 7:22,
44: 5, 54: ,
54:4, 57: 2,
58:3, 58:4,
62:9, 63:5,
63: 5, 64: 9,
64:20
**quick**
62: 2
**quickbooks**
28:22, 29: ,
29: 2, 43: ,
52:20, 52:22,
53:3, 53:7

**R**

**raise**
46: 2
**ran**
45: 4
**rate**
59: 7
**read**
:3, 40:7,
40: 5, 44: 7,
49:3, 54:9,
55: , 55: 5,
64:2 , 66:3
**reading**
67:9
**really**
2: , 5:2,
2 : 9
**reason**
9:9, 35: 7,
62: 4
**reasonably**
9:

**recall**
2:2, 2: 2,
3:3, 4:22,
35: 4, 48:20,
53: 0, 53: 2
**receipt**
39:
**receive**
: 5, : 8,
2: 4, 38:22,
42:2 , 55:4,
58: 8, 59:8
**received**
38: , 46: 2,
50: 3, 5 :3
**receiving**
52:2, 54:20
**recognize**
30: , 33: 8,
45:9, 47: ,
56:2, 57:9
**record**
6: 0, 0: 3,
39:6, 39:7,
39:8, 40: ,
54: 0, 55: ,
56:22, 57: ,
57:5, 65:3, 67:6
**records**
28:2 , 52: 4,
52: 8
**reduced**
62:22, 67:8
**refer**
8: 3, 0: ,
3 :6, 5 : 3
**reference**
6: 6
**referencing**
25: 7
**refers**
40: 8
**refrain**
6: 9
**regarding**
0:8, : 0,
32:2 , 34: 4
**regards**
36:5

**regulations**
7:3, 38: 2
**reimburse**
55: 2
**reimbursed**
55: 7
**reimbursement**
43:4, 54:20
**reimbursements**
55:4
**related**
6: 6, 67: 0
**remarked**
57:2
**remember**
:20, 7:20,
9: , 2: 3,
5 :7, 5 :9, 55:6
**renewed**
46:4, 46: 0
**rent**
2 :20
**repeat**
7:6, 7:7, 29:
**rephrase**
7:6, 7:7
**reported**
:22, 26: 0,
26: 2
**reporter**
29:9, 64:22
**reporter-notary**
67:
**represent**
6: 3
**representative**
: , 2:2
**represents**
8: 2, 8: 7
**request**
40: , 54:9,
55:
**requested**
0:3, 67:9
**requests**
4:2 , 53:20
**required**
29:20, 30: ,

**39:** 0, 39:
**residence**
23: 0, 24: 5,
24: 7
**resigned**
5 : 9, 5 :2
**respective**
3: 4
**respond**
55:
**response**
52:3, 54: 4,
55: 5
**responses**
4:2 , 7: 7
**responsibilities**
40: , 64:
**responsible**
2 : , 25:22,
26:4, 27:7
**return**
44: 8, 44:22,
45: , 45:2
**reverse**
3: 9
**review**
9: 9, 0: 3,
0: 4, 52: 8
**reviewed**
0:4, 53:7
**right**
2 : 7, 24:2 ,
33: , 33: 2,
49:3
**rmr**
:22, 2: 9
**role**
20:22, 27:2 ,
28:7
**roley**
:3, 4: 5,
4: 7, 4: 9,
6: 3, 3: 7,
30:2, 30: 6,
30:2 , 3 : 5,
32:8, 32: ,
33:22, 34:7,
34: 2, 34: 6,

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

80

34: 9, 34:2 ,
35:2, 35:5,
35: , 35: 3,
36:5, 37:4,
39:4, 39: 0,
40:2, 4 : 0,
4 : 6, 4 :2 ,
45: , 46:9,
46: 7, 47: 5,
48:2, 48:8,
48: 4, 49: 6,
49:2 , 50:6,
50: 0, 50: 2,
50: 5, 5 :2,
5 : 0, 5 : 5,
5 :20, 52: ,
52: 0, 53: 0,
54: 6, 54: 9,
55:3, 55: 8,
59: 4, 59:22,
6 :5, 6 : 0,
62: 3, 63: ,
63: 9, 64:3,
64:9, 64: 6
**roley's**
4:2 , 5:4, 5:8,
3 :22, 36:2 ,
37: 7, 43: 7,
46:2, 47:20,
50:22, 53:20,
60:9
**ross**
 :3, 6: 3,
 3: 7, 3 : 5,
33:22, 34: 9,
35:2, 47: 5,
50: 0
**rpr**
 :22, 2: 9
**rules**
38: 2
**run**
20: 7, 20:20,
25:8, 34:9
**running**
36:6
**runs**
43: 2

**S**

**said**
 3: 6,   3: 9,
3 :4, 32:5,
39: 4, 64: 2,
67:6
**salary**
4 : 3, 43: 8,
44:3, 45:3,
46:9, 48:2,
58: 8, 58:20,
59:2, 59:4, 59:6
**same**
 6:  , 45:3,
53:4, 66:4
**save**
8: 4
**say**
 8:2, 20:2,
20:3, 20:22,
23:5, 24:9,
25: 8, 27: 0,
37:6, 43: 5
**saying**
7: 9, 36: 8,
64:2
**says**
38: 0
**schedule**
6 : 4
**schetelich**
2:6, 3: 2
**scra**
 4: 9, 35: 3,
35: 5
**seal**
67: 4
**second**
 7:22
**second-to-last**
54:7
**section**
20: 2, 20: 3
**security**
28: 2, 49:7
**see**
 9:2, 23: 9,

3 : 3, 52: 4
**seek**
28: 7, 43:4
**seen**
 0:20
**sent**
29:2 , 30: ,
42: 8
**separate**
22: 4, 22: 9,
24: 7, 25:3,
25:6, 38: 4,
43:9, 44:4
**september**
 : 5, 67: 5
**series**
6: 6, 54:
**served**
57: 4
**service**
53:2
**services**
35:
**set**
5:4, 5:9,
 5: 9,   5:2 ,
32:2, 32:8,
32: 8, 59: 7,
6 : 4, 67: 3
**seven**
 8: 0
**several**
23:2
**shaking**
6:20
**sharon**
 : 2, 2:3, 4:2,
6:2, 6: , 66:2
**she'll**
64:2
**sheet**
38: 3, 39: 6,
4 :20, 42:7,
42:9, 42: 0,
42: 3, 42: 6,
42: 8, 42:2 ,
42:22, 50: 6,
66:6

**shocked**
52:4
**short**
49:6
**short-term**
 6:8
**shortage**
52: 0
**shorthand**
67:
**side**
29:4
**sign**
 5:3,  5:5,
38:  , 38: 6,
39: 6, 42: 6,
64:2
**signature**
37: 2, 47: ,
48: 2, 66: 0
**signature-mig2k**
67: 9
**signed**
37:2, 37:3,
37:4, 43: ,
66:6
**significant**
2 : 9
**signing**
47:3, 67:9
**similar**
46: 6, 47: 9
**since**
 8:5,  8:8
**sir**
 0: 0
**site**
24: 6
**sitting**
8:
**six**
 6:9,  6: ,
 8: 0
**skill**
 5: 9,  5:2 ,
32:2, 32:7,
32: 8
**small**
 5:

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

81

**social**
49:6
**software**
29: 3
**some**
 2:7, 24:2 ,
3 :20, 55:5
**somebody**
3 :  , 32: 6
**someone**
20: 6, 4 : 6
**something**
 5: 8,  5: 9,
33: 3
**sometime**
24:9, 33:7
**somewhere**
3 : 5, 59:
**sorry**
 6: 8, 20: 0,
29:6, 37: 5,
39: 5, 44: 5,
44: 6, 50:3,
64: 3
**sort**
 2:4, 3 :2 ,
53:4
**south**
2:7, 3 : 3
**space**
25:4, 6 :2
**speak**
7: 8, 7:20,
 0:8,  5:  ,
3 :20
**speaking**
49: 6
**specialty**
32: 6, 32: 7
**specific**
32:2
**spell**
26: 6
**spoke**
63: 0
**square**
25:4
**staff**
 3:9, 27: 7,

**social** (col 2)
27:22, 28: ,
28:3, 29: 6
**stairs**
24:2 , 25:
**stand**
35: 4
**start**
 9:20, 20:20,
33: 0
**started**
 8:  , 22:8,
3 : 8, 33:3
**starting**
40:8, 40: 6,
50: 0
**state**
2: 9, 6:9,
 6:2 ,  6:22,
 7:4,  7:6,
 7:9,  9:6,
 9:9, 22:20,
25:  , 25: 3,
26:2 , 40: 6,
40: 7, 4 : 3,
63: 2, 63: 9,
63:20, 63:22,
64: , 64:3,
64: 0, 64: 2,
64: 6, 67:22
**stated**
22: 8
**states**
 :  ,  8:20,
 8:22, 3 :7
**status**
45:3
**stenographically**
67:7
**still**
 9:8,  9: 3,
25:5
**stratton**
  : 7
**street**
2:7, 3 : 3
**strike**
34: 2, 37: 6,
62: 9

**structure**
26:9
**submit**
50: 5
**suite**
2:8, 3:6, 3: 4
**sum**
43: 9
**supervise**
27: 2
**supervised**
27:9
**supervising**
27:8
**supervisor**
42: 3, 42: 5,
42: 6, 50: 6
**supplemental**
49:9
**support**
36: 4
**sure**
24:5, 24:8,
29:7, 3 :5,
36: 0, 37:
**suspend**
60:4
**sworn**
6:3
**system**
38: 7, 52: 9,
52:20
**systems**
6 : 0

**T**

**take**
7: 2, 7: 4,
7: 7,  2: 8,
62: 4
**taken**
 2: 0, 67:4,
67:7
**talk**
32: 0
**talking**
 6: 7,  8: 4
**tank**
 4: 2,  4: 3

**tax**
 2:20, 50: 3
**taxable**
50:5
**taxes**
 3: , 50: 9,
50:20, 50:2 ,
64:
**tell**
23:2, 59:4,
60: 5
**temporary**
40: 2
**term**
40: 6, 40: 7
**termed**
34:9
**terms**
49:  , 5 :4
**testified**
6:5, 22: 8,
35:4, 38: ,
39: 5, 40:2 ,
58: 5
**testify**
6:4
**testifying**
8:3, 8:8,  3:4
**testimony**
9:6, 9:8, 9: 0,
 0:9,   :5,
66:3, 66:5,
67:6, 67:7
**th**
37:2, 37:3,
37:4, 67: 4
**thank**
 9:22
**thereafter**
67:8
**thing**
53:4
**things**
28: 3, 28: 6,
29:20, 44:5
**think**
9:8,  2:9,
 2:22,  4: 2,

