# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

ROSS ROLEY,

      Plaintiff,

      v.

NATIONAL PROFESSIONAL
EXCHANGE, INC. and
SHARON BELL,

      Defendants.

Civil Action No. TDC-18-0152

## MEMORANDUM OPINION

Plaintiff Ross Roley has filed this action against his former employer, Defendant National Professional Exchange, Inc. ("NPX"), and its former managing director, Defendant Sharon Bell, alleging that their failure to pay him all of his salary and travel expense reimbursements constituted a breach of contract and a violation of either the Maryland Wage Protection and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501 to 3-509 (LexisNexis 2016), or Hawaii's analogous statute, Haw. Rev. Stat. §§ 388-2, 388-6 (2019). Pending before the Court are Roley's Motion for Summary Judgment and Defendants' Cross Motion for Partial Summary Judgment. The Motions are fully briefed. Having reviewed the filings, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Roley's Motion will be GRANTED IN PART and DENIED IN PART, and Defendants' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.      Employment History

In 2011, Roley, a retired Colonel of the United States Air Force, began looking for a position with an organization that would allow him to work for the United States military at the United States Indo-Pacific Command ("PACOM") pursuant to the Intergovernmental Personnel Act of 1970 ("IPA"), 5 U.S.C. §§ 3371–3376 (2018), which authorizes temporary employee assignments from state and local governments and certain non-governmental organizations to the federal government, and vice versa. *Id.* § 3372(a), (b).   According to Roley, on the recommendation of a PACOM official, Roley reached out to Bell, NPX's Managing Director, to discuss being hired by NPX in order to be assigned to PACOM.   According to Bell, PACOM contacted her directly to request that NPX hire Roley.

NPX is a not-for-profit corporation organized pursuant to section 501(c)(6) of the Internal Revenue Code, I.R.C. § 501(c)(6) (2018), that was, during the relevant period here, incorporated in Nevada and registered to do business in Maryland, along with several other states.   From its inception in 2006, NPX had an office in Maryland.   As of 2011, the office was in Hollywood, Maryland, and since 2012 or 2013, NPX has operated out of an office attached to Bell's home in Mechanicsville, Maryland.   Bell was both the Managing Director of NPX and a member of its Board of Directors.   NPX provided personnel services to government agencies by employing individuals with uncommon skill sets and then assigning them to work at agencies that needed those skill sets but that could not hire the individuals through normal procedures.   According to Bell, a government entity would typically find an individual whose services it needed and then request that NPX hire the individual.   NPX would oblige and then assign that individual to the government entity.

On December 1, 2011, Roley was hired as an employee of NPX. According to Bell, she and the other member of NPX's Board of Directors, Marvin Fairclough, jointly made the decision to hire Roley. For the next year, Roley worked as an NPX contractor in Honolulu, Hawaii.

In November 2012, Roley, NPX, and PACOM entered into an IPA Assignment Agreement ("the 2012 Agreement") pursuant to which Roley would be temporarily assigned to work at PACOM in Hawaii. The 2012 Agreement, which ran from December 1, 2012 to November 30, 2014, listed PACOM and NPX as the parties to the agreement and Roley as the "Participating Employee." Joint Record ("J.R.") 90, ECF No. 41. It provided that Roley would be assigned to PACOM's Joint Innovation and Experimentation Division as the Director of the PACOM Energy Office, and that his direct supervisor would be Colonel Keith Felter, the Chief of that Division. It also provided that Roley's salary was $176,440 per year, that PACOM was "responsible for funding Mr. Roley's salary and related costs," but that NPX would "continue to administer the payment of Mr. Roley's salary and [would] continue to withhold contributions to taxes and benefits and bill the government for such costs." J.R. 92. Although the 2012 Agreement noted that NPX's "Fiscal Obligations" were "None," it also stated that NPX was to provide "401K, short and long term disability insurance, social security benefits, personal time off [of] 160 hours, federal holidays, health/dental/vision insurance with employee contribution, [and] supplemental insurance." J.R. 92. PACOM was responsible for paying travel expenses when it assigned Roley to work away from his primary duty station, but NPX was responsible for travel expenses incurred by Roley at its request. In order for Roley to be paid, he was required to turn in a biweekly timesheet to his PACOM supervisor for approval and then, upon approval, send it to Bell to process it for payment. NPX paid Roley every two weeks.

Each year from 2011 to 2016, NPX issued Roley an Internal Revenue Service ("IRS") Form W-2. NPX also maintained a personnel file on Roley, including his IRS Form W-4 and Hawaii tax withholding worksheet, withheld taxes from Roley's paychecks, and paid payroll taxes on his behalf.

NPX, PACOM, and Roley renewed Roley's IPA Agreement for two additional one-year stints. The first ran from December 1, 2014 to November 30, 2015 ("the 2014 Agreement"); the second ran from December 1, 2015 to November 30, 2016 ("the 2015 Agreement"). These IPA Agreements were largely identical to the 2012 Agreement, with some minor changes. Roley's pay was increased to $178,204 per year in the 2014 Agreement and then to $179,986 in the 2015 Agreement. The name, but not the title, of Roley's immediate supervisor changed.

During his time with NPX and PACOM, Roley traveled to Maryland seven times, each time to attend a multi-day conference related to his work, and he received reimbursement for his travel expenses from NPX. Bell, however, has asserted that she had no knowledge that Roley ever performed any work in Maryland relating to his duties. J.R. 69.