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

82

| | | | |
|---|---|---|---|
| 4: 3,   7: 7, | **today** | **tribes** | 7:4, 29: 9, |
| 7:22,   8: 3, | 8:3, 8:8, 9:6, | 7:5 | 37: 2, 40:7, |
| 23:2 , 33: 2, | 9:  , 9: 6, | **tribunal** | 40: 2, 40:22, |
| 63: 0 | 0:8,   :3, | 40: 9 | 43:5, 46: 0, |
| **thinking** | :5, 54: 7, | **true** | 48: 5, 49:  , |
| 23:8 | 55: 7 | 52: 4, 56: 4, | 50:2, 5 :4, 67:8 |
| **third** | **told** | 57:2 , 66:4, | **understand** |
| 26:2, 47: 5 | 52:5, 60: 9 | 67:5 | 7:5, 7: 8, |
| **thought** | **took** | **truth** | 7: 9, 8:2, 8:7, |
| 7:2 | 26:5 | 6:4, 6:5 | 8:20, 9:3, 9: 5, |
| **thousand** | **tools** | **try** | 2 :5, 43:20 |
| 25:4 | 6 :9 | 6:2 , 7:6,   9: | **understood** |
| **three** | **top** | **trying** | 7:9, 38: 2 |
| 25: 8, 33:2 | 53: 2 | 5: , 43:20 | **united** |
| **three-year** | **topics** | **turn** | : , 3 :7 |
| 23:2 | :6,   : 0 | 34: , 42:8, | **until** |
| **through** | **totally** | 42: 0, 42: 2, | 8: 5, 22:9, |
| : , 2:2, | 44:4 | 45: 8, 46:20, | 35: 5 |
| 4: 6, 4: 8, | **tradoc** | 48: 0, 48:2 , | **unusual** |
| 4:20, 27:5, | 20:8, 20:  , | 54:6, 55:8 | 5: 9 |
| 30: 6, 34: 0, | 20: 2, 2 : 8, | **turns** | **use** |
| 36:7, 45: 4, | 24:7 | 4 : 9 | 7: 4, 38: 7, |
| 46:7, 47:2 , | **transcribed** | **two** | 38: 9, 6 :22, |
| 50:3, 50:4, | 6: 9 | 26:  , 4 :20, | 62:20 |
| 50: 2, 52: 3, | **transcript** | 42:6, 42:8, | **usually** |
| 53:2 , 57: 4, | 4: 0, 5:2, 7:2, | 43:2, 44:8, | 6:9 |
| 58:2 , 62: 6, | 0: 7, 29: 0, | 44: | **utilize** |
| 62:2 | 30:8, 3 :6, | **two-week** | 53: |
| **thursday** | 33: 5, 45:6, | 50: 9 | **utilized** |
| : 5 | 47:8, 53: 5, | **two-year** | 29: 2 |
| **time** | 55:2 , 56: 9, | 6: 0 | **V** |
| 8: 4,   2:22, | 57:4, 67:5 | **type** | **vacation** |
| 6: 0, 2 : 7, | **transcription** | 4:4, 58:7 | 39:22 |
| 2 :2 , 24:6, | 66:4 | **typewriting** | **virginia** |
| 24:7, 25: 7, | **transpire** | 67:8 | 9:3 |
| 27:3, 35: 0, | 5 : 8 | **typical** | **vision** |
| 37:7, 38: 3, | **travel** | 6:7 | 49:8 |
| 39: 6, 4 :20, | 26:6, 38: 5, | **typically** | **W** |
| 42:7, 42:8, | 38: 6, 38: 7, | 6:8 | **w-2** |
| 42: 0, 42: 2, | 39: 6, 43:9, | **U** | 49:22, 50:6, |
| 42: 6, 42: 8, | 54:2 , 55:4, | **uh-huh** | 50: 0, 50: 3 |
| 42:2 , 42:22, | 55: 3, 55: 8 | 5:7,   5: 6, | **w-4** |
| 43: 9, 49:7, | **traveled** | 54:2 | 30:2, 40:2 |
| 50: 6, 5 :2, | 64:3, 64:9, | **uncommon** | **wages** |
| 54: 9, 59:3, | 64: 6 | 5:22 | 50: 8, 5 :4, |
| 59:7 | **treasurer** | **under** | 52:2, 52: 5, |
| **title** | 7: 8 | 4:7,   6: 2, | |
| 3:5 | **tribal** | | |
| | 7:5 | | |

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

83

54: 2, 54: 7
**waiting**
35: 8
**walk**
24:20, 24:22,
25:
**want**
4: 5, 20: ,
20:20, 23:5,
59: 2
**wanted**
20: 4, 20: 6,
28:
**way**
9:  , 36: 2,
64:9, 64: 5
**we'll**
0: 2,   3: 8,
30:20, 49: 5
**we're**
6: 6,   9: 2,
9: 3, 3 :5,
39:8, 4 :2, 57:5
**website**
5:3
**week**
42:6
**weeks**
4 :20, 42:6,
42:8, 43:2,
44:8, 44:
**went**
0: , 22: 0,
52: 3, 52: 9,
59:5, 64:7
**whatever**
6:4, 32: 7,
42: 7, 5 :9,
5 : 2
**whatsoever**
24:22
**whereof**
67: 3
**whole**
6:4, 38: 8
**winding**
9: 4,   9: 7,
9:2 , 20:6,

59:5
**withhold**
50: 9, 50:20
**withholding**
30:3
**without**
59: 4
**witness**
67: 3
**work**
5: 0,   5:  ,
3 :2, 3 : 4,
3 :2 , 36:3,
4 : 2 , 42:5,
43:3, 43:6,
43:20, 60:9,
6 :4, 6 :5,
6 : 0, 6 : 4,
6 : 9, 62: 5,
63:  , 63:20,
63:22
**worked**
3: 0,   3: 2,
3:2 ,  4: ,
2 :22, 26: 8,
3 : 5, 33: ,
42: , 62:5
**working**
4:2 , 28: 3,
37: 0, 4 :22,
45: 6, 49:2 ,
59:6
**works**
4 : 8
**wound**
9: 0
**written**
40: 0
**— Y —**
**yeah**
2: ,   3: 9,
23: 4
**year**
7:20, 2 : 8,
3 : 6, 3 :22,
33:2, 33:4,
43: 0, 46:5,

49:20, 52:7
**years**
:2 ,   6:9,
6:  ,   8:3,
2 : 5, 2 : 6,
50:5, 50: 3,
52:5, 52:6
**yourself**
6: 5, 8: 7,
:8, 25:  ,
28:4, 57: 4
**— $ —**
**$13,349.31**
55: 4, 55: 8
**$15,000**
52:6
**$176,440**
4 : 4
**$56,564.82**
54: 7
**— 0 —**
**0**
3:8
**00152**
:6
**01**
46:
**— 1 —**
**10**
: 6, 4: 2
**100**
2:7, 3: 3
**11**
4: 6, 4: 8,
4:20, 34:5,
46: , 65:3
**12**
: 5, 46:
**120,000**
59:
**13**
23:5
**14**
4: 6, 34:5,
4 : 2, 46: ,

46:  , 48:3
**140,000**
58:22
**1401**
2:8, 3: 4
**15**
4: 8,   8:3,
46:
**16**
4:20, 37:4
**160**
49:7
**18**
:6,   3: ,
20:2, 67: 4
**1970**
40: 4
**— 2 —**
**2,000**
46: 2
**2/1/12**
4: 6, 34:5
**2/1/14**
4: 8
**2/1/15**
4:20
**20**
20:2, 37:3,
45:2
**2004**
8:
**2006**
7:22,   8:6,
22:9
**2007**
8: 6
**2011**
9:5, 24: ,
25: 4, 25: 7,
26:8, 27:7,
33:6, 33:7,
34:20, 34:2 ,
35: 0, 37: 8,
50:3, 50:  ,
50: 2, 53:2,
58:2
**2012**
24:4, 24: 0,

Transcript of Sharon Jean Bell, Designated Representative and Individually
Conducted on September 12, 2019

25:7, 34: 0,
34: 4, 35:  ,
36:6, 37:5,
43: 3, 45: 4,
50:4
**2013**
23:7, 23: 3,
24: 0, 25:7
**2014**
34: 0, 36:7,
43: 3, 45: 5,
46:3, 46:6
**2015**
46:7, 47: 7,
47:2
**2016**
 9:5, 25: 4,
25: 7, 26:8,
27:7, 47:22,
50:4, 50: 2,
5 :  , 5 : 6,
5 :20, 53:2,
58:2
**2018**
20:2
**2019**
 : 5, 67: 5
**2021**
67: 7
**20770**
3:7
**21201**
2: 0, 3: 6
**220**
3:8
**2200**
2:  , 3:8, 3: 7
**259802**
 :20
**2725**
2: 0, 3: 6
**28**
37:2, 37:3

---
**3**
---

**30**
4: 4, 4: 6,
4: 8, 4:20,

34:5, 34: 0,
36:7, 43: 3,
45: 5, 46: ,
46:3, 46:7,
47: 7, 47:22,
5 : 6, 5 :20
**301**
3:8
**31**
49:2, 49: 3
**33**
4: 5
**34**
54:9
**35**
55:
**36**
34:3, 5 : 4
**39**
37: 3, 47: ,
48: 2

---
**4**
---

**400**
3:6
**401**
39: 9, 48: 6,
49:5
**410**
2:  , 3: 7
**43**
 : 6, 47:4
**45**
4: 7
**47**
4: 9

---
**5**
---

**50**
65:3
**501**
 4:7,  4:8,
 4:9, 58:8, 58:9
**53**
4:2
**55**
5:4
**56,564.82**
54: 3

**57**
5:8
**58**
4:4

---
**6**
---

**62**
4:5
**63**
4:6, 4:7
**6404**
3:5
**67**
 :2
**69**
33:2

---
**7**
---

**7**
46: 3

---
**8**
---

**837**
2:  , 3: 7
**86**
 :20
**87**
 :20
**88**
 :20
**8:-cv--tdc**
 :6

---
**9**
---

**90**
3 : 4, 3 :2 ,
35: 7

Nov 20 12 01:58p        301.373.6465                          301-373-6465            p.2

**PLAINTIFF'S EXHIBIT 3**

OF 80 # (REV. 2-89)                                          **Assignment Agreement**
U.S. Office of Personnel Management          Title IV of the Intergovernmental Personnel Act of 1970 (5 U.S.C. 3371-3376)
FPM Chapter 334

## INSTRUCTIONS

This agreement constitutes the written record of the obligations and responsibilities of the parties to a temporary assignment arranged under the provisions of the Intergovernmental Personnel Act of 1970.

The term "State or local government," when appearing in this form, also refers to an institution of higher education, and Indian tribal government, and any other eligible organization.

Copies of the completed and signed agreement should be retained by each signatory.

Within 30 days of the effective date of the assignment, two copies of this form must be sent to:

> U.S. Office of Personnel Management
> Personnel Mobility Program
> Staffing Operations Division/CEG
> 1900 E street, NW
> Washington, D.C. 20415

Procedural questions on completing the assignment agreement form or on other aspects relating to the mobility program should be addressed to either mobility program coordinators in each Federal agency or to the staff of the Personnel Mobility Program is the U.S. Office of Personnel Management.