In September 2016, Roley discovered that NPX had failed to pay him all of his salary and to adequately reimburse him for work-related travel expenses. On November 30, 2016, at the conclusion of the 2015 Agreement, Roley left NPX. After leaving the company, Roley contacted Bell regarding the money he was owed because she was in charge of payroll and travel reimbursements at NPX. Bell investigated Roley's complaint and discovered that he was "correct" that NPX "owed him money." J.R. 58. NPX attributes the underpayment to an accounting error by NPX that originated in December 2012 and persisted during the rest of Roley's tenure at NPX. The parties initially agreed that NPX owed Roley $69,564.82. NPX paid Roley $13,000 of that amount, but it asserts that it cannot pay the rest. Although it asked PACOM for the authority to

4

submit corrected invoices for the underpayment, PACOM rebuffed that request. During discovery, NPX and Bell acknowledged that NPX now owes Roley $56,564.82 in unpaid salary and $13,349.31 in unpaid travel expenses.

## II.   Bell

Bell received a salary for her work as Managing Director but did not have an ownership interest in NPX. As Managing Director, she "oversaw the office staff" and "the day-to-day operations" of NPX, and she "worked with [the] Department of Defense in coordinating IPA agreements." J.R. 18. She supervised two employees in Maryland, including the employee assigned to administer NPX's payroll.

In order to hire employees for NPX, Bell needed approval from NPX's Board of Directors. According to Bell, PACOM was responsible for assigning, directing, and evaluating Roley's work, as well as providing him with the equipment and office space he needed to perform it. PACOM set Roley's work schedule and approved his leave, but any leave was taken out of a leave bank controlled by NPX. Bell asserts that PACOM, rather than NPX or Bell, had the authority to suspend, demote, or fire Roley. The IPA Agreements, however, provided that both PACOM and NPX had the authority to terminate Roley's assignment at any time.

According to Bell, since 2018, NPX has been "in the process of closing down" and now conducts "no business." J.R. 24.

## III.   Procedural History

On January 17, 2018, Roley filed suit against NPX and Bell in this Court. Although the Complaint included four separate counts, at core it raises just two claims. The first claim, asserted solely against NPX, alleges that NPX's failure to pay Roley his full wages and reimburse his travel expenses breached its contract with Roley under either Maryland or Hawaii law. The second

claim, brought against both NPX and Bell, asserts that this failure violated either the MWPCL or, if that law is not applicable, Hawaii's analogous wage protection statute. As relief for the contract claim, Roley seeks payment of the money owed to him by NPX. As relief for the statutory claim, Roley seeks the unpaid wages, multiplied as required by the respective statutes; civil penalties; and attorney's fees.

After Defendants filed an Answer to the Complaint on April 4, 2018, this Court ordered discovery to begin. The Court then stayed discovery for several months to allow the parties to discuss settlement. After these discussions proved fruitless, the parties completed discovery and filed the pending Motions.

## DISCUSSION

In his Motion, Roley seeks summary judgment on both his breach of contract and statutory claims. On the breach of contract claim, he argues that under either Maryland or Hawaii law, NPX owed him a contractual duty to pay him all of his wages and reimburse all of his travel expenses, and that NPX has admitted that it failed to do so. On his statutory claim, he argues that both NPX and Bell, in her individual capacity, are liable under the MWPCL because they both qualify as employers, and that both his unpaid salary and his unpaid travel reimbursements qualify as wages under the MWPCL. He makes analogous arguments in the alternative under Hawaii's wage protection law. Finally, he argues that the Court should disregard NPX's corporate form and hold Bell personally liable for any judgment against NPX.

Defendants oppose Roley's request for summary judgment on his contract claim and, in their Cross Motion, seek summary judgment on Roley's statutory claim. On the contract claim, they argue that genuine disputes of material fact preclude summary judgment at this stage. On the statutory claim, they argue that neither NPX nor Bell qualify as employers under the MWPCL—

6

though for different reasons—and that Roley's alternative claim under Hawaii's wage law is barred by that law's statute of limitations.

## I.       Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing a summary judgment motion, the Court must believe the evidence of the non-moving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248-49.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.      Breach of Contract

In Counts I and III, Roley claims that, under Maryland and Hawaii law respectively, NPX breached a contractual duty set out in the IPA Agreements by failing to pay him his full salary and travel expenses. NPX responds that because the IPA Agreements refer to PACOM's obligation to

fund Roley's assignment, there is a genuine issue of material fact whether PACOM, rather than NPX, is responsible for the unpaid wages.

As an initial matter, the Court must determine which state's law to apply. In cases arising under diversity jurisdiction such as this one, a district court applies the conflict-of-law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Where, as here, a contract lacks a forum-selection clause, Maryland courts, "when determining the construction, validity, enforceability, or interpretation of a contract," will "apply the law of the jurisdiction where the contract was made." *Cunningham v. Feinberg*, 107 A.3d 1194, 1204 (Md. 2015). The place of contracting is "the place where the last act is performed which makes an agreement a binding contract." *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 215 A.2d 467, 471 (Md. 1965). The record is not clear on this point. As to the 2012 Agreement, the last act appears to have occurred in Hawaii, as based on the dates of signature, the last party to sign the assignment was a PACOM official. For the 2014 and 2015 Agreements, however, all parties, including Bell and the PACOM official, signed on the same date.

Nevertheless, this uncertainty is immaterial, as Roley is entitled to summary judgment under either Maryland or Hawaii law. Courts in both states interpret contracts by reference to their terms' objective meaning and, where those terms are unambiguous, refuse to look beyond them. *See Credible Behavioral Health, Inc. v. Johnson*, 220 A.3d 303, 310 (Md. 2019); *Hawaiian Ass'n of Seventh-Day Adventists v. Wong*, 305 P.3d 452, 461 (Haw. 2013). Here, the terms of the IPA Agreements unambiguously commit NPX to pay Roley his full salary. In the section entitled "Fiscal Obligations," the IPA Agreements provide that "NPX will continue to administer the payment of Mr. Roley's salary and will continue to withhold contributions to taxes and benefits and bill the government for such costs." J.R. 92, 96, 100. In conjunction with the language

8

committing NPX to also provide Roley with employment benefits like a 401(k) plan and health insurance, this language establishes that NPX was required to maintain its role as Roley's official employer, along with the duties that such a role generally entails.  Likewise, the IPA Agreements also specifically provide that when NPX required Roley to travel, the travel expenses would "be paid by NPX." J.R. 91, 95, 99.  The plain, unambiguous language of the IPA Agreements therefore establishes that NPX had a contractual duty to pay Roley his full salary and certain travel reimbursements.