## PART 1 - NATURE OF THE ASSIGNMENT AGREEMENT

1. Check Appropriate Box

[X] New Agreement          [ ] Modification          [ ] Extension

## PART 2 - INFORMATION ON PARTICIPATING EMPLOYEE

| 2. Name (Last, First, Middle) Roley, Ross E. | 3. Social Security Number ███1B32 |
|---|---|

| 4. Home Address (Street, City, State, Zip Code) 9B-708 Nohoapunpl Place Aiea, HI 96701 | 5.- A. Have you ever been on a mobility assignment? [ ] YES  [X] NO |
|---|---|
| | 5.- B. If "YES", date of each assignment (Month and Year) From            To |

## PART 3 - PARTIES TO THE AGREEMENT

| 6. Federal Agency (List office, bureau or organizational unit which is party to the agreement) U.S. Pacific Command J8, Resources and Assessment Directorate | 7. State or Local Government (Identify the governmental agency) National Professional Exchange, DUNS#78509094 Cage Code: 4JQ40, EIN #███5671 |
|---|---|
| 8. Is assignment being made through a faculty fellows program? If "YES", give name of the program. | [ ] YES          [X] NO |

## PART 4 - POSITION DATA

### A - Position Currently Held

| 9. Employment Office Name and Address (Street, City, State and ZIP Code) National Professional Exchange, Inc. (NPX) 25946 Chaffee CT., Mechanicsville, MD 20659 | 10. Employee's Position Title PACOM Energy Office Lead | 11. Office Telephone Number (include the Area Code) (301) 373-2488 |
|---|---|---|
| | 12 Immediate Supervisor (Name and Title) Sharon Bell, (301) 904-1229 Managing Director, NPX | |

### B - Type of Current Appointment

| 13. Federal Employees (Check appropriate box.) | | 14. State and Local Employees | |
|---|---|---|---|
| [ ] Career Competitive | Grade Level | State or Local Annual Salary | Original Date Employed by the State or Local Government (Month, Day, Year) |
| [ ] Other (Specify): | | $176,440.00 | 12/01/2011 |

### C - Position To Which Assignment Will Be Made

| 15. Employment Office Name and Address (Street, City, State and ZIP Code) Joint Innovation and Experimentation Division (J81) HQ, U.S. Pacific Command PO Box 64028, Cam H.M. Smith, HI, 96861-4028 | 16. Assignee's Position Title Director, PACOM Energy Ofc | 17. Office Telephone Number (include the Area Code) (808) 477-9267 |
|---|---|---|
| | 18. Immediate supervisor (Name and Title) Col Keith Felter Chief, PACOM Joint Innovation and Experimentation Division | |

Previous edition is usable                                                          50 69 - 105

Nov 20 12 01:58p        301 373 6465                          301-373-6466                    p.3

## PART 5 - TYPE OF ASSIGNMENT

19. Check Appropriate Boxes

| | | |
|---|---|---|
| On detail from a Federal agency | [X] Full Time | 20. Period of Assignment (Month, Day, Year) |
| On leave c from a Federal agency | [ ] Part Time | From            To |
| [X] On detail to a Federal agency | [ ] Intermittent | |
| On appointment in a Federal agency | | 12/01/2012        11/30/2014 |

## PART 6 - REASON FOR MOBILITY ASSIGNMENT

21. Indicate the reasons for the mobility assignment and discuss how the work will benefit the participating governments. In addition, indicate how the employee will be utilized at the completion of this assignment.

Efforts at U.S. Pacific Command are underway to experiment with and implement transformational energy programs and technologies across the Pacific. Given his 35 years of DoD experience including the last 4 years in the innovative and experimental energy field, Mr. Roley is uniquely qualified to fill this new role. This action directly supports, at lowest possible cost, senior leadership's direction to enhance energy security. PACOM is in the process of executing numerous major energy efforts valued in the hundreds of millions of dollars and is in need of government oversight for these projects. Mr. Roley will fill this need until full-time civil service positions can be established and filled. National Professional Exchange (NPX) operates through a knowledge network among its employees. This network provides additional value to the client and to our IPA by allowing them immediate access to significant expertise resident in the total resources of NPX. From time to time, Ross Roley will make himself available for advice and counsel, to speak with other employees, and/or to participate in an event, conference, or training session. These duties will be of short duration and will not be allowed to disrupt normal duties in support of the client. Travel, if required, for events under this portion of the agreement will be paid by NPX. Under no circumstances will the discussion of any client proprietary data be requested or expected.

## PART 7 - POSITION DESCRIPTION

22. List the major duties and responsibilities to be performed while on the mobility assignment.

- Lead the USPACOM Energy Office, Resources & Assessment Directorate, Innovation & Experimentation Division (J81)
- Provide the overall policy, management, and direction necessary for a balanced program of strategy development, technology R&D, and experimentation that will lead to energy reduction and an energy security transformation
- Oversee programs and personnel of the PACOM Energy Office. Prioritize tasks, track progress and report progress
- Oversee and convene joint and interagency working groups and workshops
- Provide authoritative advice to the Commander, U.S Pacific Command and the Director, Resources and Assessment Directorate (J8) on energy policies, technologies, economic assessments, and experimentation programs.
- Ensure coordination of command priorities, objectives, and programs with national vision, policies, and legislation
- Execute the Smart Power Infrastructure Demonstration for Energy Reliability and Security (SPIDERS) JCTD, Transformative Reductions in Operational Energy Consumption (TROPEC) line of experiments, Green Initiative for Fuel Transition (GIFTPAC) joint biofuel initiative, in addition to developing projects such as the Waste-to-Energy and Waste-to-Fuel Community of Interest, and Industrial Control Experiments to Block Cyber Attack on Base Infrastructure (ICEBABI)
- Look for additional opportunities and initiatives to impact the command's energy posture in a positive way
- Top Secret clearance is required

## PART 8 - EMPLOYEE BENEFITS

| 23. Rate of Basic Pay During Assignment | 24. Special Pay Conditions (Indicate any conditions that could increase the assigned employee's compensation during the assignment period) |
|---|---|
| $176,440 per annum | Annual pay increase equal to civil service and bonus up to 4% |

25. Leave Provisions (Indicate the annual and sick leave benefits for which employee is eligible. Specify the procedures for reporting, requesting and recording such leave.)

24. (cont) Pay increases will be payable in June of each year. Financials in section 26 do not include bonus.

25. Employee will continue with benefits established by NPX of 160 hours of personal time off per year and will follow the government organization's procedure for requesting leave. The employer will track leave. Billable hours per fiscal year are 1840.

Return to previous position Provision: Mr. Roley will be eligible to return to the employer with the same salary and status that he had prior to the IPA assignment.

Page 2

Nov 20 12 01:58p          301.373.6465                              301-373-6465          p.4

## PART 9 - FISCAL OBLIGATIONS

Identify, where appropriate, the office to which invoices and time and attendance records should be sent.

| 26. Federal Agency Obligations (If paying more than 50 percent of a Federal employee's salary beyond a 6-month period, specify rationale for cost-sharing decision.) | 27. State or Local Government agency Obligations |
|---|---|

26. Federal Agency Obligations (If paying more than 50 percent of a Federal employee's salary beyond a 6-month period, specify rationale for cost-sharing decision.)

PACOM J81 will be responsible for funding Mr. Roley's salary and related costs from RDT&E funds allocated to J81, subject to availability, with prior concurrence from J02 & J84. This Agreement is subject to immediate termination by USPACOM due to funding limitations without fiscal penalties or obligation.

| Estimated Costs: | FY13 | FY14 | FY15 | |
|---|---|---|---|---|
| Labor | $152,327 | $189,003 | $31,806 | |
| Benefits | $59,093 | $74,623 | $13,571 | Grand |
| Admin | $18,279 | $22,680 | $3,817 | Total |
| Total | $229,699 | $286,306 | $49,194 | $565,199 |

The IPA will be considered to be a government employee for the purposes of this agreement.

continuation of comments in block 32.

27. State or Local Government agency Obligations

Certified Organization: National Professional Exchange (NPX)

Fiscal Obligations: None. NPX is a non-profit organization with limited financial resources supporting the technology base of the Department of Defense through the cooperation of industry and government. NPX will continue to administer the payment of Mr. Roley's salary and will continue to withhold contributions to taxes and benefits and bill the government for such costs.

Quarterly invoices will be submitted to:

HQ USPACOM, J81
Box 64028
Camp H.M. Smith, HI 96861-4028
POC Lt Col Karen Dillard
(808) 477-8149

## PART 10 - CONFLICTS OF INTEREST AND EMPLOYEE CONDUCT

[X]  28. Applicable Federal, State or local conflict-of-interest laws have been reviewed with the employee to assure that conflict-of-interest situations do not inadvertently arise during this assignment.

[X]  29. The employee has been notified of laws, rules and regulations, and policies on employee conduct which apply to him/her while on this assignment.

## PART 11 - OPTIONS

| 30. Indicate coverage "N/A", if not applicable. | 31. State or Local Agency Benefits (Indicate all State employee benefits that will be related by the State or local agency employee being assigned to a Federal agency. Also include a statement certifying coverage in all State and local employee benefit programs that are elected by Federal employee on leave without pay from the Federal agency to a State or local agency.) |
|---|---|
| A. Federal Employees Group Life Insurance <br> [ ] Covered    [X] N/A | |
| B. Federal Civil Service Retirement system or federal Employees Retirement System <br> [ ] Covered    [X] N/A | Benefits provided by NPX include: 401K, short and long term disability insurance, social security benefits, personal time off |
| C. Federal employee Health Benefits <br> [ ] Covered    [X] N/A | 160 hours, federal holidays, health/dental/vision insurance with employee contribution, supplemental insurance available |

32. Other Benefits (indicate any other employee benefits to be made part of this agreement)

26. (cont) He will receive a Common Access Card (CAC) indicating his status as an IPA and will be entered into all security data bases as if he were a federal employee or in such a way as to ensure access to data bases & programs relevant to the performance of his duties.

## PART 12 - TRAVEL AND TRANSPORTATION

33. Indicate: (1) Whether the Federal agency or State or local agency will pay travel and transportation expenses to, from, and during the assignment as specified in Chapter 3344 of the Federal Personnel Manual, and (2) which travel and relocation expenses will be included.

HQ USPACOM is required to pay travel and transportation expenses associated with the duties and assignments made by the Federal Government for travel away from the primary duty station and for official local travel. Payments will be made in accordance with the Federal Travel Regulations. Employee is authorized full base logistical support, government facilities and conveyances, and government rate structure for travel and lodging. No moving expenses will be authorized for this position. All costs for this assignment will be paid for by HQ USPACOM. No relocation expenses will be paid by HQ USPACOM. Since there are no moving expenses associated with this assignment, there will be no moving costs repayment agreement for non-completion of the assignment.

Page 3

Nov 20 12 01.58p          301.373.6465                          301-373-6465          p.5

---

### PART 13 - APPLICABILITY OF RULES, REGULATIONS AND POLICIES

34. Check Appropriate Boxes.

☒ A. The rules and policies governing the internal operation and management of the agency to which my assignment is made under this agreement will be observed by me.

☒ B. I have been informed that my assignment may be terminated at any time at the option of the Federal agency or the State or local government.

☒ C. I have been informed that any travel and transportation expenses covered from Federal agency appropriations may be recoverable as a debt due the united states, if I do not serve until the completion of my assignment (unless terminated earlier by either employer) or one year, whichever is shorter.

☒ D. I have been informed of applicable provisions should my position with my permanent employer become subject to a reduction-in-force procedure.

☐ E. I agree to serve in the Civil Service upon the completion of my assignment for a period equal to that of my assignment. Should I fail to serve the required time, I have been informed that I will be liable to the United States for all expenses (except salary) of my assignment. (For Federal Employees only).

### PART 14 - CERTIFICATION OF ASSIGNED EMPLOYEE

In signing this agreement   I certify that I understand the terms of this agreement and agree to the rules, regulations and policies as indicated in Part 13 above.

| 35. Location of Assignment (Name of Organization) | 36. Date (Month, Day, Year) | |
| | From | To |
| HQ U.S. Pacific Command, Joint Innovation and Experimentation Division (J81) | 12/01/2012 | 11/30/2014 |

| 37. Signature of Assigned Employee | 38. Date of Signature (Month, Day, Year) |
| | 11/16/2012 |

### PART 15 - CERTIFICATION OF APPROVING OFFICIALS

In signing this agreement, we certify that,

- the description of duties and responsibilities is current and fully and accurately describes those of the assigned employee;

- this assignment is being entered in to to serve a sound, mutual public purpose and not solely for the employee's benefit;

- at the completion of the assignment, the participating employee will be returned to the position he or she occupied at the time this agreement was entered into or a position of like seniority, status pay.

| State or Local Government Agency | Federal Agency |
| 39. Signature of Authorizing Officer | 40. Signature of Authorizing Officer         ACTING DIRECTOR |
| 41. Date of Signature (Month, Day, Year)  11-20-12 | 42. Date of Signature (Month, Day, Year)  Nov 28, 2012 |
| 43. Typed Name and Title  Sharon Bell  Managing Director, National Professional Exchange | 44. Typed Name and Title  Dr. George Ka'iliwai III, USPACOM Director, Resources & Assessment |

## PRIVACY ACT STATEMENT

Sections 3373 and 3374, Assignment of Employees To or From State or Local Governments, of Title 5, U.S. Code, authorizes collection of this information. The data will be used primarily to formally document and record your temporary assignment to or from a State or local government, institution of higher education, Indian tribal government, or other eligible organization. This information may also be used as the legal basis for personal and financial transactions, to identify you when requesting information about you, e.g., from prior employers, educational institutions, or law agencies, or by State, local, or Federal income taxing agencies.