Defendants do not challenge the formation or validity of the IPA Agreements but instead seek to inject ambiguity into them by pointing to the provisions noting that NPX has no fiscal obligations and that PACOM "will be responsible for funding Mr. Roley's salary and related costs." J.R. 92, 96, 100.  But this argument ignores the reality that, as Bell has acknowledged, "[f]unding and paying are totally separate things."  J.R. 49.  Fairly construed, this language obligated PACOM to pay to NPX the full amount of Roley's compensation so that NPX could then pay Roley, not that NPX had no obligation to pay Roley.  Indeed, Defendants' conflation of the funding and paying would create the perverse consequence that, if PACOM had prepaid NPX for Roley's salary for an entire year and NPX refused to pay Roley any of it, Roley would be able to seek recovery only from PACOM, not NPX.  Where Defendants' proffered interpretation would lead to an unreasonable result, the Court will not conclude that this possible interpretation creates an ambiguity in the contract. *Middlebrook Tech, LLC v. Moore*, 849 A.2d 63, 79 (Md. Ct. Spec. App. 2004) ("The court's interpretation should not permit an absurd or unreasonable result."); *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 839 P.2d 10, 25 (Haw. 1992) ("Where the language of a contract is 'susceptible of two constructions, one of which makes it fair, customary and such as prudent men would naturally execute, while the other makes it inequitable, unusual, or such as

reasonable men would not likely enter into, the interpretation which makes a fair, rational and probable contract must be preferred.'" (quoting *Management Sys. Assoc. v. McDonnell Douglas Corp.*, 762 F.2d 1161, 1172 (4th Cir. 1985))).

Moreover, the requirement that PACOM fund Roley's assignment must also be read alongside the separate provision stating that the IPA Agreements record "the obligations and responsibilities of the parties to a temporary assignment arranged under the provisions of the Intergovernmental Personnel Act of 1970." J.R. 90, 94, 98. Consideration of the IPA, which provided the authority underlying the personnel arrangement delineated in the IPA Agreements, leaves no doubt that NPX, not PACOM was required to pay Roley. *See Auction & Estate Representatives, Inc. v. Ashton*, 731 A.2d 441, 447 (Md. 1999) ("Maryland adheres to the general rule that parties to a contract are presumed to contract mindful of the existing law and that all applicable or relevant laws must be read into the agreement of the parties just as if expressly provided by them, except where a contrary intention is evident." (quoting *Wright v. Commercial & Sav. Bank*, 464 A.2d 1080, 1083 (Md. 1983))); *Gabriel v. Island Pac. Acad., Inc.*, 400 P.3d 526, 537 (Haw. 2017) ("A contract is presumed to include all applicable statutes and settled law relating to its subject matter.").

The IPA provides that:

During the period of assignment, a State or local government employee on detail to a Federal agency—

(1) is not entitled to pay from the agency, except to the extent that the pay received from the State or local government is less than the appropriate rate of pay which the duties would warrant under the applicable pay provisions of this title or other applicable authority.

5 U.S.C. § 3374(c). The IPA also states that an assigned employee of an organization such as NPX shall be treated the same as an assigned employee of a State or local government as set forth in the IPA. *Id.* § 3372(e)(2); *see also* J.R. 90, 94, 98 (stating that within the IPA Agreements, "[t]he term

'State or local government' . . . also refers to . . . any other eligible organization"). Thus, under an IPA personnel agreement such as the IPA Agreements relating to Roley, the obligation to pay an employee assigned to a federal agency by an organization such as NPX rests on the organization, not the federal agency, even if the agency has a separate requirement to fund the assignment by reimbursing the organization for the amounts paid to the employee.

In turn, the IPA Agreement provision stating that PACOM "is required to pay travel and transportation expenses associated with the duties and assignments made by the Federal Government," J.R. 92, 96, 100, read together with this provision of the IPA stating that Roley is entitled to pay only from NPX, is most fairly interpreted as requiring PACOM to pay the amount of any travel expenses it authorized to NPX, with NPX then obligated to pay those amounts to Roley.

Even if the IPA Agreements could be deemed ambiguous on the question whether NPX had a duty to pay Roley's salary and travel expenses, the extrinsic evidence compels the conclusion that NPX was, in fact, contractually obligated to pay Roley these amounts. It is undisputed that, over the life of the IPA Agreements, it was NPX rather than PACOM that actually paid Roley his salary and travel reimbursements. *See Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc.*, 971 A.2d 309, 319 (Md. 2009) ("The construction placed upon the ambiguous language before any controversy has arisen holds significant importance."); *In re Fasi*, 634 P.2d 98, 104 (Haw. 1981) ("[T]he interpretation by the parties of an ambiguous contract controls."). In discovery, NPX admitted that it was "responsible for paying Plaintiff's wages under the terms of each Assignment Agreement" and that it was "responsible for reimbursing Plaintiff for travel expenses incurred under the terms of each Assignment Agreement," in both instances "after being funded by [PACOM]." J.R. 106. Where Bell, who signed and executed the IPA Agreements on behalf of