Solicitation of your Social Security Number (SSN) is authorized by Executive Order 9397, which permitted by use of the SSN as an identifier of individual records maintained by Federal agencies. Furnishing your SSN or any other data requested is voluntary. However, failure to provide any of the requested information may result in your being ineligible for participation in the Intergovernmental Assignment Program.

Page 4

**SUMMARY JUDGMENT J.R. 93**

**PLAINTIFF'S EXHIBIT 4**

OF 69 # (REV. 2-89)
U.S. Office of Personnel Management
FPM Chapter 334

**Assignment Agreement**
Title IV of the Intergovernmental Personnel Act of 1970 (5 U.S.C. 3371-3376)

| INSTRUCTIONS |
| --- |

This agreement constitutes the written record of the obligations and responsibilities of the parties to a temporary assignment arranged under the provisions of the Intergovernmental Personnel Act of 1970.

The term "State or local government," when appearing in this form, also refers to an institution of higher education, and Indian tribal government, and any other eligible organization.

Copies of the completed and signed agreement should be retained by each signatory.

Within 30 days of the effective date of the assignment, two copies of this form must be sent to:

U.S. Office of Personnel Management
Personnel Mobility Program
Staffing Operations Division/CEG
1900 E street, NW
Washington, D.C. 20415

Procedural questions on completing the assignment agreement form or on other aspects relating to the mobility program should be addresses to either mobility program coordinators in each Federal agency or to the staff of the Personnel Mobility Program is the U.S. Office of Personnel Management.

| PART 1 - NATURE OF THE ASSIGNMENT AGREEMENT |
| --- |

1. Check Appropriate Box    ☐ New Agreement    ☐ Modification    ☒ Extension

| PART 2 - INFORMATION ON PARTICIPATING EMPLOYEE |
| --- |

| 2. Name (Last, First, Middle) | 3. Social Security Number |
| --- | --- |
| Roley, Ross E. | ▮▮▮1832 |

| 4. Home Address (Street, City, State, Zip Code) | 5.- A. Have you ever been on a mobility assignment? |
| --- | --- |
| 98-708 Nohoaupuni Place | ☐ YES    ☒ NO |
| Aiea, HI 96701 | 5.- B. If "YES", date of each assignment (Month and Year) |
| | From      To |

| PART 3 - PARTIES TO THE AGREEMENT |
| --- |

| 6. Federal Agency (List office, bureau or organizational unit which is party to the agreement) | 7. State or Local Government (Identify the governmental agency) |
| --- | --- |
| U.S. Pacific Command J8, Resources and Assessment Directorate | National Professional Exchange, DUNS#78509094 Cage Code: 4JQ40, EIN #▮▮▮6671 |

8. Is assignment being made through a faculty fellows program?
If "YES", give name of the program.    ☐ YES    ☒ NO

| PART 4 - POSITION DATA |
| --- |

| A - Position Currently Held | | |
| --- | --- | --- |
| 9. Employment Office Name and Address (Street, City, State and ZIP Code) | 10. Employee's Position Title | 11. Office Telephone Number (Include the Area Code) |
| National Professional Exchange, Inc. (NPX) 25926 Chaffee CT., Mechanicsville, MD 20659 | PACOM Energy Office Lead | (301) 373-2488 |
| | 12. Immediate Supervisor (Name and Title) Sharon Bell, (301) 904-1229 Managing Director, NPX | |

| B - Type of Current Appointment | | | |
| --- | --- | --- | --- |
| 13. Federal Employees (Check appropriate box.) | | 14. State and Local Employees | |
| ☐ Career Competitive | Grade Level | State or Local Annual Salary | Original Date Employed by the State or Local Government (Month, Day, Year) |
| ☐ Other (Specify): | | $178,204.00 | 12/01/2011 |

| C - Position To Which Assignment Will Be Made | | |
| --- | --- | --- |
| 15. Employment Office Name and Address (Street, City, State and ZIP Code) | 16. Assignee's Position Title | 17. Office Telephone Number (Include the Area Code) |
| Joint Innovation and Experimentation Division (J81) HQ, U.S. Pacific Command PO Box 64028, Cam H.M. Smith, HI, 96861-4028 | PACOM Energy Office Lead | (808) 477-7860 |
| | 18. Immediate supervisor (Name and Title) Mr. Matt Goda Chief, PACOM Joint Innovation and Experimentation Division | |

Previous edition is usable

50 69 - 105

## PART 5 - TYPE OF ASSIGNMENT

| 19. Check Appropriate Boxes | | 20. Period of Assignment (Month, Day, Year) | |
|---|---|---|---|
| | | From | To |
| ☐ On detail from a Federal agency | ☒ Full Time | | |
| ☐ On leave c from a Federal agency | ☐ Part Time | | |
| ☒ On detail to a Federal agency | | | |
| ☐ On appointment in a Federal agency | ☐ Intermittent | 12/01/2014 | 11/30/2015 |

## PART 6 - REASON FOR MOBILITY ASSIGNMENT

21. Indicate the reasons for the mobility assignment and discuss how the work will benefit the participating governments. In addition, indicate how the employee will be utilized at the completion of this assignment.

Efforts at U.S. Pacific Command are underway to experiment with and implement transformational energy programs and technologies across the Pacific. Given his 38 years of DoD experience including the last 6 years in the innovative and experimental energy field, Mr. Roley is uniquely qualified to fill this role. This action directly supports, at lowest possible cost, senior leadership's direction to enhance energy security. PACOM is in the process of executing numerous major energy efforts valued in the hundreds of millions of dollars and is in need of government oversight for these projects. Mr. Roley will fill this need until full-time civil service positions can be established and filled. National Professional Exchange (NPX) operates through a knowledge network among its employees. This network provides additional value to the client and to our IPA by allowing them immediate access to significant expertise resident in the total resources of NPX. From time to time, Ross Roley will make himself available for advice and counsel, to speak with other employees, and/or to participate in an event, conference, or training session. These duties will be of short duration and will not be allowed to disrupt normal duties in support of the client. Travel, if required, for events under this portion of the agreement will be paid by NPX. Under no circumstances will the discussion of any client proprietary data be requested or expected.

## PART 7 - POSITION DESCRIPTION

22. List the major duties and responsibilities to be performed while on the mobility assignment.

- Lead the USPACOM Energy Office, Resources & Assessment Directorate, Innovation & Experimentation Division (J81)
- Provide the overall policy, management, and direction necessary for a balanced program of strategy development, technology R&D, and experimentation that will lead to an energy reduction and an energy security transformation
- Oversee programs and personnel of the PACOM Energy Office. Prioritize tasks, track progress and report progress
- Oversee and convene joint and interagency working groups and workshops
- Provide authoritative advice to the Commander, U.S Pacific Command and the Director, Resources and Assessment Directorate (J8) on energy policies, technologies, economic assessments, and experimentation programs.
- Ensure coordination of command priorities, objectives, and programs with national vision, policies, and legislation
- Execute the Smart Power Infrastructure Demonstration for Energy Reliability and Security (SPIDERS) JCTD, Transformative Reductions in Operational Energy Consumption (TROPEC) program, and Cyber Defense of Industrial Control Systems campaign of experiments, in addition to overseeing projects such as the Joint Deployable Waste-to-Energy initiative, and the Joint Deployment Energy Planning and Logistics Optimization Initiative (J-DEPLOI)
- Look for additional opportunities and initiatives to impact the command's energy posture in a positive way
- Top Secret SCI clearance is required

## PART 8 - EMPLOYEE BENEFITS

| 23. Rate of Basic Pay During Assignment | 24. Special Pay Conditions (Indicate any conditions that could increase the assigned employee's compensation during the assignment period) |
|---|---|
| $178,204 per annum | Annual pay increase equal to civil service and bonus up to 4% |

25. Leave Provisions (Indicate the annual and sick leave benefits for which employee is eligible. Specify the procedures for reporting, requesting and recording such leave.)

24. (cont) Pay increases will be payable in June of each year. Financials in section 26 do not include bonus.

25. Employee will continue with benefits established by NPX of 160 hours of personal time off per year and will follow the government organization's procedure for requesting leave. The employer will track leave. Billable hours per fiscal year are 1840.

Page 2

**SUMMARY JUDGMENT J.R. 95**

## PART 9 - FISCAL OBLIGATIONS

Identify, where appropriate, the office to which invoices and time and attendance records should be sent.

26. Federal Agency Obligations *(If paying more than 50 percent of a Federal employee's salary beyond a 6-month period, specify rationale for cost-sharing decision.)*

PACOM J81 will be responsible for funding Mr. Roley's salary and related costs from RDT&E funds allocated to J81, subject to availability, with prior concurrence from J02 & J84. This Agreement is subject to immediate termination by USPACOM due to funding limitations without fiscal penalties or obligation.

| Estimated Costs: | FY15 | FY16 | FY17 | |
|---|---|---|---|---|
| Labor | $152,327 | $189,003 | $31,806 | |
| Benefits | $59,510 | $74,623 | $13,571 | Grand |
| Admin | $18,279 | $22,680 | $3,817 | Total |
| Total | $230,116 | $286,306 | $49,194 | $565,616 |

continuation of comments in block 32.

27. State or Local Government agency Obligations

Certified Organization: National Professional Exchange (NPX) Fiscal Obligations: None. NPX is a non-profit organization with limited financial resources supporting the technology base of the Department of Defense through the cooperation of industry and government. NPX will continue to administer the payment of Mr. Roley's salary and will continue to withhold contributions to taxes and benefits and bill the government for such costs.

Quarterly invoices will be submitted to:

HQ USPACOM, J81
Box 64028
Camp H.M. Smith, HI 96861-4028
POC Gina Galdiano
(808) 477-5410

## PART 10 - CONFLICTS OF INTEREST AND EMPLOYEE CONDUCT

[X] 28. Applicable Federal, State or local conflict-of-interest laws have been reviewed with the employee to assure that conflict-of-interest situations do not inadvertently arise during this assignment.

[X] 29. The employee has been notified of laws, rules and regulations, and policies on employee conduct which apply to him/her while on this assignment.

## PART 11 - OPTIONS

30. Indicate coverage "N/A", if not applicable.

A. Federal Employees Group Life Insurance

[ ] Covered     [X] N/A

B. Federal Civil Service Retirement system or federal Employees Retirement System

[ ] Covered     [X] N/A

C. Federal employee Health Benefits

[ ] Covered     [X] N/A

31. State or Local Agency Benefits *(Indicate all State employee benefits that will be related by the State or local agency employee being assigned to a Federal agency. Also include a statement certifying coverage in all State and local employee benefit programs that are elected by Federal employee on leave without pay from the Federal agency to a State or local agency.)*

Benefits provided by NPX include: 401K, short and long term disability insurance, social security benefits, personal time off 160 hours, federal holidays, health/dental/vision insurance with employee contribution, supplemental insurance available

32. Other Benefits *(Indicate any other employee benefits to be made part of this agreement)*

26. (cont) He will receive a Common Access Card (CAC) meeting his status as an USPACOM IPA and will be entered into the security data bases to ensure access to data and programs relevant to the performance of his duties.

## PART 12 - TRAVEL AND TRANSPORTATION

33. Indicate: (1) Whether the Federal agency or State or local agency will pay travel and transportation expenses to, from, and during the assignment as specified in Chapter 3344 of the Federal Personnel Manual, and (2) which travel and relocation expenses will be included.