NPX, has admitted that "[f]unding and paying" are separate steps, J.R. 49, the Court finds that the extrinsic evidence can only be construed as reflecting the parties' understanding that NPX was obligated to pay Roley his salary and travel expenses. *Goodman v. Resolution Tr. Corp.*, 7 F.3d 1123, 1126 (4th Cir. 1993) (finding that a court may grant summary judgment either based on its interpretation of an unambiguous contract, or based on its interpretation of an ambiguous contract where the extrinsic evidence is "as a matter of law, dispositive of the interpretative issue"). Thus, whether or not the language of the IPA Agreements is ambiguous, the Court finds that their terms required NPX to pay Roley his full salary and travel expenses. Where NPX has expressly admitted that it failed to pay Roley $56,564.82 in unpaid salary and $13,349.31 in travel expenses owed to him, there is no genuine issue of material fact whether NPX breached the IPA Agreements. The Court will therefore grant summary judgment to Roley on the breach of contract claim.

## III.    Statutory Claim

In his Complaint, Roley also seeks relief for his unpaid wages either under the MWPCL or, if the Court finds the MWPCL does not apply, under Hawaii's analogous law. The Court finds that the MWPCL applies and so does not assess the Hawaii statute.

"The MWPCL is a statutory cause of action, the purpose of which is 'to provide a vehicle for employees to collect, and an incentive for employers to pay, back wages.'" *Cunningham*, 107 A.3d at 1202 (quoting *Battaglia v. Clinical Perfusionists, Inc.*, 658 A.2d 680, 686 (Md. 1995)). As relevant here, it provides that "each employer shall pay an employee . . . all wages due for work that the employee performed before the termination of employment, on or before the day on which the employee would have been paid the wages if the employment had not been terminated." Md. Code Ann., Lab. & Empl. § 3-505(a). It defines an employer as "any person who employs an individual in the State." *Id.* § 3-501(b). Although the MWPCL does not define the term employee,

the term "[e]mploy" is defined elsewhere in the same title of the Labor and Employment article of the Maryland Code as "to engage an individual to work," including "allowing an individual to work" and "instructing an individual to be present at a work site." *Id.* § 3-101(c). The MWPCL provides employees a private right of action to seek unpaid wages from their employers and further provides that if "a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage, and reasonable counsel fees and other costs." *Id.* § 3-507.2(b).

The parties do not seriously contest that, if Roley is entitled to invoke the MWPCL, NPX's admitted failure to pay Roley all of his wages subjects it to liability under that statute. Instead, the parties dispute whether the MWPCL is applicable here at all, whether reimbursements for travel expenses qualify as wages under the MWPCL, and whether Bell qualifies as an employer under the MWPCL such that she is individually liable for any violation of the statute. The Court addresses each of these disputes in turn.

### A.     Applicability of the MWPCL

The applicability of the MWPCL is not limited to cases in which there is an employment contract governed by Maryland law. *Cunningham*, 107 A.3d at 1203-04. As a matter of the plain text of the statute, the MWPCL pulls NPX into its purview. The MWPCL defines an employer as "any person who employs an individual in the State." Md. Code Ann., Lab. & Empl. § 3-501(b). NPX meets this definition because during the relevant time period, NPX operated from an office in Maryland in which it employed several individuals—specifically Bell, a bookkeeper, and an administrative staff member—and from which it paid Roley. Although Defendants argue that an entity is an "employer" for purposes of an MWPCL claim only if the "individual" working in Maryland is the employee bringing the claim, the definition contains no such requirement. Had

the legislature intended such a limitation, it would have used the term "the individual," rather than "an individual" in the definition. *See id.* Moreover, the MWPCL uses one term, "individual," in section 3-501(b) in establishing the requirement that an employer actually employ someone in Maryland, and a different term, "employee," in section 3-505 in identifying the type of person who can seek to recover wages. *See Drew v. First Guar. Mortg. Corp.*, 842 A.2d 1, 9 (Md. 2003) ("[I]t is a common rule of statutory construction that, when a legislature uses different words, especially in . . . a part of the statute that deals with the same subject, it usually intends different things." (quoting *Toler v. Motor Vehicle Admin.*, 817 A.2d 229, 235 (Md. 2003))). To the extent that this is a broad reading of the statute, it is consistent with the intent of the statute: "Maryland is willing generally to allow itself to be used as a forum by workers seeking recovery of their wage claims." *Cunningham*, 107 A.3d at 1218. In fact, as Maryland courts have recognized, the MWPCL was passed not just to benefit Maryland employees, but also to ensure that Maryland employers pay their employees what they are owed. *Id.* at 1202 (stating that the "purpose" of the MWPCL, in part, is to provide "an incentive for employers to pay . . . back wages") (quoting *Battaglia v. Clinical Perfusionists, Inc.*, 658 A.2d 680, 686 (1995))).

Against the plain language of the statute, Defendants point to several cases in which out-of-state employees conducting a limited amount of work in Maryland were deemed to be covered by the MWPCL and argue that Roley cannot invoke the MWPCL because he worked in Maryland less than those employees. In all of these cases, however, the employer was located outside of Maryland. *See Cunningham*, 107 A. 3d at 1198; *Himes Assocs., Ltd. v. Anderson*, 943 A.2d 30, 35 (Md. Ct. Spec. App. 2008); *Hausfeld v. Love Funding Corp.*, 131 F. Supp. 3d 443, 447 (D. Md. 2015); *see also Sigala v. ABR of VA, Inc.*, No. GJH-15-1779, 2016 WL 1643759, at *1 (D. Md.

Apr. 21, 2016). In those cases, the basis to apply the MWPCL rested only on the limited work assignments occurring in Maryland. *See, e.g.*, *Hausfeld*, 131 F. Supp. 3d at 455-56.