HQ USPACOM is required to pay travel and transportation expenses associated with the duties and assignments made by the Federal Government for travel away from the primary duty station and for official local travel. Payments will be made in accordance with the Federal Travel Regulations. Employee is authorized full base logistical support, government facilities and conveyances, and government rate structure for travel and lodging. No moving expenses will be authorized for this position. All costs for this assignment will be paid for by HQ USPACOM. No relocation expenses will be paid by HQ USPACOM. Since there are no moving expenses associated with this assignment, there will be no moving costs repayment agreement for non-completion of the assignment.

Page 3

## PART 13 - APPLICABILITY OF RULES, REGULATIONS AND POLICIES

34. Check Appropriate Boxes.

[X] A. The rules and policies governing the internal operation and management of the agency to which my assignment is made under this agreement will be observed by me.

[X] B. I have been informed that my assignment may be terminated at any time at the option of the Federal agency or the State or local government.

[X] C. I have been informed that any travel and transportation expenses covered from Federal agency appropriations may be recoverable as a debt due the united states, if I do not serve until the completion of my assignment (unless terminated earlier by either employer) or one year, whichever is shorter.

[X] D. I have been informed of applicable provisions should my position with my permanent employer become subject to a reduction-in-force procedure.

[ ] E. I agree to serve in the Civil Service upon the completion of my assignment for a period equal to that of my assignment. Should I fail to serve the required time, I have been informed that I will be liable to the United States for all expenses (except salary) of my assignment. (For Federal Employees only).

## PART 14 - CERTIFICATION OF ASSIGNED EMPLOYEE

In signing this agreement , I certify that I understand the terms of this agreement and agree to the rules, regulations and policies as indicated in Part 13 above.

| 35. Location of Assignment (Name of Organization) | 36. Date (Month, Day, Year) | |
|---|---|---|
| | From | To |
| HQ U.S. Pacific Command, Joint Innovation and Experimentation Division (J81) | 12/01/2014 | 11/30/2015 |
| 37. Signature of Assigned Employee | 38. Date of Signature (Month, Day, Year) | |
| | 11/26/2014 | |

## PART 15 - CERTIFICATION OF APPROVING OFFICIALS

In signing this agreement, we certify that;

- the description of duties and responsibilities is current and fully and accurately describes those of the assigned employee;

- this assignment is being entered in to to serve a sound, mutual public purpose and not solely for the employee's benefit;

- at the completion of the assignment, the participating employee will be returned to the position he or she occupied at the time this agreement was entered into or a position of like seniority, status pay.

| State or Local Government Agency | Federal Agency |
|---|---|
| 39. Signature of Authorizing Officer | 40. Signature of Authorizing Officer |
| 41. Date of Signature (Month, Day, Year) 11/26/14 | 42. Date of Signature (Month, Day, Year) NOVEMBER 26, 2014 |
| 43. Typed Name and Title Sharon Bell Managing Director, National Professional Exchange | 44. Typed Name and Title Dr. George Ka'iliwai III, USPACOM Director, Resources & Assessment |

# PRIVACY ACT STATEMENT

Sections 3373 and 3374, Assignment of Employees To or From State or Local Governments, of Title 5, U.S. Code, authorizes collection of this information. The data will be used primarily to formally document and record your temporary assignment to or from a State or local government, institution of higher education, Indian tribal government, or other eligible organization. This information may also be used as the legal basis for personal and financial transactions, to identify you when requesting information about you, e.g., from prior employers, educational institutions, or law agencies, or by State, local, or Federal income taxing agencies.

Solicitation of your Social Security Number (SSN) is authorized by Executive Order 9397, which permitted by use of the SSN as an identifier of individual records maintained by Federal agencies. Furnishing your SSN or any other data requested is voluntary. However, failure to prove any of the requested information may result in your being ineligible for participation in the Intergovernmental Assignment Program.

Page 4

**PLAINTIFF'S EXHIBIT 5**

OF 69 k (REV. 2-89)

U.S. Office of Personnel Management

FPM Chapter 334

**Assignment Agreement**

Title IV of the Intergovernmental Personnel Act of 1970 (5 U.S.C. 3371-3376)

INSTRUCTIONS

This agreement constitutes the written record of the obligations and responsibilities of the parties to a temporary assignment arranged under the provisions of the Intergovernmental Personnel Act of 1970.

The term "State or local government," when appearing in this form, also refers to an institution of higher education, and Indian tribal government, and any other eligible organization.

Copies of the completed and signed agreement should be retained by each signatory.

Within 30 days of the effective date of the assignment, two copies of this form must be sent to:

U.S. Office of Personnel Management
Personnel Mobility Program
Staffing Operations Division/CEG
1900 E. street, NW
Washington, D.C. 20415

Procedural questions on completing the assignment agreement form or on other aspects relating to the mobility program should be addresses to either mobility program coordinators in each Federal agency or to the staff of the Personnel Mobility Program is the U.S. Office of Personnel Management.

### PART 1 – NATURE OF THE ASSIGNMENT AGREEMENT

1. Check Appropriate Box

| | |
|---|---|
| ☐ New Agreement | ☐ Modification | ☒ Extension |

### PART 2 – INFORMATION ON PARTICIPATING EMPLOYEE

| 2. Name (Last, First, Middle) Roley, Ross E. | 3. Social Security Number ████832 |
|---|---|

| 4. Home Address (Street, City, State, Zip Code) 98-708 Nohoaupuni Place Aiea, HI 96701 | 5.- A. Have you ever been on a mobility assignment? ☐ YES  ☒ NO |
|---|---|
| | 5.- B. If "YES", date of each assignment (Month and Year) From               To |

### PART 3 – PARTIES TO THE AGREEMENT

| 6. Federal Agency (List office, bureau or organizational unit which is party to the agreement) U.S. Pacific Command J8, Resources and Assessment Directorate | 7. State or Local Government (Identify the governmental agency) National Professional Exchange, DUNS#78509094 Cage Code: 4JQ40, EIN #██████3671 |
|---|---|
| 8. Is assignment being made through a faculty fellows program? If "YES", give name of the program. | ☐ YES  ☒ NO |

### PART 4 – POSITION DATA

A - Position Currently Held

| 9. Employment Office Name and Address (Street, City, State and ZIP Code) National Professional Exchange, Inc. (NPX) 25926 Chaffee CT., Mechanicsville, MD 20659 | 10. Employee's Position Title PACOM Energy Office Lead | 11. Office Telephone Number (Include the Area Code) (301) 373-2488 |
|---|---|---|
| | 12. Immediate Supervisor (Name and Title) Sharon Bell, (301) 904-1229 Managing Director, NPX | |

B - Type of Current Appointment

| 13. Federal Employees (Check appropriate box.) | | 14. State and Local Employees | |
|---|---|---|---|
| ☐ Career Competitive | Grade Level | State or Local Annual Salary | Original Date Employed by the State or Local Government (Month, Day, Year) |
| ☐ Other (Specify): | | $179,986.00 | 12/01/2011 |

C - Position To Which Assignment Will be Made

| 15. Employment Office Name and Address (Street, City, State and ZIP Code) Joint Innovation and Experimentation Division (J81) HQ, U.S. Pacific Command PO Box 64028, Cam H.M. Smith, HI, 96861-4028 | 16. Assignee's Position Title PACOM Energy Office Lead | 17. Office Telephone Number (Include the Area Code) (808) 477-7860 |
|---|---|---|
| | 18. Immediate supervisor (Name and Title) Mr. Matt Goda Chief, PACOM Joint Innovation and Experimentation Division | |

Previous edition is usable

50 69 - 105

## PART 5 - TYPE OF ASSIGNMENT

| 19. Check Appropriate Boxes | | 20. Period of Assignment (Month, Day, Year) | |
|---|---|---|---|
| ☐ On detail from a Federal agency | ☑ Full Time | From | To |
| ☐ On leave c from a Federal agency | ☐ Part Time | | |
| ☒ On detail to a Federal agency | ☐ Intermittent | | |
| ☐ On appointment in a Federal agency | | 12/01/2015 | 11/30/2016 |

## PART 6 - REASON FOR MOBILITY ASSIGNMENT

21. Indicate the reasons for the mobility assignment and discuss how the work will benefit the participating governments. In addition, indicate how the employee will be utilized at the completion of this assignment.

Efforts at U.S. Pacific Command are underway to experiment with and implement transformational energy programs and technologies across the Pacific. Given his 38 years of DoD experience including the last 6 years in the innovative and experimental energy field, Mr. Roley is uniquely qualified to fill this role. This action directly supports, at lowest possible cost, senior leadership's direction to enhance energy security. PACOM is in the process of executing numerous major energy efforts valued in the hundreds of millions of dollars and is in need of government oversight for these projects. Mr. Roley will fill this need until full-time civil service positions can be established and filled. National Professional Exchange (NPX) operates through a knowledge network among its employees. This network provides additional value to the client and to our IPA by allowing them immediate access to significant expertise resident in the total resources of NPX. From time to time, Ross Roley  will make himself available for advice and counsel, to speak with other employees, and/or to participate in an event, conference, or training session. These duties will be of short duration and will not be allowed to disrupt normal duties in support of the client. Travel, if required, for events under this portion of the agreement will be paid by NPX. Under no circumstances will the discussion of any client proprietary data be requested or expected.

## PART 7 - POSITION DESCRIPTION

22. List the major duties and responsibilities to be performed while on the mobility assignment.

- Lead the USPACOM Energy Office, Resources & Assessment Directorate, Innovation & Experimentation Division (J81)
- Provide the overall policy, management, and direction necessary for a balanced program of strategy development, technology R&D, and experimentation that will lead to energy reduction and an energy security transformation
- Oversee programs and personnel of the PACOM Energy Office. Prioritize tasks, track progress and report progress
- Oversee and convene joint and interagency working groups and workshops
- Provide authoritative advice to the Commander, U.S Pacific Command and the Director, Resources and Assessment Directorate (J8) on energy policies, technologies, economic assessments, and experimentation programs.
- Ensure coordination of command priorities, objectives, and programs with national vision, policies, and legislation
- Execute the Smart Power Infrastructure Demonstration for Energy Reliability and Security (SPIDERS) JCTD, Transformative Reductions in Operational Energy Consumption (TROPEC) program, and Cyber Defense of Industrial Control Systems campaign of experiments, in addition to overseeing projects such as the Joint Deployable Waste-to-Energy initiative, and the Joint Deployment Energy Planning and Logistics Optimization Initiative (J-DEPLOI)
- Look for additional opportunities and initiatives to impact the command's energy posture in a positive way
- Top Secret SCI clearance is required

## PART 8 - EMPLOYEE BENEFITS

| 23. Rate of Basic Pay During Assignment | 24. Special Pay Conditions (indicate any conditions that could increase the assigned employee's compensation during the assignment period) |
|---|---|
| $$179,986.00 per annum | Annual pay increase equal to civil service and bonus up to 4% |

25. Leave Provisions (Indicate the annual and sick leave benefits for which employee is eligible. Specify the procedures for reporting, requesting and recording such leave.)

24. (cont) Pay increases will be payable in June of each year. Financials in section 26 do not include bonus.

25. Employee will continue with benefits established by NPX of 160 hours of personal time off per year and will follow the government organization's procedure for requesting leave. The employer will track leave. Billable hours per fiscal year are 1840. Employer will track billable hours year to date (YTD) and report to PACOM J81 on monthly invoices.

Page 2

## PART 9 - FISCAL OBLIGATIONS

Identify, where appropriate, the office to which invoices and time and attendance records should be sent.

**29. Federal Agency Obligations** (If paying more than 50 percent of a Federal employee's salary beyond a 6-month period, specify rationale for cost-sharing decision.)