Here, NPX operated out of an office in Maryland, including for purposes of its payroll activity. Maryland plainly has an interest in ensuring that an employer operating in Maryland, such as NPX, does not withhold wages from its employees. *See Cunningham*, 107 A.3d at 1202. To the extent that the MWPCL arguably should be limited so as not to include employees with no connection of any kind to Maryland, that is not the case here. Not only was Roley's payment administered from the NPX office in Maryland, but he also worked in Maryland during seven multi-day business trips to Maryland during his five years as an NPX employee. J.R. 2-3. Where the MWPCL has been found to apply to a project manager for a Virginia corporation who worked at the company Virginia headquarters but had to attend meetings twice a month in a client's office in Maryland, *Himes*, 943 A.2d at 35-36, Roley's work for a Maryland-based company that paid him from a Maryland office, which included several work trips to Maryland, provides more than a sufficient basis to permit the application of the MWPCL. *See Hausfeld*, 131 F. Supp. 3d at 455 ("The threshold for establishing employment in Maryland under the MWPCL is relatively low.").

Roley may therefore avail himself of the MWPCL. As discussed above, it is undisputed that NPX currently owes Roley $56,564.82 in unpaid salary. J.R. 106. Accordingly, the Court will grant summary judgment to Roley on this count and dismiss his claim under Hawaii's analogous law. It remains to be determined, however, what the total amount of unpaid wages was and who is to be held responsible for them.

## B.    Travel Expenses

Roley argues that the amount of unpaid wages for which NPX is liable under the MWPCL properly includes the $13,349.31 in unreimbursed travel expenses that NPX has admitted were

owed to him.  NPX argues that reimbursed travel expenses do not fall within the MWPCL's definition of wages.

The MWPCL defines wages as "all compensation that is due to an employee for employment."  Md. Code Ann., Lab. & Empl. § 3-501(c)(1).  The definition includes "a bonus," "a commission," "a fringe benefit," "overtime wages, and "any other remuneration promised for service."  *Id.* § 3-501(c)(2).  "Thus, what is due an employee who terminates employment with an employer are wages for work performed before termination, or all compensation due to the employee as a result of employment including any remuneration, other than salary, that is promised in exchange for the employee's work."  *Whiting-Turner Contracting Co. v. Fitzpatrick*, 783 A.2d 667, 671 (Md. 2001).

While Defendants argue that reimbursements are "functionally different from compensating an employee for their services," Cross Mot. Summ. J. at 14, ECF No. 37-2, they still constitute a "remuneration promised for service."  Md. Code Ann., Lab. & Empl. § 3-501(c)(2). By their own terms, the IPA Agreements promised Roley that he would be paid the value of his travel expenses when he was required to travel on NPX or PACOM business.  The IPA Agreements provided that "[f]rom time to time, Ross Roley will make himself available for advice and counsel, to speak with other employees, and/or to participate in an event, conference, or training session. . . . Travel, if required, . . . will be paid by NPX."  J.R. 91, 95, 99.  They also stated that PACOM was "required to pay travel and transportation expenses associated with duties and assignments made by the Federal Government for travel away from the primary duty station and for official local travel."  J.R. 92, 96, 100.  Thus, as part of the contract under which Roley agreed to take on the PACOM assignment, he was explicitly promised additional payments to defray costs associated with his work which, in the absence of such an agreement, he would have had to pay

16

by himself in order to fulfill his work duties.  Where travel reimbursements are fairly construed to be remuneration for services, they constitute wages recoverable under the MWPCL under the plain language of the statute.

The Court's interpretation is bolstered by two additional factors.  First, the Maryland Department of Labor includes "Mileage" and "Business Expenses" as forms of claimable wages on its Wage Claim Form available for employees to file a claim under the MWPCL.  J.R. 112, 114. The Department therefore necessarily interprets the MWPCL as including reimbursements for work expenses such as travel expenses, not just salary and hourly wages, as a form of wages under the MWPCL.  It is "well-settled precedent" in Maryland that "an administrative agency's interpretation and application of the statute it administers . . . ordinarily is entitled to considerable weight by reviewing courts." *Adventist Health Care Inc. v. Md. Health Care Comm'n*, 896 A.2d 320, 335-36 (Md. 2006) (quoting *Bd. of Physician Quality Assur. v. Banks*, 729 A.2d 376, 381 (Md. 1999)).

Second, Maryland law, in defining "wages" in a separate statutory provision relating to unemployment insurance, expressly excludes from that definition "any payment to an individual as allowance or reimbursement for travel or other expenses incurred on the business of the employer up to the amount of expenses actually incurred and accounted for by the individual to the employer."  Md. Code Ann., Lab. & Empl. § 8-101(aa)(3)(xi).  The fact that the Maryland General Assembly knew how to exclude travel reimbursements from the term "wages" but declined to do so in the MWPCL reveals that it did not intend to do so.  *Montgomery Cty. v. Phillips*, 124 A.3d 188, 192 (Md. 2015) ("[B]ecause it is part of the context, related statutes or a statutory scheme that fairly bears on the fundamental issue of legislative purpose or goal must also be considered." (quoting *Stoddard v. State*, 911 A.2d 1245, 1249-50 (Md. 2006))).  These two

17

factors, along with the plain text of the statute, demonstrate that the travel reimbursements NPX promised to Roley are wages under the MWPCL. Accordingly, the judgment in favor of Roley on the MWPCL claim will include the amount of the unpaid travel reimbursements.