PACOM JB1 will be responsible for funding Mr. Roley's salary and related costs from RDT&E funds allocated to J81, subject to availability, with prior concurrence from J02 & J84. This Agreement is subject to immediate termination by USPACOM due to funding limitations without fiscal penalties or obligation.

Estimated Costs:

| | FY16 | FY17 | |
|---|---|---|---|
| Labor | $151,788 | $30,898 | |
| Benefits | $59,343 | $13,893 | Grand |
| Admin | $21,251 | $4,326 | Total |
| Total | $232,382 | $49,117 | $281,499 |

continuation of comments in block 32.

**31. State /or Local Government Agency Obligations**

Certified Organization: National Professional Exchange (NPX) Fiscal Obligations: None. NPX is a non-profit organization with limited financial resources supporting the technology base of the Department of Defense through the cooperation of industry and government. NPX will continue to administer the payment of Mr. Roley's salary and will continue to withhold contributions to taxes and benefits and bill the government for such costs. NPX is responsible for accurate and timely invoicing and will notify PACOM J81 when billable hours reach 80% of 1840.

Monthly invoices will be submitted to:

HQ USPACOM, J81
Box 64028
Camp H.M. Smith, HI 96861-4028
POC Gina Galdiano
(808) 477-5410

## PART 10 - CONFLICTS OF INTEREST AND EMPLOYEE CONDUCT

[X] 28. Applicable Federal, State or local conflict-of-interest laws have been reviewed with the employee to assure that conflict-of-interest situations do not inadvertently arise during this assignment.

[X] 29. The employee has been notified of laws, rules and regulations, and policies on employee conduct which apply to him/her while on this assignment.

## PART 11 - OPTIONS

**30. Indicate coverage "N/A", if not applicable.**

A. Federal Employees Group Life Insurance

[ ] Covered   [X] N/A

B. Federal Civil Service Retirement system or federal Employees Retirement System

[ ] Covered   [X] N/A

C. Federal employee Health Benefits

[ ] Covered   [X] N/A

**31.** State or Local Agency Benefits (Indicate all State employee benefits that will be related by the State or local agency employee being assigned to a Federal agency. Also include a statement certifying coverage in all State and local employee benefit programs that are elected by Federal employee on leave without pay from the Federal agency to a State or local agency.)

Benefits provided by NPX include: 401K, short and long term disability insurance, social security benefits, personal time off 160 hours, federal holidays, health/dental/vision insurance with employee contribution, supplemental insurance available

32. Other Benefits (Indicate any other employee benefits to be made part of this agreement)

28. (cont) He will receive a Common Access Card (CAC) meeting his status as an USPACOM IPA and will be entered into the security data bases to ensure access to data and programs relevant to the performance of his duties.

27. Hours billed in excess of 80 per pay period require USPACOM approval and may be denied at the discretion of USPACOM.

28. The FY16 billable hourly rate is $126.29 and FY17 billable hourly rate is $136.43. Employee may also be eligible for a bonus up to 4%

## PART 12 - TRAVEL AND TRANSPORTATION

33. Indicate: (1) Whether the Federal agency or State or local agency will pay travel and transportation expenses to, from, and during the assignment as specified in Chapter 3344 of the Federal Personnel Manual, and (2) which travel and relocation expenses will be included.

HQ USPACOM is required to pay travel and transportation expenses associated with the duties and assignments made by the Federal Government for travel away from the primary duty station and for official local travel. Payments will be made in accordance with the Federal Travel Regulations. Employee is authorized full base logistical support, government facilities and conveyances, and government rate structure for travel and lodging. No moving expenses will be authorized for this position. All costs for this assignment will be paid for by HQ USPACOM. No relocation expenses will be paid by HQ USPACOM. Since there are no moving expenses associated with this assignment, there will be no moving costs repayment agreement for non-completion of the assignment.

Page 3

PART 13 - APPLICABILITY OF RULES, REGULATIONS AND POLICIES

34. Check Appropriate Boxes

[X] A. The rules and policies governing the internal operation and management of the agency to which my assignment is made under this agreement will be observed by me.

[X] B. I have been informed that my assignment may be terminated at any time at the option of the Federal agency or the State or local government.

[X] C. I have been informed that any travel and transportation expenses covered from Federal agency appropriations may be recoverable as a debt due the United States, if I do not serve until the completion of my assignment (unless terminated earlier by either employer) or one year, whichever is shorter.

[X] D. I have been informed of applicable provisions should my position, with my permanent employer become subject to a reduction-in-force procedure.

[ ] E. I agree to serve in the Civil Service upon the completion of my assignment for a period equal to that of my assignment. Should I fail to serve the required time, I have been informed that I will be liable to the United States for all expenses (except salary) of my assignment. (For Federal Employees only).

PART 14 - CERTIFICATION OF ASSIGNED EMPLOYEE

In signing this agreement, I certify that I understand the terms of this agreement and agree to the rules, regulations and policies as indicated in Part 13 above.

| 35. Location of Assignment (Name of Organization) | 36. Date (Month, Day, Year) | |
|---|---|---|
| | From | To |
| HQ U.S. Pacific Command, Joint Innovation and Experimentation Division (J81) | 12/01/2015 | 11/30/2016 |
| 37. Signature of Assigned Employee | 38. Date of Signature (Month, Day, Year) | |

PART 15 - CERTIFICATION OF APPROVING OFFICIALS

In signing this agreement, we certify that:

- the description of duties and responsibilities is current and fully and accurately describes those of the assigned employee:

- this assignment is being entered in to to serve a sound, mutual public purpose and not solely for the employee's benefit.

- at the completion of the assignment, the participating employee will be returned to the position he or she occupied at the time this agreement was entered into or a position of like seniority, status pay.

| State or Local Government Agency | Federal Agency |
|---|---|
| 39. Signature of Authorizing Officer | 40. Signature of Authorizing Officer |
| 41. Date of Signature (Month, Day, Year) | 42. Date of Signature (Month, Day, Year) |
| 1-23-15 | 11/23/15 |
| 43. Typed Name and Title | 44. Typed Name and Title |
| Sharon Bell | Dr. George Ka'iliwai III, USPACOM Director, Resources & |
| Managing Director, National Professional Exchange | Assessment |

## PRIVACY ACT STATEMENT

Sections 3373 and 3374, Assignment of Employees To or From State or Local Governments, of Title 5, U.S. Code, authorizes collection of this information. The data will be used primarily to formally document and record your temporary assignment to or from a State or local government, institution of higher education, Indian tribal government, or other eligible organization. This information may also be used as the legal basis for personal and financial transactions, to identify you when requesting information about you, e.g., from prior employers, educational institutions, or law agencies, or by State, local, or Federal income taxing agencies.

Solicitation of your Social Security Number (SSN) is authorized by Executive Order 9397, which permitted by use of the SSN as an identifier of individual records maintained by Federal agencies. Furnishing your SSN or any other data requested is voluntary. However, failure to prove any of the requested information may result in your being ineligible for participation in the Intergovernmental Assignment Program.

Page 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROSS ROLEY       . | * | |
| | * | |
| Plaintiff, | * | Civil Action |
| | * | |
| v. | * | No. 18-cv-00152 |
| | * | |
| NATIONAL PROFESSIONAL EXCHANGE, INC., et al. | * | |
| | * | |
| Defendants. | * | |

### DEFENDANT NATIONAL PROFESSIONAL EXCHANGE INC.'S RESPONSES TO PLAINTIFF ROSS ROLEY'S REQUESTS FOR ADMISSION TO DEFENDANT NATIONAL PROFESSIONAL EXCHANGE, INC.

**TO:**      **Ross Roley, Plaintiff**

**FROM:**    **National Professional Exchange Inc.**

REQUEST NO. 1:    Admit that you are a corporation organized under the laws of the State of Nevada who maintains its principal place of business at 3155 E. Patrick Lane, Las Vegas, Nevada 89120.

RESPONSE NO. 1:    Admitted.

REQUEST NO. 2:    Admit that between 2011 and 2016 you were registered to conduct business within the State of Maryland.

RESPONSE NO. 2:    Admitted.

REQUEST NO. 3:    Admit that between 2011 and 2016 you conducted business each year within the State of Maryland.

RESPONSE NO. 3:    Admitted.

REQUEST NO. 4:     Admit that between 2011 and 2016 you were an "employer" within the meaning of Md. Code Labor & Emply. § 3-501(b).

RESPONSE NO. 4:     Denied.

REQUEST NO. 5:     Admit that from December 1, 2011, through November 30, 2016, you "employed' Plaintiff within the meaning of Md. Code Labor & Emply. § 3-101(c).

RESPONSE NO. 5:     Denied.

REQUEST NO. 6:     Admit that you issued to Plaintiff an Internal Revenue Service, ("IRS"), Form W-2 for the year 2011.

RESPONSE NO. 6: Admitted.

REQUEST NO. 7:     Admit that you issued to Plaintiff an Internal Revenue Service, ("IRS"), Form W-2 for the year 2012.

RESPONSE NO. 7: Admitted.

REQUEST NO. 8:     Admit that you issued to Plaintiff an Internal Revenue Service, ("IRS"), Form W-2 for the year 2013.

RESPONSE NO. 8: Admitted.

REQUEST NO. 9:     Admit that you issued to Plaintiff an Internal Revenue Service, ("IRS"), Form W-2 for the year 2014.

RESPONSE NO. 9: Admitted.

REQUEST NO. 10:     Admit that you issued to Plaintiff an Internal Revenue Service, ("IRS"), form W-2 for the year 2015.

RESPONSE NO. 10: Admitted.

REQUEST NO. 11:     Admit that you issued to Plaintiff an Internal Revenue Service, ("IRS"), form W-2 for the year 2016.

RESPONSE NO. 11: Admitted.

REQUEST NO. 12:    Admit that you paid payroll taxes for Plaintiff for the year 2011.

RESPONSE NO. 12: Admitted.


REQUEST NO. 13:    Admit that you paid payroll taxes for Plaintiff for the year 2012.

RESPONSE NO. 13: Admitted.


REQUEST NO. 14:    Admit that you paid payroll taxes for Plaintiff for the year 2013.

RESPONSE NO. 14: Admitted.


REQUEST NO. 15:    Admit that you paid payroll taxes for Plaintiff for the year 2014.

RESPONSE NO. 15: Admitted.


REQUEST NO. 16:    Admit that you paid payroll taxes for Plaintiff for the year 2015.

RESPONSE NO. 16: Admitted.


REQUEST NO. 17:    Admit that you paid payroll taxes for Plaintiff for the year 2016.

RESPONSE NO. 17: Admitted.


REQUEST NO. 18:    Admit that Sharon Bell is an employee at Defendant whose job title is Managing Director.

RESPONSE NO. 18: Defendant NPX admits that Sharon Bell was an employee at Defendant NPX whose job title was Managing Director.


REQUEST NO. 19:    Admit that Sharon Bell supervised the office, department, operational unit, and/or person responsible at Defendant for the administration of compensation and payroll.

RESPONSE NO. 19:  Admitted.


REQUEST NO. 20:    Admit that Sharon Bell had the power to hire and fire employees at Defendant.

RESPONSE NO. 20:  Admitted.


REQUEST NO. 21:   Admit that under each of Plaintiff's Assignment Agreements, his position would, on occasion, require him to be present and perform work in the State of Maryland.

RESPONSE NO. 21: Denied.


REQUEST NO. 22:   Admit that under the terms of each Assignment Agreement, Defendant provided benefits to Plaintiff.

RESPONSE NO. 22: Admitted.


REQUEST NO. 23:   Admit that under the terms of each Assignment Agreement, Defendant provided 401k benefits to Plaintiff.

RESPONSE NO. 23: Admitted.


REQUEST NO. 24:   Admit that under the terms of each Assignment Agreement, Defendant provided short and long term disability insurance to Plaintiff.