### C.    Individual Liability

Roley asserts that in addition to NPX, Bell should be deemed have been his "employer" under the MWPCL and thus held individually liable for NPX's failure to pay Roley his full wages. Md. Code Ann., Lab. & Empl. §§ 3-501(b), 3-505(a). As a preliminary matter, employees can have multiple employers for MWPCL purposes. *See, e.g.*, *Pinnacle Grp., LLC v. Kelly*, 178 A.3d 581, 604-05 (Md. Ct. Spec. App. 2018) (holding an individual jointly and severally liable, along with his business, as an employer under the MWPCL). An individual's liability under the MWPCL turns on whether the individual qualifies as an "employer" as defined by that statute. *Campusano v. Lusitano Const., LLC*, 56 A.3d 303, 308 (Md. Ct. Spec. App. 2012). As discussed above, an "employer" under the MWPCL includes "any person who employs an individual in the State or a successor of the person." Md. Code Ann., Lab. & Empl. § 3-501(b).

To determine whether an individual can be a considered an employer under this definition, Maryland courts use the "economic reality" test. *Newell v. Runnels*, 967 A.2d 729, 771-72 (Md. 2009); *Campusano*, 56 A.3d at 308. Specifically, courts consider whether the employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Newell*, 967 A.3d at 772; *Campusano*, 56 A.3d at 310. Consideration of these four factors is aimed at assessing the broader question of whether the putative employer played a role in "causing" the underpayment of the employee and the decision to prioritize other financial obligations. *Campusano*, 56 A.3d at 310 (quoting *Baystate Alt. Staffing v. Herman*, 163

18

F.3d 668, 678 (1st Cir. 1998)).  As a result, courts also consider whether the putative employer had "operational control over significant aspects of the business" and an "ownership interest in the business."  *Id.*  While Roley proposes other factors for the Court to consider and argues that the application of this four-factor test is inappropriate, multiple Maryland courts have applied these factors in this precise scenario:  to determine whether an individual, in addition to the employing organization, is jointly liable as an employer for MWPCL violations.  *See id.* at 310; *see also Pinnacle Grp.*, 178 A.3d at 604-05.

In applying the economic reality test, courts assess specifically the putative employer's relationship with the plaintiff-employee in particular.  *See Auto. Trade Ass'n of Md. v. Harold Folk Enters., Inc.*, 484 A.2d 612, 621 (Md. 1984) ("The decisive test in determining the existence of an employer-employee relationship is the right of the employer to control and direct *the employee* in the performance of the work and in the manner in which the work is to be done." (emphasis added)); *see also Campusano*, 56 A.3d at 310 (focusing on the assessment of the economic reality factors on the putative employer's relationship to the plaintiff-employees).  In *Campusano*, the court held that a supervisor at a construction site, whose son was the sole owner of the company, was not an employer under the MWPCL because, although he "supervised and controlled appellants' work schedules and conditions of employment, and although he maintained their work logs, these supervisory tasks are not sufficient to make him personally liable for appellants' wages, particularly where he had no ownership, control, or investment in the [company] that was appellants' formal employer." *Campusano*, 56 A.3d at 305-06, 310.  Among other considerations, the court relied on the facts that the supervisor lacked the power to hire and fire employees or to set their rate and method of pay, and that he merely distributed paychecks that originated from the company's sole owner.  *Id.* at 310.

By contrast, in *Pinnacle Group*, the court found that an individual who was the sole owner of a limited liability company providing home healthcare workers for senior citizens and persons with disabilities was an employer under the MWPCL. *Pinnacle Grp., LLC*, 178 A.3d at 588, 604-05. The court relied on the fact that although two employees assisted with bookkeeping, payroll, scheduling, and other personnel duties, the individual was the only person in the company with the authority to officially hire or fire employees and had "the final say" on employees' schedules and the daily operations of the organization. *Id.* at 604. The court also noted that the individual had "total control" over the employees' rate and method of payment and had the authority to maintain employment records. *Id.*

Upon consideration of the economic reality test and its application in *Campusano* and *Pinnacle Group*, the Court finds that Bell was not Roley's employer for purposes of the MWPCL. First, Bell did not have the power to hire Roley of her own accord. In order to hire NPX employees generally, she needed the approval of the other member of the NPX Board of Directors. This policy was followed when Roley was hired. Moreover, Bell testified in her deposition, and Roley has not disputed, that PACOM's approval was also required in order to hire Roley in particular.

Though there is no evidence in the record regarding Bell's general firing powers, she has testified that only PACOM had the authority to fire, suspend, or demote Roley. While the IPA Agreements confirm that PACOM had the authority to terminate the assignment, the 2012 Agreement also provided that Roley "will be eligible to return to the employer with the same salary and status that he had prior to the IPA assignment." J.R. 91. It is therefore unclear whether PACOM had the power to terminate Roley's underlying employment relationship with NPX, or only his assignment from NPX to PACOM. Moreover, where the IPA Agreements also required Roley to certify that "I have been informed that my assignment may be terminated at any time at

20

the option of the Federal agency or the State or local government," they apparently also provided NPX with the authority to terminate Roley's assignment to PACOM as well.  J.R. 93, 97, 101. Overall, however, Bell's hiring and firing powers were more circumscribed than those of the putative employer in *Pinnacle Group*, who was "the only person at the Pinnacle Group, LLC with the authority to 'officially hire' or 'officially fire' its employees."  178 A.3d at 604 (finding that this factor favored finding an individual liable as an employer).  Where Bell's power was far more constrained, this factor weighs against treating Bell as Roley's employer.