RESPONSE NO. 24: Admitted.


REQUEST NO. 25:   Admit that under the terms of each Assignment Agreement, Defendant provided social security benefits to Plaintiff.

RESPONSE NO. 25: Admitted.


REQUEST NO. 26:   Admit that under the terms of each Assignment Agreement, Defendant provided health, dental, and vision insurance benefits to Plaintiff.

RESPONSE NO. 26: Admitted.


REQUEST NO. 27:   Admit that under the terms of each Assignment Agreement, Plaintiff was listed as "on detail to Federal agency" in "Part 5-Type of Assignment."

RESPONSE NO. 27: Admitted. The document speaks for itself.

REQUEST NO. 28:   Admit that under the terms of each Assignment Agreement, Sharon Bell was listed as Plaintiff's "Immediate Supervisor" in "Part 5-Position Data."

RESPONSE NO. 28: Admitted. The document speaks for itself.


REQUEST NO. 29:   Admit that under the terms of each Assignment Agreement, Defendant is listed as "State or Local Government" in "Part 3-Parties to the Agreement."

RESPONSE NO. 29:   Defendant NPX admits that Part 3 lists NPX as a "State or Local Government," but Defendant NPX denies that it is a State or Local Government.


REQUEST NO. 30:   Admit that under the terms of each Assignment Agreement, December 1, 2011, is the date listed as the "Original Date Employed by the State or Local Government' in "Part 4-Position Data."

RESPONSE NO. 30: Admitted. The document speaks for itself.


REQUEST NO. 31:   Admit that you tracked Plaintiff's billable hours and use of leave.

RESPONSE NO. 31: Admitted.


REQUEST NO. 32:   Admit that you were responsible for paying Plaintiff's wages under the terms of each Assignment Agreement.

RESPONSE NO. 32: Defendant NPX admits that it was responsible for paying Plaintiff's wages after being funded by USPACOM.


REQUEST NO. 33:   Admit that you were responsible for reimbursing Plaintiff for travel expense incurred under the terms of each Assignment Agreement.

RESPONSE NO. 33: Defendant NPX admits that it was responsible for reimbursing Plaintiff for travel expenses after being funded by USPACOM.


REQUEST NO. 34:   Admit that you failed to pay to Plaintiff wages that are due, owing, and payable in the amount of $56,564.82.

RESPONSE NO. 34: Admitted.

REQUEST NO. 35:   Admit that you failed to reimburse Plaintiff for his travel expenses incurred that are due, owing, and payable in the amount of $13,349.31

RESPONSE NO. 35:   Admitted.

By: _____

Craig F. Ballew
Federal Trial Bar No.: 04932
Rafiq R. Gharbi
Federal Trial Bar No.: 20526
100 S. Charles Street, Suite 1401
Baltimore, MD 21201-2725
(410) 837-2200
(410) 837-1188 (fax)
cballew@fsb-law.com
rgharbi@fsb-law.com
*Attorneys    for    National    Professional Exchange, Inc. and Sharon Bell*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on this August 23, 2019, a copy of the foregoing Responses to Plaintiff Roley's Request for Admission to Defendant National Professional Exchange, Inc. was mailed via first-class mail, postage prepaid to:

Brian J. Markovitz (Bar No. 15859)
Matthew E. Kreiser (Bar No. 14923)
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770-1417
(240) 553-1207 – Phone
(240) 553-1747 – Fax
bmarkovitz@jgllaw.com
mkreiser@jgllaw.com
*Attorneys for Plaintiff*

_____
Attorney for Defendants

**SUMMARY JUDGMENT J.R. 107**



# Wage Claim Form

**Instructions for Completing the Wage Claim Form**



Maryland Division of Labor and Industry

**(Please retain the Instructions and a copy of your Wage Claim Form for your records)**

**READ CAREFULLY**

## WHO SHOULD FILE A WAGE CLAIM?

An employee who has worked in Maryland and believes an employer has unlawfully withheld the employee's wages, including any bonus, commission, fringe benefits, overtime wages, or any other payment promised for service, may file a claim for unpaid wages on the attached Wage Claim Form.

Typically, there is a three (3) year statute of limitations under the Maryland Wage & Hour Law (MWHL) and/or the Maryland Wage Payment & Collection Law (MWCPL) for filing a lawsuit for unpaid wages in a court. (Note that federal wage laws may have different statutes of limitations for filing claims.) For the Maryland Department of Labor, Division of Labor and Industry, Employment Standards Service (ESS) to have sufficient time to investigate a claim for unpaid wages, ESS should receive an employee's Wage Claim Form, along with any supporting documents, as soon as possible but in no event later than two (2) years from the date the wages became due.

Alternatively, instead of filing a wage claim with ESS, an employee may choose to bring a lawsuit against an employer for unpaid wages under the MWHL and/or the MWPCL with or without the assistance of a private attorney in a Maryland court. Please note that ESS, the Commissioner of the Division of Labor and Industry (Commissioner), and the Office of the Attorney General will not participate in any such action.

## BEFORE FILING A WAGE CLAIM WITH ESS

Before filing your wage claim with ESS, you must first have asked the employer for your wages and been denied. To maximize your chances of recovery, you should send a written demand to the employer for payment of any wages claimed. You should keep a copy of any written demand and obtain proof of receipt by the employer, e.g., a certified mail receipt, an email receipt, an employer's written response, etc.

## TO FILE YOUR WAGE CLAIM WITH ESS

- You must fill out and return the Wage Claim Form legibly and completely, and must sign the form under oath.

- You must provide all known names (including corporate and trade names), addresses, phone numbers, and email addresses for your employer.

- You also should attach to the Wage Claim Form the following documents that support your claim, if available: An employment contract and/or wage agreement, time sheets and/or a list of dates and hours worked, commission statements or other proof that commissions were earned, paystubs, employee handbooks, manuals or policy statements, business cards, and correspondence with an employer.

- You must fill out, sign, and return the Wage Claim Authorization.

*Note: In order to file a claim, you are NOT required to keep your own time records or have the documents above. These documents are being requested if you have them because they will help ESS better understand your claim and improve your chances of recovery.*

## WHAT TO EXPECT AFTER FILING YOUR CLAIM

After you file your wage claim with ESS, ESS will investigate your claim. ESS will assign an investigator to your claim who will contact your employer for information, and, if ESS needs additional information from you, the investigator also will contact you. If you get additional related documents, please mail or fax the documents directly to the investigator assigned to your claim. Once ESS completes its investigation, you and your employer will be notified in writing if the Commissioner will take action on the claim.

## HOW THE COMMISSIONER CAN RESOLVE A WAGE CLAIM

Following an investigation of your claim, the Commissioner will determine whether the MWHL and/or the MWPCL have been violated. The Commissioner may try to resolve your claim in one of three ways:

1) Informally through mediation;

2) for claims under $3,000, by issuing an administrative order directing your employer to pay the unpaid wages the Commissioner has determined are due to you; or

3) by asking the Office of the Attorney General (OAG) to bring a lawsuit for unpaid wages on behalf of the Commissioner to your use and benefit against your employer in a Maryland court.

**Please note:** (1) the OAG is not required to file a lawsuit and may decline to accept the case; (2) acceptance of a wage claim by ESS, the Commissioner, and/or the OAG does not guarantee collection of unpaid wages; and (3) under the MWCPL, an employee may not knowingly make to a governmental unit or official a false statement with regard to any investigation or proceeding under the MWPCL with the intent that the government unit or official consider or otherwise act in connection with the statement. An employee who does so may be charged with a misdemeanor and, on conviction, is subject to a fine not exceeding $500. In addition, if an employee provides false or inaccurate information or fails to cooperate, the Commissioner may decline to take any action or may cease taking action.

Please mail your completed and signed Wage Claim Form, Wage Claim Authorization, and any supporting documents to:

EMPLOYMENT STANDARDS SERVICE
1100 N. EUTAW STREET, ROOM 607
BALTIMORE, MARYLAND 21201

**Department of Labor**
**Division of Labor and Industry**
**Employment Standards Service**
1100 North Eutaw Street, Room 607
Baltimore, MD 21201
Telephone Number: 410-767-2357

SUMMARY JUDGMENT J.R. 109



# Wage Claim Form

**(A copy of this form and supporting documents will be
sent to your employer for a response.)**



Maryland Division of Labor and Industry

For Office Use Only:  Reference _____  Claim # _____

## SECTION A. Personal Information

Name: [_____]

      First                      Middle                      Last

SSN or ITIN, if available: [____] - [___] - [_____]

Address: [_____]

      Street              City            State          Zip Code

Daytime Telephone: [_____]  Email Address: [_____]

*If you change your address, email address, or telephone number after submitting this form, notify Employment Standards Service (ESS) immediately in writing. If ESS cannot contact you, your claim will be dismissed.*

Driver's License #: [_____]  State of Issue: [_____]

Date of Birth: [_____]  Gender: ☐ M  ☐ F  Other: [_____]

*Race (*choose all that apply*):  ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black/African American
☐ Hispanic or Latino  ☐ Native Hawaiian or Other Pacific Islander  ☐ White
*This information is collected for statistical purposes only.*

## SECTION B. Employment Information
*Please list all known names (including corporate and trade names) addresses and telephone numbers.*

Employer Name: [_____]  Telephone: [_____]

Employer's Trade Name (if any): [_____]

Employer's Address: [_____]

      Street              City            State          Zip Code

Owner's Name, if known: [_____]  Phone: [_____]

Owner's Address, if known:
[_____]

      Street              City            State          Zip Code

Supervisor's Name, if known: [_____]  Phone: [_____]

Supervisor's Address, if known:
[_____]

      Street              City            State          Zip Code

1

Supervisor's and Owner's License Plate or other identifying information, if known:

_____

Type of Business: _____   Job Position/Title: _____
(Example: retail, restaurant, construction, etc.)                    (Example: office worker, carpenter, etc.)

First date of work: _____   Last date of work: _____   Number of days worked each week: _____

Number of hours worked each day: _____   Next scheduled payday is: _____

Rate of pay:  $ _____ per:  ☐ Day   ☐ Hour   ☐ Week   ☐ Month   ☐ Year   ☐ Commission

Frequency of pay:   ☐ Daily        ☐ Weekly        ☐ Bi-Weekly        ☐ Monthly        ☐ Bi-Monthly

I was:   ☐ Fired   ☐ Laid-Off   ☐ Quit   ☐ Other   ☐ I am still working there _____ number of days per week.