Second, on the issue of supervision and control of employee work schedules and conditions of employment, while Bell did supervise certain NPX employees, she did not supervise Roley and exercised little to no control over his work.  Under the IPA Agreements, Roley's immediate supervisors were PACOM officials.  It was PACOM—not Bell—that gave Roley assignments, directed his work, evaluated his performance, set his work schedule, and determined where he would work.  Although NPX set Roley's total amount of leave, PACOM approved any leave requests he made.  In any event, there is no evidence that it was Bell in particular who set his total leave amount.  Bell's limited control over Roley's work is a far cry from the level of control exercised by the individual employer in *Pinnacle Group*, who "ha[d] the final say regarding employees' work schedules," "ha[d] final authority to oversee the daily operations' of the business," and "would personally call individuals if he needed someone to cover a shift."  *Pinnacle Grp., LLC*, 178 A.3d at 604.  The second factor cuts against finding Bell to have been Roley's employer in her individual capacity.

The third factor, determining the rate and method of pay, also weighs against treating Bell as Roley's employer.  According to Bell, PACOM set Roley's rate of pay.  This is unsurprising, as it was PACOM's responsibility to fund Roley's salary, and Roley was hired by NPX only at the

behest of PACOM.  Though Roley was required to submit his timesheets to NPX and Bell after they were approved by his PACOM supervisor, Bell had significantly less control over the rate of pay than the defendant in *Pinnacle Group*, who, in addition to authorizing payment to employees, also approved salary and pay raises and determined when and how much employees would be paid.  *Pinnacle Grp.,* 178 A.3d at 604.  Even taking into account the fact that it was NPX—under Bell's supervision of the payroll operation—that paid Roley, these facts are closer to those in *Campusano*, where the supervisor "merely distributed appellants' paychecks, all of which indisputably originated from" another individual.  *Campusano*, 56 A.3d at 310.  This factor also cuts against deeming Bell to be Roley's employer under the MWPCL.

The only factor to favor Roley is the final one:  whether Bell maintained employment records for Roley.  Bell stated in her deposition that NPX maintained personnel files for its employees on IPA assignments, and that the files included W-4s and state-specific forms.  Since NPX was operated out of her house, it is reasonable to infer that she personally had custody of, or at least significant control over, those records.  Although it is unclear whether such personnel files were limited to payroll-related documents, whether they included documents such as performance evaluations and disciplinary records, or whether PACOM had its own personnel file relating to Roley, where the only available evidence relating to employment records places them with NPX, this factor weighs slightly in favor of treating Bell as an employer.

Although the four factors do not all point in the same direction, they "are not to be applied mechanistically."  *Campusano*, 56 A.3d at 310.  "[I]t is the totality of the circumstances, and not any one factor, which determines whether a worker is the employee of a particular alleged employer."  *Id.* (quoting *Baystate Alt. Staffing v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998)).  The core of the inquiry that the factors are meant to aid is "assigning *responsibility* under the law."  *Id.*

Here, even where Bell exercised some control over Roley's employment, her control was too limited to amount to actual responsibility. Bell did not have unilateral authority to hire and fire Roley and did not manage his schedule or conditions of employment. Although she had control over the actual transmission of payments to Roley and maintained some employment records, PACOM had the initial authority to approve his biweekly timesheets, had full or joint control over how much he was to be paid, and ultimately funded his salary. As to the additional factors identified in *Campusano*, Bell lacked an ownership interest in NPX, which is a not-for-profit corporation, and although she arguably had "operational control" over NPX, that level of control was tempered by the prominent role that PACOM played in Roley's employment. *See Campusano*, 56 A.3d at 310.

Finally, Roley's argument that the traditional four-factor test, aimed at assessing the degree of formal control over the employee, is inappropriate in light of the unique nature of the IPA Agreements at issue here is unpersuasive. Roley relies on *Newell*, which noted that some courts have developed alternative economic reality tests, including one to "assess whether an entity that lacked formal control nevertheless exercised functional control over a worker." *Newell*, 967 A.3d at 772 (citing *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.2d 132, 143 (2d Cir. 2008)). Roley thus argues that the Court should apply a test focused not on Bell's formal control, but her functional control. If anything, however, the IPA Agreements gave NPX, the formal employer, and by extension, Bell, significantly less functional control over Roley than in an ordinary employment relationship. Accordingly, application of such an alternative test would only reinforce, not alter, the Court's conclusion.

Where there are no genuine issues of material fact regarding Bell's relationship to Roley and the record demonstrates that Bell was not an employer for purposes of the MWPCL, the Court will grant summary judgment to Bell on Roley's MWPCL claim against her.

###    D.    Damages

Roley's Motion includes a request for treble damages on the MWPCL claim.  The MWPCL provides that if "a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as a result of a bona fide dispute, the court may award the employee an amount not exceeding 3 times the wage."  Md. Code Ann., Lab. & Empl. § 3-507.2(b).  The assessment whether a bona fide dispute exists centers on whether the party resisting the claim "has a good faith basis for doing so, whether there is a legitimate dispute over the validity of the claim or the amount that is owing."  *Admiral Mortg. v. Cooper*, 745 A.2d 1026, 1031 (Md. 2000).  The existence of a bona fide dispute is generally a fact-based inquiry best left for resolution by the jury.  *Balt. Harbor Charters, Ltd. v. Ayd*, 780 A.2d 303, 320-21 (Md. 2001).  Thus, at this stage, the question is whether there is sufficient evidence to permit a trier of fact to determine that there was a legitimate dispute over the wage claim and amount due, and whether NPX acted in good faith when it refused to pay Roley.  *Id.*  It is the defendant's burden to produce this evidence.  *Peters v. Early Healthcare Giver, Inc.*, 97 A.3d 621, 628 (Md. 2014).

There is no such evidence in the record.  From the time Roley notified it of the underpayment, NPX has agreed that it owes Roley what he claims it owes him.  It has admitted as much multiple times in this litigation.  The only relevant evidence in the record reveals that NPX's failure to pay the owed amount was due to a supposed lack of funds, not a disagreement as to Roley's entitlement to the money.  Where the parties are in agreement on what plaintiff is owed,

there is no dispute—bona fide or otherwise—for purposes of the MWPCL. *See* Md. Code Ann., Lab. & Empl. § 3-507.2(b).  The Court may therefore award treble damages.