## SECTION C. Eligibility

| Unknown | Yes | No | Questions |
|---|---|---|---|
| ☐ | ☐ | ☐ | 1. Are you or have you been represented by a private attorney in this matter? *If yes, provide the following: Attorney Name:* _____ *Attorney Address and Phone:* _____ |
| ☐ | ☐ | ☐ | 2. Have you filed a claim for these unpaid wages elsewhere against your employer/former employer? |
| ☐ | ☐ | ☐ | 3. Was the work for which you are claiming wages performed in Maryland? *If yes, what is the precise address where the work was performed?* _____ *If no, in what state(s) was the work performed?* _____ |
| ☐ | ☐ | ☐ | 4. Are you a federal, state, or local government employee? *Maryland's Labor & Employment laws do not cover government employees. Contact the U.S. Dept. of Labor at 1-866-4US-WAGE for assistance.* |
| ☐ | ☐ | ☐ | 5. Was your work performed as a union member? *Union members must exhaust all union remedies before filing a claim with ESS. Attach documentation showing all union remedies have been exhausted without success.* |
| ☐ | ☐ | ☐ | 6. Is your employer/former employer still in business? |
| ☐ | ☐ | ☐ | 7. Has your employer/former employer filed for bankruptcy? |
| ☐ | ☐ | ☐ | 8. Are you a shareholder, officer or director of the company that employed you? |
| ☐ | ☐ | ☐ | 9. Do you have any property belonging to your employer? *If yes, identify the property you still have:* _____ |
| ☐ | ☐ | ☐ | 10. Did your employer/former employer deduct FICA and federal and state taxes from your paycheck? |
| ☐ | ☐ | ☐ | 11. Did you receive a paystub from your employer/former employer? *If yes, attach copies of your paystubs for the last 30 days.* |
| ☐ | ☐ | ☐ | 12. Do you have any written agreement(s) with the employer/former employer? *If yes, attach any agreements.* |
| ☐ | ☐ | ☐ | 13. Have you signed any document allowing your employer/former employer to deduct money from your pay? *If yes, attach a copy of any documents.* |

2

**SUMMARY JUDGMENT J.R. 111**

**SECTION D. TYPE OF WAGES OWED**

| What Type of Wages Are You Claiming? | Check all that apply | Instruction |
|---|:---:|---|
| Hourly Wages | ☐ | Fill out Section E |
| Salary | ☐ | Fill out Section E |
| Minimum Wage | ☐ | Fill out Section E |
| Overtime | ☐ | Fill out Section E |
| Commission | ☐ | Fill out Section F |
| Bonus | ☐ | Fill out Section F |
| Piece Rate or Flat Rate | ☐ | Fill out Section F |
| Unauthorized Deduction | ☐ | Fill out Section G |
| Vacation | ☐ | Fill out Section H |
| Sick Leave | ☐ | Fill out Section H |
| Paid Time Off (PTO) | ☐ | Fill out Section H |
| Holiday | ☐ | Fill out Section H |
| Personal Leave | ☐ | Fill out Section H |
| Mileage | ☐ | Fill out Section I |
| Business Expenses | ☐ | Fill out Section J |
| Other | ☐ | Attach written description |

**SECTION E: LIST ALL DATES AND HOURS (MONTH/DAY/YEAR) WORKED FOR WHICH YOU WERE NOT PAID.**

| | | Mon. (Mo./Day/Year) | Tues | Wed | Thurs | Fri | Sat | Sun | Total Hours Worked | Total Wages Earned but Not Paid |
|---|---|---|---|---|---|---|---|---|---|---|
| Week 1 | Date: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | Hours: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| Week 2 | Date: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | Hours: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| Week 3 | Date: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | Hours: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| Week 4 | Date: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | Hours: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |

*Use additional paper if needed.*

**SECTION E SUBTOTAL:**     $

3

**SUMMARY JUDGMENT J.R. 112**

## SECTION F: COMMISSION, BONUS, PIECE RATE, OR FLAT RATE

*Complete this section if you claim unpaid commissions, bonuses, piece rates, or flat rates. <u>Attach any evidence, including commission, bonus, piece rate, or flat rate agreements,</u> or explain in detail how these wages were earned.*

| **COMMISSION: Sales earned and not paid** | **Date commission was earned** | **"Gross" commission amount owed** |
|---|---|---|
| | | $ |
| | | |
| **BONUS earned and not paid** | **Date bonus was earned** | **"Gross" bonus amount owed** |
| | | $ |
| | | |
| **PIECE RATE or FLAT RATE: Work completed for which you were not paid** | **Date work completed** | **"Gross" amount owed** |
| | | $ |
| | | |

**SECTION F SUBTOTAL:**  $

## SECTION G: UNAUTHORIZED DEDUCTIONS

*Complete this section if you claim your employer deducted money from your wages that you did not authorize. List each deduction and <u>attach copies of your paystubs</u> reflecting the deduction if possible. Use additional paper if needed.*

| **Unauthorized Deductions – Describe** | **Dates Deducted** | **Amount Deducted** |
|---|---|---|
| | | $ |
| | | |
| | | |

**SECTION G SUBTOTAL:**  $

## SECTION H: FRINGE BENEFITS

*Complete this section if you claim you are owed wages for unused vacation, sick leave, paid time off (PTO), holiday leave, or personal leave hours. If possible, <u>attach a copy of your paystub or other document</u> showing the accrued but unused hours.*

| **Benefits** | **Accrued Unused hours** | **Amount due (hours x wage rate)** |
|---|---|---|
| Vacation | | $ |
| Sick leave | | $ |
| Paid time off (PTO) | | $ |
| Holiday leave | | $ |
| Personal leave | | $ |

**SECTION H SUBTOTAL:**  $

4

**SUMMARY JUDGMENT J.R. 113**

**SECTION I: MILEAGE REIMBURSEMENT**

*Complete this section if you claim you are owed mileage reimbursement. Use additional paper if needed.*
*Mileage reimbursement rate: $_____ per mile. Normal roundtrip commute is _____ miles.*

| | | | Mon. | Tue. | Wed. | Thrs. | Fri. | Sat. | Sun. | Weekly Total Miles | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week 1 | Date: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | Miles: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| Week 2 | Date: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | Miles: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| Week 3 | Date: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | Miles: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| Week 4 | Date: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | Miles: | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | $ |
| | | | | | | | | Total Mileage Reimbursement Claimed | | | $ |

**SECTION I SUBTOTAL:**     $

**SECTION J: BUSINESS EXPENSES**

*Complete this section if you claim you are owed for business expenses, other than mileage reimbursement. Identify each business expense you are claiming and <u>attach receipts</u>. Use additional paper if needed.*

| Business Expense Description | Amount Due |
|---|---|
| | $ |
| | |

**SECTION J SUBTOTAL:**     $_____

**SECTION K. LIST BELOW THE SUBTOTALS CLAIMED FOR SECTIONS E THROUGH J:**

| | Amount |
|---|---|
| **Section E Subtotal:** | $ |
| **Section F Subtotal:** | $ |
| **Section G Subtotal:** | $ |
| **Section H Subtotal:** | $ |
| **Section I Subtotal:** | $ |
| **Section J Subtotal:** | $ |
| **Other:** | $ |
| **TOTAL WAGE CLAIM:** | $ |

5

**SUMMARY JUDGMENT J.R. 114**

**PLEASE READ AND SIGN THE CERTIFICATION AT THE BOTTOM** (This page and the Wage Claim Authorization following this page must be signed)

**I. ADDITIONAL INFORMATION:**  If you have any additional information about your claim, provide it below. *Use additional paper if needed.*

**I HEREBY CERTIFY, UNDER THE PENALTIES OF PERJURY, THAT ALL OF THE STATEMENTS I HAVE MADE ON THIS WAGE CLAIM FORM ARE TRUE.**

Signature: _____  Date: _____
**(Original signature required, no photocopied signature accepted)**

6

**Maryland**
DEPARTMENT OF LABOR

Maryland Division of Labor and Industry



## WAGE CLAIM AUTHORIZATION

I understand that once my claim is investigated, the Commissioner will determine whether there has been an apparent violation of the Maryland Wage and Hour Law (MWHL) and/or the Maryland Wage Payment and Collection Law (MWPCL) by my employer/former employer (employer). If the Commissioner determines the MWHL and/or the MWPCL have been violated, I consent to the Commissioner resolving my wage claim:

1) Informally through mediation;
2) if my claim is less than $3,000, by issuing an administrative order directing my employer to pay my unpaid wages under the MWPCL; or
3) by asking the Office of the Attorney General (OAG) to file a lawsuit on behalf of the Commissioner to my use and benefit in a Maryland court of proper jurisdiction under the MWPCL. I understand the OAG is not required to file a lawsuit and may decline to accept the case. I also understand that acceptance of my claim by ESS, the Commissioner, and the OAG does not guarantee collection of my unpaid wages.

I understand that any order issued by the Commissioner or any lawsuit filed by the OAG on behalf of the Commissioner to my use and benefit is limited to collection of my unpaid wages under the MWHL and/or the MWPCL. I also understand that if my employer files an action against me in any court or other forum, neither the Commissioner nor the OAG will represent me and I will have to retain a private lawyer or represent myself.

I understand I have the right to file a lawsuit against my employer for unpaid wages under the MWHL and/or the MWPCL (with or without the assistance of a private lawyer) in a Maryland court without first filing a wage claim with ESS. I understand that if, after I file my wage claim with ESS, I retain a private lawyer to assist me with my wage claim then ESS, the Commissioner, and/or the OAG will stop all actions on my behalf and close my case.

## Cooperation with ESS, Commissioner, and OAG

I agree to cooperate with ESS, the Commissioner, and the OAG in their investigation of my wage claim and during all phases of any order issued by the Commissioner or any lawsuit filed by the OAG. Therefore, I agree to promptly return phone calls, respond to letters or emails, and, if required, to participate in any settlement conference, mediation, hearing, and/or trial related to my wage claim. I also agree to notify ESS, the Commissioner, and/or the OAG immediately if my address, email, or telephone number changes, if I receive payment in connection with my wage claim, and/or if I retain a private lawyer.

If I do not cooperate fully with ESS, the Commissioner, and/or the OAG, I hereby authorize ESS, the Commissioner and/or the OAG to take whatever action they consider appropriate, which may include stopping an investigation and closing my claim, dismissing an order, or withdrawing from and/or dismissing a lawsuit. If the Commissioner and the OAG withdraw from a lawsuit, I agree that they will not be liable for any added costs associated with pursuing the lawsuit. In the event a lawsuit filed on my behalf is dismissed, I understand I may not be able to file a new lawsuit in my own name (with or without the assistance of a private lawyer) if the statute of limitations has run on my claim or if the court's dismissal of the case is with prejudice (dismissed "with prejudice" means that you cannot refile the case but you may be able to appeal the dismissal).

 

**Maryland**
**DEPARTMENT OF LABOR**

Maryland Division of Labor and Industry

### Settlement of Wage Claim

I agree that ESS, the Commissioner, and/or the OAG may settle my wage claim for the amount claimed on my Wage Claim Form, the amount determined to be due and owing to me in any order issued by the Commissioner, or the amount claimed due to me in any lawsuit filed on my behalf, without prior notice to me or my prior approval. I understand any settlement of my claim may not include additional damages a court may award at its discretion under the MWPCL. I understand I will be notified of any proposed settlement that would be a compromise of the amount of my claim. I agree that if I do not approve a settlement that would be a compromise of my claim that is recommended by ESS, the Commissioner, and/or the OAG, then that ESS, the Commissioner, or the OAG may close and/or withdraw from the case (subject to the applicable Rules of Court if a lawsuit has been filed). I understand and agree that any determination of whether or not to appeal an unfavorable decision by the Office of Administrative Hearings or any Maryland court regarding my wage claim is solely within the Commissioner's and/or the OAG's discretion.

### Collection of Checks or Money Orders for Wage Claim

I hereby authorize ESS, the Commissioner, or the OAG to receive, endorse my name on, and deposit into the Commissioner's account, or other appropriate account, any checks or money orders made out to me as payment on my wage claim. I understand that, once cleared, I will then be issued a check from the state of Maryland representing the amount deposited. I understand, however, that the amount may be reduced by any outstanding state debt that I owe, such as past due child support or state income taxes, etc. I also understand that I should contact a tax advisor about reporting any monies I receive to the appropriate taxing authorities. I understand that I am not responsible for the payment of any expenses incurred by the Commissioner in pursuing an action filed on my behalf to collect my wages, unless the expenses were: (a) approved by me in advance, or (b) mandated by statute or rule of court. If the Commissioner and OAG withdraw from my case, I understand I will be responsible for any added costs associated with pursuing the lawsuit. I also understand that any judgment entered in my favor by a court may be referred to the Maryland Department of Budget and Management's Central Collection Unit for collection.

_____                     _____
Name of Wage Claimant (Print Legibly)                              Signature of Wage Claimant

_____
Date

_____
Address                                    City                         State              Zip Code

_____
Telephone Number(s)                                        Email Address(es)

Draft 4/18

**SUMMARY JUDGMENT J.R. 117**