The Court, however, is not required to grant treble damages.  "[A]n employee is not presumptively entitled to enhanced damages, even if the court finds that wages were withheld without a bona fide dispute." *Peters*, 97 A.3d at 630; Md. Code Ann., Lab. & Empl. § 3-507.2(b) (stating that absent a bona fide dispute "the court *may* award the employee an amount not exceeding 3 times the wage" (emphasis added)).  Although the Court of Appeals of Maryland has "not attempted in the past to set forth any guiding principles that trial courts should follow when they exercise their discretion whether and in what amount to award a plaintiff employee enhanced damages," it has advised that courts "are encouraged to consider the remedial purpose of the [MWPCL] when deciding whether to award enhanced damages to employees." *Peters*, 97 A.3d at 630.  That remedial purpose was "to cure what the Legislature saw as a problem with 'wage theft,' and practical difficulties that employees had in bringing lawsuits to recover wages owed." *Id.* (footnote omitted).  In the circumstances of this case, although enhanced damages are warranted where Roley has been forced to file suit to recover undisputed unpaid wages and has had to wait several years for recovery, awarding treble damages would not serve these purposes.  It is undisputed that the underpayment resulted from an administrative error by NPX, rather than a conscious attempt to shortchange Roley.  Moreover, although NPX has still failed to make Roley whole, it took steps to address his underpayment, including paying him a portion of what he was owed and requesting, unsuccessfully, for PACOM to provide the amount required by the IPA Agreements.  In light of these efforts, the Court will award Roley double, rather than treble, damages on the MWPCL claim.

## IV.    Corporate Veil

In a related argument, Roley also asks this Court to pierce NPX's corporate veil and hold Bell individually liable for what NPX owes him in order to prevent an injustice because NPX is in the process of "closing down" its business, J.R. 24, and has claimed that it lacks the funds to pay Roley what he is owed. In Maryland, "[t]he corporate entity will be disregarded only when necessary to prevent fraud or to enforce a paramount equity." *Stein v. Smith*, 751 A.2d 504, 510 (Md. 2000) (quoting *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 340 A.2d 225, 235 (Md. 1975)). Roley has introduced no evidence that the underpayment was fraudulent, while Defendants have introduced evidence that it was the result of an administrative error that went unnoticed by all parties for several years. As to whether piercing the corporate veil is necessary to "enforce a paramount equity," the Court of Appeals of Maryland has found that the corporate entity is not to be disregarded merely "to prevent an evasion of legal obligations—absent evidence of fraud or similar conduct." *Hildreth v. Tidewater Equip. Co.*, 838 A.2d 1204, 1212 (Md. 2003). It has, however, stated that a need to "enforce paramount equity" may arise where the corporation is a mere alter ego for another individual. *Id.* at 1210, 1212-13.

Maryland courts apply the alter ego doctrine only in "exceptional circumstances" when the plaintiff shows:

> (1) complete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own, (2) that such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights, and (3) that such control and breach of duty proximately caused the injury or unjust loss.

*Id.* (citing 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10 at 583-86 (1999 rev. vol.)). In assessing whether these requirements are met, Maryland courts consider yet another set of factors that includes:

26

> (1) whether the corporation is inadequately capitalized, fails to observe corporate formalities, fails to issue stock or pay dividends, or operates without a profit, (2) whether there is commingling of corporate and personal assets, (3) whether there are non-functioning officers or directors, (4) whether the corporation is insolvent at the time of the transaction, and (5) the absence of corporate records.

*Id.* Roley has introduced no evidence of NPX satisfying any of these factors. Rather, the record reflects that NPX had a Board of Directors that acted together on certain decisions, including the decision to hire Roley, and an Advisory Board to provide NPX with strategic advice. The Court will therefore not pierce NPX's corporate veil.

## V.   Prejudgment Interest

Finally, Roley also seeks pre-judgment interest at a rate of six percent per annum. Maryland law provides for prejudgment interest in contract actions where, like here, the amount due was predetermined and due on a date certain. *Imgarten v. Bellboy Corp.*, 383 F. Supp. 2d 825, 846-47 (D. Md. 2005). An award of enhanced damages under the MWPCL does not preclude an award of prejudgment interest. *Id.* at 848-49. The customary rate of prejudgment interest under Maryland law is six percent per annum. *Id.* at 849. Where there is no evidence in the record revealing the first date on which Roley informed NPX of the underpayment, but there is evidence that Roley provided proof of the underpayment to NPX on March 31, 2017, the Court will award prejudgment interest on the $69,914.13 in unpaid salary and reimbursable travel expenses calculated from that date.

## CONCLUSION

For the foregoing reasons, Roley's Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. The Motion will be granted as to the Maryland breach of contract and the MWPCL claims against NPX and will be denied as to the MWPCL claim against Bell and Roley's request to pierce NPX's corporate veil. The Court will dismiss Roley's alternative claims under Hawaii law. Defendant's Cross Motion for Summary Judgment will be GRANTED IN

PART and DENIED IN PART.  The Cross Motion will be granted as to the MWPCL claim against Bell and will be otherwise DENIED.  The Court will award double damages under the MWPCL and enter judgment in favor of Roley and against NPX in the amount of $56,564.82 in unpaid salary, $13,349.31 in unpaid reimbursable travel expenses, $13,354.72 in prejudgment interest on this combined amount, and $69,914.13 in liquidated damages, for a total judgment of $153,182.98. A separate Order shall issue.


Date:  July 22, 2020                                    /s/ *Theodore D. Chuang*
                                                       THEODORE D. CHUANG
                                                       United States District Judge